1  STEPHEN M. DANE*
   GLENN SCHLACTUS #208414
2  D. SCOTT CHANG #146403
   YIYANG WU*
3  RELMAN, DANE & COLFAX PLLC
   1225 19th St. NW, Suite 600
4  Washington, D.C. 20036
   Telephone: (202) 728-1888
5  schang@relmanlaw.com

6  *Attorneys for Plaintiffs*

7  MORGAN WILLIAMS*
   NATIONAL FAIR HOUSING ALLIANCE
8  1101 Vermont Ave., N.W., Suite 710
   Washington, D.C. 20005
9  Telephone: (202) 898-1661
   mwilliams@nationalfairhousing.org
10
   *Attorney for Plaintiff NFHA*

CASEY EPP # 284139
FAIR HOUSING ADVOCATES
OF NORTHERN CALIFORNIA
1314 Lincole Ave. Suite A,
San Rafael, CA 94901
Telephone: (415) 457-5025
casey@fairhousingnorcal.org

*Attorney for Plaintiff Fair Housing Advocates of Northern California*

*Application for Admission Pro Hac Vice To Be Filed*

11

12

### UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

13

14

| | |
|---|---|
| 15  **NATIONAL FAIR HOUSING ALLIANCE; FAIR HOUSING ADVOCATES OF NORTHERN** | ) ) ) |
| 16  **CALIFORNIA; CENTRAL OHIO FAIR HOUSING ASSOCIATION;** | ) ) |
| 17  **CONNECTICUT FAIR HOUSING CENTER; DENVER METRO FAIR** | ) **COMPLAINT AND** ) |
| 18  **HOUSING CENTER; FAIR HOUSING CENTER OF CENTRAL INDIANA;** | ) **JURY DEMAND** ) |
| 19  **FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR** | ) ) |
| 20  **HOUSING CENTER OF WEST MICHIGAN; FAIR HOUSING** | ) ) |
| 21  **CONTINUUM, INC.; GREATER NEW ORLEANS FAIR HOUSING ACTION** | ) ) |
| 22  **CENTER; HOPE FAIR HOUSING CENTER; HOUSING** | ) ) |
| 23  **OPPORTUNITIES MADE EQUAL OF VIRGINIA;** | ) ) |
| 24  **HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.;** | ) ) |
| 25  **HOUSING RESEARCH & ADVOCACY CENTER; MIAMI VALLEY FAIR** | ) ) |
| 26  **HOUSING CENTER; METRO FAIR HOUSING SERVICES;** | ) ) |

27

28

**METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; NORTH TEXAS FAIR HOUSING CENTER; OPEN COMMUNITIES, INC.; SOUTH SUBURBAN HOUSING CENTER; AND TOLEDO FAIR HOUSING CENTER;**

)
)
)
)
)
)
)
)

   Plaintiffs,

v.

**FEDERAL NATIONAL MORTGAGE ASSOCIATION ("FANNIE MAE");**

   Defendant.

## I.   INTRODUCTION AND SUMMARY OF CLAIMS

1.   This complaint is filed under the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.* ("FHA"), for compensatory and injunctive relief arising out of the Defendant's racially discriminatory behavior in communities of color throughout the country.

2.   Plaintiffs are private, fair housing organizations dedicated to ending housing discrimination and promoting residential integration in their communities and around the nation. Plaintiffs work throughout the United States to eliminate housing discrimination and to ensure equal opportunity for all people through leadership, education, outreach, membership services, public policy initiatives, advocacy, investigation of fair housing violations, investment in community development and stabilization projects, and enforcement.

3.   Between July, 2011 and October, 2015, Plaintiffs conducted a comprehensive investigation of Defendant's real estate related activities in communities of color, including predominantly African-American and Latino neighborhoods, and predominantly white

neighborhoods[1] in 38 metropolitan areas throughout the United States.  The purpose of the investigation was to determine if Defendant was discriminating based on the predominant race or national origin of the residents of neighborhoods in the routine maintenance of dwellings it came to own after foreclosures. Over the course of four years, Plaintiffs investigated over 2,300 properties owned and maintained by Defendant, collected evidence on over 35 aspects of the maintenance of each property investigated, and accumulated over 49,000 photographs.

4.      Defendant Federal National Mortgage Association ("Fannie Mae") is a corporation chartered by the U.S. Congress to promote access to residential mortgage credit throughout the nation.  Fannie Mae's primary purpose and business activity is to purchase and guarantee home mortgages. When a home mortgage owned by Fannie Mae goes into default and foreclosure, Fannie Mae obtains title to the dwelling securing the mortgage. A dwelling owned by Fannie Mae after a completed foreclosure is referred to as a "Real Estate Owned" or "REO" dwelling. As a consequence of the recent mortgage foreclosure crisis, Fannie Mae has obtained title to a significant number of REO dwellings covered by the Fair Housing Act.

5.      Once a dwelling becomes an REO property, Fannie Mae assumes all duties and responsibilities of ownership, including ordinary maintenance, while it markets the dwelling for sale to the general public. Fannie Mae conducts such maintenance to preserve the dwelling so it can be sold and can recover the highest and best market price. Fannie Mae's stated strategic goal for its REO properties is to secure and maintain them so that they are appealing to prospective buyers and ready for sale. Specifically, Fannie Mae's strategy is to "maintain each property in [its] inventory at a level of market-readiness both inside and outside of the property, supporting neighborhood stabilization." The stated mission of the Fannie Mae Property

---

[1]      For purposes of this Complaint and the statistical facts set forth below, "predominantly white neighborhoods" refers to those census block groups with more than 50% non-Hispanic white residents, and "communities of color" refer to all other census block groups.

1  Maintenance team is "to ensure the quality of our REO property maintenance services,

2  consistently producing best-in-class, market-ready properties and maintaining them until

3  removal from our inventory."

4          6.      Fannie Mae's routine exterior maintenance of REO dwellings includes, but is not

5  limited to: regular mowing, edging of walkways and driveways, weeding, trimming shrubs and

6  trees trimming, removing snow, removing trash and debris, eliminating overgrown grass and

7  shrubbery, securing doors and windows, securing or replacing loose handrails and steps, and

8  covering any holes in the dwelling such as dryer vents.  These routine maintenance functions

9  are intended to be readily and regularly met with respect to every REO property, regardless of

10  the condition of the property at the time of foreclosure. These basic maintenance duties do not

11  vary from region to region or from city to city.

12

13          7.      Fannie Mae is required, under the Fair Housing Act, to maintain all REO

14  properties, regardless of their location, without regard to race, color, religion, sex, handicap,

15  familial status, or national origin.

16  Plaintiffs investigated Fannie Mae's

17  treatment of REO properties in

18  neighborhoods of differing racial and

19  ethnic compositions according to Fannie

20  Mae's own specific maintenance norms,

21  which are standard in the REO

22  maintenance industry. Plaintiffs'

23  investigation involved identifying

24  whether certain routine exterior maintenance tasks were completed and taking photographic

25

26  evidence of the property's exterior maintenance. Plaintiffs compared the quality of maintenance

27



*Figure 1: Fannie Mae REO in AA neighborhood in Oakland, CA*

28

in properties located in a metropolitan area's communities of color with the quality of maintenance in properties located in the same metropolitan area's predominantly white neighborhoods.

8.      The data and pictures collected in Plaintiffs' investigation demonstrate that Fannie Mae has failed to conduct routine exterior maintenance and marketing of REO properties in communities of color, thereby leaving those REOs in a state of neglect, while satisfactorily conducting routine exterior maintenance and marketing of its REO properties in predominantly white neighborhoods, thereby leaving those REOs in a materially better condition.

9.      Across the over 2,300 properties investigated by Plaintiffs in 38 metropolitan areas, Fannie Mae's REO properties in predominantly white neighborhoods are far more likely to have a small number of exterior maintenance deficiencies, while REO properties in communities of color are far more likely to have large numbers of such deficiencies.  In predominantly white neighborhoods, the average number of deficiencies was 4.8. In communities of color, however, the average number was 7.2, *i.e.*, 50% higher than in white areas. Moreover, Plaintiffs documented significant differing treatment based on the predominant race or national origin of the neighborhood in many of the objective maintenance factors evaluated.

10.      A few examples of differing maintenance based on the predominant race or national origin of a neighborhood include:

    a.   Nationwide, 24% of the Fannie Mae REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 6% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

b.  39.0% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 14.9% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

c.  24.9% of the Fannie Mae REO properties in communities of color had unsecured or broken doors, while only 11.1% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors.

d.  41.5% of the Fannie Mae REO properties in communities of color had damaged, boarded, or unsecured windows, while only 19.1% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged, boarded, or unsecured windows.

11.    The disparity between Fannie Mae's treatment of REO properties in communities of color and predominantly white neighborhoods can only be explained by race. To assess the role of race, Plaintiffs conducted a regression analysis taking into account non-racial factors such as prior sales dates and prices, additional property transfer history, local crime statistics based on FBI standards, local housing market data, property age, dwelling size, lot size, how long properties have been in Fannie Mae's REO inventory at the time of the site visit, and property values. The results show that the exterior maintenance deficiencies existing at Fannie Mae REO properties in communities of color remain higher by a statistically significant margin as compared to the maintenance deficiencies at Fannie Mae REO properties in predominantly white neighborhoods.

12.    For example, 60% of the difference in the average number of deficiencies cannot be explained by the many non-racial factors included in Plaintiffs' regression analyses. Likewise, 65% of the difference in the likelihood that a property had ten or more deficiencies likewise cannot be explained by the non-racial factors.

13.     Defendant's racially discriminatory treatment of REO properties is prevalent throughout the country.  The repetitive pattern of differing maintenance – across 2,300 properties, 38 metropolitan areas, and over four years – indicates that Defendant's policies and practices are set at a level of Defendant's management with responsibility for Defendant's policies nationwide, and not the result of lower-level regional, state, or local decision makers.

14.     Defendant's racially discriminatory treatment of REO properties is continuous throughout the period of Plaintiffs' investigation. Whether analyzed on a year-to-year basis or over the entire period of investigation, the same pattern of discriminatory treatment is evident. From July 2011 to October 2015, Defendant's continuous practice had the purpose and effect of providing inferior maintenance to REO properties in communities of color, while providing better maintenance to REO properties in predominantly white neighborhoods. Upon information and belief, Defendant's discriminatory policies and practices are ongoing.

15.     There are no valid business purposes served by, or valid excuses for, Defendant's differing maintenance of REO properties based on neighborhood composition. Fannie Mae has a financial interest in maintaining and securing its inventory of REO properties in order to preserve the value of each property until it is sold.



**Figure 2: Fannie Mae REO in AA neighborhood in Washington, D.C.**

16.     In the wake of the 2008 mortgage foreclosure crisis, many financial lenders, including Fannie Mae, found themselves the new owners of a significant number of properties and homes that had been dispossessed through foreclosure. Plaintiff National Fair Housing Alliance became aware that Defendant and other lenders were engaging in discriminatory

maintenance of those properties based on the racial composition of the neighborhood in which the REO properties were located.

17.     Plaintiff National Fair Housing Alliance conducted an initial investigation of Defendant's REO properties to determine whether it had properly maintained homes in communities of color. Subsequently, beginning in the summer of 2009, the National Fair Housing Alliance on behalf of itself and its member organizations engaged in a series of meetings with Fannie Mae officials to discuss discriminatory maintenance of REO properties in the lending industry. Plaintiff National Fair Housing Alliance advised Fannie Mae that it and several of its members had conducted an investigation of Fannie Mae's properties and provided photographic evidence of the failed maintenance in communities of color. The National Fair Housing Alliance provided suggestions for correcting the differing levels of maintenance. Nonetheless, Fannie Mae's pattern and practice of discriminatory maintenance continued.

18.     As Plaintiffs' investigation of Fannie Mae's maintenance of REO properties continued, but prior to the initiation of this litigation, Plaintiffs met several times with Fannie Mae officials, informed them that their company was still engaging in the discriminatory maintenance of REO properties, and asked them to take appropriate action.

19.     Despite Plaintiffs' efforts to get Fannie Mae to voluntarily comply with the Fair Housing Act, Fannie Mae did not change its behavior. With deliberate indifference to the purpose and effects of its discriminatory policies and practices, Fannie Mae continued to maintain its REO properties differently based on the predominant race and national origin of neighborhoods. Fannie Mae's discriminatory exterior maintenance of REO properties in communities of color violates the rights of homeowners and residents in those neighborhoods, and causes particularized and concrete injury to those homeowners and residents.

20.     The proper maintenance of REO dwellings is vital to the stability of



neighborhoods and to the economic, social, and physical well-being of their residents. REO properties that are poorly maintained have significant, negative outcomes to a neighborhood, affecting the health and safety of surrounding residents and otherwise interfering with the rights of homeowners in communities of color to exercise the right to enjoy their homes in a manner free from discrimination. The stress related to living near a neglected, vacant property contributes to increased high blood pressure rates for neighboring homeowners. Properties that are vacant and boarded up increase a sense of social isolation and anxiety for the residents living in those neighborhoods. Several academic and government reports acknowledge the negative effects of neglected vacant properties on nearby homeowners, neighborhoods, and local governments. *See, e.g.*, Government Accountability Office, Vacant Properties: Growing Number Increases Communities' Costs and Challenges, GAO-12-34 (Nov. 4, 2011), at pp. 27-48 (available at http://www.gao.gov/products/GAO-12-34).

**Figure 3: Fannie Mae REO in AA neighborhood in Oakland, CA.**

21.     The cities investigated by Plaintiffs – with just one exception – are all located in metropolitan areas that are moderately or highly segregated.  Allowing REO properties in communities of color to deteriorate has the necessary and foreseeable consequence of perpetuating segregation by re-entrenching historically discriminatory practices, sometimes with governmental support, the "vestiges [of which] remain today." *Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2515 (2015).

22.     The existence of poorly maintained REO dwellings in a neighborhood diminishes home values for surrounding homeowners. When REO dwellings are poorly maintained, the price of homes for sale in their vicinity decrease. Lower home values in



**Figure 4: Fannie Mae REO in AA neighborhood in Temple Hills, MD.**

communities of color restrict the ability of minority homeowners to move to majority-white or integrated neighborhoods by reducing the equity they can use to buy a new home.

23.     By failing to maintain REO dwellings in communities of color according to the same standards as it maintains REO dwellings in predominantly white neighborhoods, Fannie Mae stigmatizes communities of color as less desirable than predominantly white neighborhoods.  The prospects for integration in the affected neighborhoods are reduced

1  because white buyers are deterred from purchasing homes in neighborhoods with poorly
2  maintained REO properties, leaving the existing segregated racial composition of these
3  neighborhoods unchanged. At the same time, research has shown that white homeowners in
4  predominantly minority neighborhoods
5  with high concentrations of foreclosed
6  properties have greater resources to leave
7  those neighborhoods, and the presence of
8  poorly maintained REO properties
9  increases their incentive to move out.
10 Neighborhood residents are therefore



**Figure 5: Fannie Mae REO in AA neighborhood in Vallejo, CA.**

11 deprived of the social, economic, and
12 professional benefits of living in an integrated community. The U.S. Supreme Court has
13 recognized the harms to neighborhood residents and municipalities "flowing from the realities
14 of a racially segregated community" caused by housing practices that perpetuate racial
15 segregation. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 111 (1979).
16
17
18       24.      Defendant's systematic and continuing violations of the Fair Housing Act have
19 thwarted Congressional efforts to eradicate housing discrimination and eliminate segregated
20 housing patterns. As the Supreme Court has noted, Congress has delegated private attorney
21 general status to private organizations like Plaintiffs to achieve these purposes. *See Trafficante*
22 *v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211 (1972); *Havens Realty Corp v. Coleman*, 455
23 U.S. 363, 379 (1982).
24
25
26
27
28

25.     Defendant's conduct has caused particularized and concrete injury to the Plaintiffs. Defendant's discriminatory REO maintenance practices have interfered with Plaintiffs' activities and programs designed to promote compliance with fair housing laws, and have frustrated Plaintiffs' missions by perpetuating the very unlawful discrimination and segregation that they are dedicated to dismantling.  Plaintiffs' purposes and interests fall squarely within the zone of interests protected by the Fair Housing Act. Defendant's discriminatory behavior has caused Plaintiffs to divert substantial time and resources away from their usual activities and instead to detecting, investigating, and counteracting Defendant's unlawful conduct, and engaging in outreach and education efforts to address Defendant's ongoing discrimination. These efforts are above and beyond the operational activities and costs normally expended by Plaintiffs.



**Figure 6: Fannie Mae REO in AA neighborhood in Oakland, CA.**

## II.     JURISDICTION AND VENUE

26.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, and 42 U.S.C. § 3613(a).

27.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendant does business in this district, the Defendant is subject to personal jurisdiction in this district, a substantial part of the events giving rise to these claims occurred in this district, and a substantial part of the property that is the subject of these claims is located in this district.

- 12 -

28.     Intradistrict assignment in the San Francisco and Oakland Division is proper under Civil Local Rule 3.2(c) because a substantial part of the events giving rise to the claims occurred in Alameda County and Contra Costa County.

### III.     PARTIES

**A. Plaintiffs**

29.     Plaintiff National Fair Housing Alliance, Inc. ("NFHA") is a national, nonprofit public service organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business at 1101 Vermont Avenue NW, Suite 710, Washington, D.C. 20005. NFHA is a nationwide alliance of private, nonprofit, fair housing organizations, including organizations in 28 states. NFHA is the only national organization dedicated solely to ending housing discrimination and promoting residential integration. NFHA works throughout the United States to eliminate housing discrimination and to ensure equal opportunity for all people through leadership, education and outreach, membership services, public policy initiatives, advocacy, investigation of fair housing violations, investment in community development and stabilization projects, and enforcement. One of NFHA's goals is the elimination of segregation in housing and the promotion of residential integration. NFHA has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. NFHA implemented a community development program using grants to homeowners and people living in rental properties to make homes accessible to people with disabilities and to senior homeowners in Washington, D.C.'s African-American neighborhoods to bring their homes up to code, so that their homes could qualify for replacement coverage from homeowners insurance companies. Its most recent program, the Inclusive Communities grant program,

provides grants to ameliorate some of the adverse effects of discriminatory practices during the foreclosure crisis.  Focusing on predominantly African American and Latino neighborhoods and clients, these grants promote homeownership through direct down payment and closing cost assistance, invest in emergency repairs and foreclosure prevention measures to preserve existing homeownership, and implement housing repair programs and other blight reducing activities. The grants also provide accessible housing opportunities and facilitate general quality of life improvements to support greenspace development and fresh food access. The Inclusive Communities Grant Program is being implemented by NFHA in 6 metropolitan areas: Baltimore, Maryland; Charleston, South Carolina; Philadelphia, Pennsylvania, Prince George's County, Maryland; Washington, D.C.; and Oakland, California.

30.     Plaintiff Fair Housing Advocates of Northern California (formerly Fair Housing of Marin) is a nonprofit fair housing organization incorporated under the laws of the State of California with its principal place of business in San Rafael, California in the Northern District of California. Fair Housing Advocates of Northern California's primary objectives are to promote equal opportunity in the renting, purchasing, financing and advertising of housing; to educate people regarding federal and state fair housing laws; to promote racially integrated communities and neighborhood diversity; and to eliminate discriminatory housing practices.  It is engaged in several different activities to further its mission of promoting equal housing opportunities, including:  education programs in schools and in the community regarding fair housing and diversity, training programs for real estate professionals, research regarding housing discrimination in the community, pre-purchase education for homebuyers, advocacy for affordable housing, and foreclosure prevention and fair housing counseling.

31.     Plaintiff Central Ohio Fair Housing Association ("COFHA") is a private, nonprofit corporation based in Columbus, Ohio.  COFHA recognizes the importance of "home"

as a component of the American dream and seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under state or local laws.  One of COFHA's goals is the elimination of segregation in housing and the promotion of residential integration. COFHA has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

32.     Plaintiff Connecticut Fair Housing Center ("CFHC") is a nonprofit organization dedicated to ensuring that all people have equal access to housing opportunities in Connecticut. The Connecticut Fair Housing Center provides investigative and legal services to those who believe that they have been the victims of housing discrimination and additionally works with state and local government, as well as housing providers, to promote compliance with federal fair housing laws.  One of Connecticut Fair Housing Center's goals is the elimination of segregation in housing and the promotion of residential integration. Connecticut Fair Housing Center has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

33.     Plaintiff Denver Metro Fair Housing Center ("DMFHC") established in 2012, is a private, nonprofit fair housing enforcement agency serving six Denver Metro Counties: Adams, Arapahoe, Broomfield, Denver, Douglas, and Jefferson.  DMFHC is dedicated to eliminating housing discrimination and promoting housing choice for all through education, advocacy, and enforcement of fair housing laws.  One of DMFHC's goals is the elimination of segregation in housing and the promotion of residential integration. DMFHC has launched

1  multiple educational campaigns to address housing discrimination designed to teach both

2  consumers and housing professionals about equality of treatment of neighborhoods, the negative

3  consequences that flow from racial steering, and the benefits of residential diversity.

4       34.     Plaintiff Fair Housing Center of Central Indiana ("FHCCI") is a private,

5  nonprofit fair housing organization based in Indianapolis, Indiana and primarily serves 24

6  counties in Central Indiana.  FHCCI's mission is to ensure equal housing opportunities by

7  eliminating housing discrimination through advocacy, enforcement, education and

8
   outreach.  One of FHCCI's goals is the elimination of segregation in housing and the promotion

9
10 of residential integration. FHCCI has launched multiple educational campaigns to address

11 housing discrimination designed to teach both consumers and housing professionals about

12 equality of treatment of neighborhoods, the negative consequences that flow from racial

13 steering, and the benefits of residential diversity.

14
        35.     Plaintiff Fair Housing Center of the Greater Palm Beaches ("FHCGPB") is a
15
16 nonprofit corporation dedicated to ensuring fair and affordable housing opportunities for all

17 people, by promoting culturally diverse communities, through open housing and the elimination

18 of all barriers to that goal. The FHCGPB's primary purpose is the elimination of housing

19 discrimination on the basis of race, color, national origin, religion, sex, familial status,

20 disability, marital status, age, sexual orientation, and gender identity or expression throughout

21
   the Greater Palm Beaches area.  The FHCGPB seeks the eradication and elimination of direct
22
23 and indirect obstacles that limit full access to the housing market throughout Florida and seeks

24 to end unlawful housing discrimination through enforcement, education, public awareness, and

25 helping victims enforce their rights. One of FHCGPB's goals is the elimination of segregation

26 in housing and the promotion of residential integration. FHCGPB has launched multiple

27 educational campaigns to address housing discrimination designed to teach both consumers and

28

housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

36.     Plaintiff Fair Housing Center of West Michigan ("FHCWM") is a private, non-profit organization established in 1980 to ensure equal housing opportunity as guaranteed under federal, state, and local fair housing laws.  Based in Grand Rapids, Michigan, FHCWM works cooperatively throughout Michigan with governmental and community-based agencies to further fair housing goals.  In particular, FHCWM investigates claims of illegal housing discrimination; assists claimants in litigation and/or administrative enforcement actions; conducts testing to determine compliance with federal and state laws; and provides practical education to rental, sales, and lending professionals, any organization or professional with a role in the housing industry, and home-seekers.

37.     Plaintiff Fair Housing Continuum, Inc. is a private, nonprofit fair housing agency dedicated entirely to the elimination of housing discrimination in Florida. Fair Housing Continuum serves Brevard, Indian River, Seminole, Osceola, Orange, and Volusia Counties. One of Fair Housing Continuum's goals is the elimination of segregation in housing and the promotion of residential integration. Fair Housing Continuum has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

38.     Plaintiff Greater New Orleans Fair Housing Action Center ("GNOFHAC") is a private, nonprofit civil rights organization established in 1995.  For more than 15 years, GNOFHAC has been dedicated to eradicating housing discrimination throughout Southeast Louisiana.  GNOFHAC has been responsible for fighting housing discrimination that has arisen in the wake of Hurricane Katrina and, in recent years, from the effects of the economic

recession. One of GNOFHAC's goals is the elimination of segregation in housing and the promotion of residential integration. GNOFHAC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

39.     Plaintiff HOPE Fair Housing Center ("HOPE"), established in 1968, is the oldest fair housing center in Illinois.  HOPE is based in Wheaton, Illinois and represents 30 counties in Northern and North Central Illinois.  HOPE works to end the hurt and devastation of housing discrimination and segregation because of race, color, religion, national origin, sex, disability, familial status, or any other characteristics protected under state or local laws. One of HOPE's goals is the elimination of segregation in housing and the promotion of residential integration. HOPE has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

40.     Plaintiff Housing Opportunities Made Equal of Virginia ("HOME of Virginia") is a fair housing and housing counseling organization founded in 1971 to fight discrimination in housing access.  HOME of Virginia offers a variety of programs and services designed to ensure equal access to housing for all Virginians. One of HOME's goals is the elimination of segregation in housing and the promotion of residential integration. HOME has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

41.     Plaintiff Housing Opportunities Project for Excellence, Inc. ("HOPE, Inc.") is the first nonprofit fair housing agency organized in the state of Florida and has been responsible for bringing fair housing discriminatory issues out of the hidden corners of the housing industry. HOPE, Inc.'s mission to fight housing discrimination in Miami-Dade and Broward Counties and to ensure equal housing opportunities throughout Florida.  One of HOPE's goals is the elimination of segregation in housing and the promotion of residential integration. HOPE has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

42.     Plaintiff Housing Research & Advocacy Center (HRAC) is a private, non-profit organization, incorporated under the laws of Ohio and located in Cleveland, Ohio.  Its mission is to eliminate housing discrimination and assure choice in Northeast Ohio by providing those at risk with effective information, intervention, and advocacy.  In furthering this goal, HRAC provides counseling, guidance and support to individuals who encounter discrimination in their search for housing. This may include investigation of their complaints.  HRAC also engages in activities designed to encourage fair housing practices by educating consumers of their rights and professionals of their responsibilities under the FHA, identifying barriers to fair housing in order to counteract and eliminate discriminatory housing practices, and by working with elected and government representatives to protect and improve fair housing laws.   HRAC also conducts research into housing and lending patterns, and related fair housing matters, throughout Northeast Ohio in order to educate government officials, individuals who work in the housing industry, and the public as a whole regarding housing discrimination and segregation.

43.     Plaintiff Miami Valley Fair Housing Center ("MVFHC") is a private, nonprofit corporation based in Dayton, Ohio.  MVFHC recognizes the importance of "home" as a

component of the American dream and seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under state or local laws.  One of MVFHC's goals is the elimination of segregation in housing and the promotion of residential integration. MVFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

44.     Plaintiff Metro Fair Housing Services, Inc. ("Metro") is a private, nonprofit fair housing organization whose primary purpose is to prevent housing discrimination in the metropolitan Atlanta area and throughout the state of Georgia.  Metro was founded in 1974 to promote social justice and eliminate housing and lending inequities for all people, including those with disabilities, through leadership, education and outreach, public policy advocacy, and enforcement. One of Metro's goals is the elimination of segregation in housing and the promotion of residential integration. Metro has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

45.     Plaintiff Metropolitan Milwaukee Fair Housing Council ("MMFHC"), established in 1977, is a private, nonprofit organization that operates a full-service fair housing program. MMFHC serves numerous counties in Wisconsin and works to combat illegal housing discrimination by creating and maintaining racially and economically integrated housing patterns.  MMFHC has won numerous awards for its work to eliminate housing discrimination. One of MMFHC's goals is the elimination of segregation in housing and the promotion of residential integration. MMFHC has launched multiple educational campaigns to address

housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

46.     Plaintiff North Texas Fair Housing Center ("NTFHC") is a nonprofit organization dedicated to eliminating housing discrimination in North Texas.  The organization provides counseling, discrimination complaint investigation, and outreach and education programs with the goal of ensuring that all persons have the opportunity to secure the housing they desire and can afford.  One of North Texas Fair Housing Center's goals is the elimination of segregation in housing and the promotion of residential integration. North Texas Fair Housing Center has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

47.     Plaintiff Open Communities is a nonprofit corporation that serves 17 north suburban communities in the Chicago, Illinois area.  Open Communities works to promote economically and culturally diverse communities that are welcoming to all in north suburban Chicago.  Open Communities educates, advocates, and organizes in the name of social justice. One of Open Communities' goals is the elimination of segregation in housing and the promotion of residential integration. Open Communities has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

48.     Plaintiff South Suburban Housing Center ("SSHC") is a nonprofit community organization that primarily serves the south metropolitan Chicago area including underserved

areas of northwest Indiana.  SSHC is dedicated to eliminating all forms of discrimination in the

housing market through the operation of fair housing enforcement and affirmative housing

counseling programs to foster stable, racially and economically, diverse communities. SSHC's

primary goal is the elimination of segregation in housing and the promotion of residential

integration through expanding housing and mortgage lending choices. SSHC has launched

multiple educational activities to address housing discrimination designed to teach both

consumers and housing professionals about equality of treatment of neighborhoods, the negative

consequences that flow from racial steering, and the benefits of residential diversity.

49.     Plaintiff Toledo Fair Housing Center ("TFHC") is a public service agency

operated by Fair Housing Opportunities of Northwest Ohio, Inc., a non-profit corporation

organized under the laws of the State of Ohio, with its principal place of business in Toledo,

Ohio.  The purposes of the Toledo Fair Housing Center are to identify and eliminate all forms of

unlawful discrimination in housing in the greater Toledo area, including discriminatory

advertising, marketing, and sales practices; to educate the public about housing discrimination

laws, discriminatory housing practices, and the availability of legal remedies for such

discriminatory practices; to provide counseling and referral services to the public with respect to

housing discrimination matters; and to expand equal housing opportunities for all persons.

50.     All Plaintiffs are "aggrieved persons" within the meaning of the Fair Housing

Act, and are authorized to commence litigation to obtain appropriate relief against Defendant

Fannie Mae. 42 U.S.C. §3602, 3612, 3613.  All Plaintiffs fall within the zone of interests

protected by the Fair Housing Act. All Plaintiffs have suffered concrete and particularized

injuries in fact that are fairly traceable to Defendant Fannie Mae's conduct in their communities,

and that are likely to be redressed by a favorable judicial decision.

**B. Defendant**

51.     Defendant Federal National Mortgage Association ("Fannie Mae") is a publicly traded company that operates under a congressional charter directing it to increase the availability and affordability of homeownership for low-, moderate- and middle-income Americans.  12 U.S.C. §1716 et seq. Fannie Mae's primary purpose and business activity is to purchase and guarantee home mortgages that meet its funding criteria. Fannie Mae maintains offices throughout the country, including a Regional Office in the State of California.

52.     When a mortgage owned by Fannie Mae goes into default and foreclosure, Fannie Mae eventually obtains title to the dwelling securing the mortgage.  The property is thereafter referred to as a "Real Estate Owned" or "REO" dwelling.  Once a dwelling becomes an REO property, Fannie Mae assumes all duties and responsibilities of ownership, including ordinary maintenance, while it attempts to market the dwelling for sale to the general public. Fannie Mae conducts routine maintenance to preserve the dwelling so it can be sold and can recover the highest and best market price. REO properties are "dwellings" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602.

**IV.     FACTS**

**A. Defendant's REO Maintenance Policies and Practices Discriminate Against Communities of Color Throughout the Country.**

*a. Fannie Mae's Maintenance of REO Properties*

53.     Once Fannie Mae takes title to a REO property, its stated goal is to perform basic and routine maintenance services on the property that are standard in the REO maintenance industry. Fannie Mae conducts such routine maintenance to preserve the dwelling so it can be sold at the highest and best market price. Through its maintenance of its REO properties, Fannie Mae seeks to ensure that they are appealing to prospective buyers and are ready for sale. As

Fannie Mae states, its strategy is to "maintain each property in [its] inventory at a level of market-readiness both inside and outside of the property, supporting neighborhood stabilization." Fannie Mae is also required to perform maintenance to ensure that each REO property complies with local codes. To achieve these goals, Fannie Mae has developed its own REO maintenance checklist.

54. The routine exterior maintenance that Fannie Mae is supposed to perform on all REO properties is objectively measurable, verifiable, and externally visible. Such maintenance activities include, but are not limited to, mowing, weeding, and edging; trimming shrubs and trees; removing snow, trash, and debris; securing doors and windows; repairing or replacing loose handrails and steps; and covering any holes into the dwelling.  Under Fannie Mae's policies, these routine exterior maintenance functions are supposed to be met readily and regularly at every REO property, regardless of the condition or location of the property.

### b. Plaintiffs' Investigation of Fannie Mae's Exterior Maintenance of REO Properties

55. In one of the most comprehensive fair housing investigations conducted under the Fair Housing Act, Plaintiffs investigated Defendant's maintenance of REO properties throughout the country from July 2011 to October 2015.  The investigation included over 2,300 residential dwellings covered by the Fair Housing Act.

56. Plaintiffs' investigation focused on the following metropolitan areas:

| Metropolitan Area | Metropolitan Area |
| --- | --- |
| Albuquerque, New Mexico | Louisville, Kentucky |
| Atlanta, Georgia | Memphis, Tennessee |
| Baltimore, Maryland | Miami, Florida |
| Baton Rouge, Louisiana | Milwaukee, Wisconsin |
| Charleston, South Carolina | Minneapolis, Minnesota |
| Chicago, Illinois | Muskegon, Michigan |
| Cleveland, Ohio | New Orleans, Louisiana |

| | |
|---|---|
| Columbus, Ohio | Newark, New Jersey |
| Dallas, Texas | Orlando, Florida |
| Dayton, Ohio | Philadelphia, Pennsylvania |
| Denver, Colorado | Phoenix, Arizona |
| Dallas, Texas | Providence, Rhode Island |
| Gary, Indiana | Richmond & Oakland, California |
| Grand Rapids, Michigan | Richmond, Virginia |
| Greater Palm Beaches, Florida | San Diego, California |
| Hartford, Connecticut | Toledo, Ohio |
| Indianapolis, Indiana | Tucson, Arizona |
| Kansas City, Missouri | Vallejo, California |
| Las Vegas, Nevada | Washington, D.C. & Prince George's County, Maryland |

57.     In each of these 38 metropolitan areas, Plaintiffs identified the zip codes in a given metropolitan area with the highest foreclosure rates that were racially concentrated (*i.e.* were predominantly African-American, Latino, non-white, or white). Plaintiffs then inspected all (100%) of Fannie Mae's REO properties in those zip codes within the same relative time period, unless the properties were already occupied or work appeared to be underway at the time of the site visits.

58.     Fannie Mae's ownership of properties was determined by using county property records, records kept by the clerk of courts, RealtyTrac, Fannie Mae's Homepath website, and other database sources.  The data was also crosschecked with other records in order to verify the ownership of the homes.

59.     Plaintiffs evaluated Defendant's treatment of these properties according to specific exterior maintenance requirements set forth on Fannie Mae's REO maintenance checklist, which are standard in the REO maintenance industry.[2] According to Fannie Mae's own requirements, all REO properties must be secured within 5-7 calendar days of vacancy;

---

[2]     *See* sample Fannie Mae Maintenance Checklist, attached as Exhibit A.

1   initial lawn maintenance and shrub maintenance must be completed within 10 calendar days of

2   vacancy; and there is no legitimate reason for failing to perform this maintenance for more than

3   a minimal period of time after foreclosure.

4        60.      Plaintiffs' investigators observed, recorded, and photographed the maintenance

5   condition of Fannie Mae's REO properties with respect to over three dozen exterior factors,

6   such as accumulation of trash and mail, overgrown grass and shrubbery, unsecured doors,

7   damaged steps and handrails, windows and fences, and broken or missing signage. Plaintiffs'

8   investigators recorded their observations. To ensure consistency, investigators utilized a specific

9   glossary of terminology, using samples to illustrate the components being evaluated. The

10  glossary accounted for and illustrated variations in severity. The investigators also

11  photographed the exterior maintenance factors observed. The investigators' reports and pictures

12  were uploaded into a central database, and each property was assigned a neighborhood

13  designation based on racial or ethnic makeup of the Census block group in which the address

14  was located.

15       c. **The Results of Plaintiffs' Investigation of Fannie Mae's Maintenance of REO**

16          **Properties (National Findings)**

17       61.      Plaintiffs' investigation of Fannie Mae's REO properties across the nation

18  establishes that Defendant treated properties differently depending on the racial composition of

19  the neighborhoods in which the properties were located.  In each of the metropolitan areas

20  visited, the REO properties located in predominantly white neighborhoods were better

21  maintained and exhibited fewer maintenance deficiencies than the REO properties located in

22  communities of color.  Moreover, the severity of the exterior maintenance deficiencies observed

23  in communities of color were significantly worse than for those observed in predominantly

24  white neighborhoods.

28

62.     Overall, Plaintiffs documented significant differing treatment in many of the objective factors evaluated.  For example:

a.  52.8% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 23.6% of the Fannie Mae REO properties in communities of color had fewer than 5 deficiencies.

b.  39.0% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 14.9% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

c.  24.9% of the Fannie Mae REO properties in communities of color had unsecured or broken doors, while only 11.1% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors.

d.  18.3% of the Fannie Mae REO properties in communities of color had damaged steps and handrails on the property, while only 8.9% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails on the property.

e.  41.5% of the Fannie Mae REO properties in communities of color had damaged, boarded, or unsecured windows, while only 19.1% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged, boarded, or unsecured windows.

f.  15.3% of the Fannie Mae REO properties in communities of color had broken or hanging gutters, while only 7.0% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or hanging gutters.

63.     Statistical analysis of Plaintiffs' evidence shows a large difference in the average number of deficiencies between communities of color and predominantly white neighborhoods. The average number of deficiencies in communities of color is 7.2, but the average in predominantly white neighborhoods is only 4.8.

## Average Number of Deficiencies



64.     Similarly, the average number of deficiencies in neighborhoods that are over 75% minority is 7.4, while the average in neighborhoods that are less than 25% minority is only 4.7.

## Average Number of Deficiencies

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

65.     Further demonstrating the outsized role of race in connection with Fannie Mae's REO maintenance efforts, properties with a large number of deficiencies were disproportionately concentrated in communities of color.  24% of properties in communities of color – but only 6% of those in predominantly white neighborhoods – had ten or more deficiencies.



66.     All of the disparities identified in paragraphs 63 through 65 are statistically significant at a 99% confidence level ($p<0.01$).[3]

67.     These disparities in treatment are not explained or caused by any other non-racial factors. To the contrary, a regression analysis of the data collected by Plaintiffs confirms that the disparities in Fannie Mae's REO maintenance are attributable to neighborhood racial composition, not to non-racial factors, and that the role of race in determining the difference in disparities is statistically significant.

68.     Plaintiffs' regression analysis incorporated publicly available data from across the country in locations where Plaintiffs investigated Fannie Mae's maintenance practices.  The

[3] This is based on a two-tailed t test.

data concerned both the individual properties and the areas in which they are located. Specifically, the data included prior sales dates and prices; additional property transfer history; local crime statistics based on FBI standards; local housing market data; property age; dwelling size; lot size; how long properties had been in Fannie Mae's REO inventory at the time of the site visit; and property values.

69.     The results of the regression analyses establish that even after taking into account these non-racial factors, the maintenance deficiencies existing at Fannie Mae REO properties in communities of color remain greater than the maintenance deficiencies existing at Fannie Mae REO properties in predominantly white communities, and that the differences remain statistically significant.

70.     With respect to the average number of deficiencies at Fannie Mae's REO properties in communities of color and predominantly white neighborhoods, respectively, 60% of the difference cannot be explained by the many non-racial factors included in Plaintiffs' regression analyses.

71.     With respect to the average number of deficiencies at properties in neighborhoods that are over 75% minority and less than 25% minority, respectively, 59% of the difference cannot be explained by the non-racial factors.

72.     Similarly, 65% of the difference in the likelihood that a property in a communities of colorhad ten or more deficiencies, as compared to a property in a predominantly white neighborhood, is unexplained by the non-racial factors in Plaintiffs' regression analyses.

73.     These examples of statistical disparities are merely representative of the numerous forms of data establishing the differential treatment of communities of color as compared to predominantly white neighborhoods.

74.     Plaintiffs' regression analyses demonstrate that the remaining disparities identified in paragraphs 70 to 72 are attributable to neighborhood racial composition.  These remaining disparities due to neighborhood race are statistically significant at a 99% or higher confidence level (p<0.01).

75.     The evidence establishes that the disparity between Fannie Mae's treatment of communities of color and white neighborhoods can only be explained by race.

76.     Fannie Mae's maintenance policies and practices are the direct and proximate cause of the statistical disparities in the maintenance of properties in neighborhoods with different racial and ethnic compositions as alleged herein and revealed by Plaintiffs' investigation.

77.     The differences in maintenance at Defendant's REO properties is consistent in metropolitan areas regardless of their location in the country. Whether analyzed on a national or a metropolitan area basis, the same pattern of discriminatory treatment is evident.  The consistent and repetitive pattern of discriminatory treatment across cities and over the span of time indicates that Defendant's practices are the result of policies and practices set at a management level with responsibility for Defendant's policies nationwide.

78.     Defendant's different treatment of REO properties based on the predominant race or ethnicity of neighborhoods is consistent and continuous throughout the period of Plaintiffs' investigation. Whether analyzed on a year-to-year basis or over the entire period of investigation, the same pattern of differential treatment is evident and constitutes a continuing violation of the Fair Housing Act.

79.     There are no valid business purposes served by, or valid excuses for, Defendant's differing maintenance of REO properties based on neighborhood racial composition. Fannie

Mae has a financial interest in maintaining and securing its inventory of REO properties in order to preserve the value until the property is sold.

80.     Notably, during the relevant time period, Plaintiffs' investigation of REO properties owned by Freddie Mac, an analogous public government-sponsored enterprise, revealed no differences between the quality of maintenance of Freddie Mac's REO properties in communities of color and those in predominantly white neighborhoods. Freddie Mac is a sound comparator to Fannie Mae because it is similarly situated to Fannie Mae with respect to its REO maintenance responsibilities: both are government-sponsored enterprises that purchase and guarantee home mortgages on the secondary market; both obtain title and ownership of properties if those mortgages default and are foreclosed upon; both experienced a significant increase in property ownership as a result of the financial crisis, resulting in large inventories of REO properties throughout the nation; and both were subsequently responsible for the large-scale endeavor of maintaining those REO properties. However, in stark contrast to their findings with respect to Fannie Mae, Plaintiffs found no differences in Freddie Mac's exterior maintenance of REO properties based on racial or ethnic composition of the neighborhood.

**B. Plaintiffs Advised Fannie Mae of Its Systemic Racial Discrimination, But Fannie Mae Did Not Change Its Behavior.**

81.     During an initial investigation into the maintenance of REO properties throughout the lending industry, Plaintiffs observed that many of the REO properties demonstrating poor maintenance in communities of color were owned by Defendant Fannie Mae.  Plaintiffs published and disseminated the results of its industry-wide investigation, *see* http://www.nationalfairhousing.org/Portals/33/Banks%20are%20Back%20Final%2012.3.2012.pdf , and engaged in a series of meetings with Fannie Mae officials.  Plaintiffs informed Fannie Mae of its findings and appealed to Fannie Mae to cease and desist its discriminatory behavior.

82.     Plaintiffs thereafter continued to gather additional evidence regarding Fannie Mae's maintenance of REO properties.  Prior to the initiation of this litigation, Plaintiffs met several more times with Fannie Mae officials and informed them again that their maintenance of REO properties was discriminatory. Plaintiffs provided photographs and comparative data to Fannie Mae demonstrating its poor maintenance of REO properties in communities of color. Plaintiffs also provided training to Fannie Mae employees concerning the unequal maintenance of Fannie Mae's REO properties. Plaintiffs asked Fannie Mae to take appropriate action. Plaintiffs made more attempts to obtain voluntary compliance and met with Fannie Mae representatives again in September 2014 and January 2015.

83.     On May 13, 2015, Plaintiffs filed with the U.S. Department of Housing and Urban Development ("HUD") an administrative complaint of discrimination against Defendant Fannie Mae pursuant to 42 U.S.C. § 3610. That administrative complaint is under investigation by HUD and remains pending.

84.     Despite Plaintiffs' notices and efforts to obtain Fannie Mae's voluntary compliance with the Fair Housing Act, Fannie Mae did not change its behavior and continued to maintain its REO properties differently based on the predominant race or national origin of neighborhoods.

85.     Fannie Mae is well aware of the negative effects that poorly maintained REO dwellings can have on neighborhoods.  Fannie Mae maintains a website that lists all of its REO inventory:  www.homepath.com. On this website, Fannie Mae states that, in addition to maintaining its REO inventory to a level of market readiness, it also strives to "be a good neighbor," "support marketing efforts" and "support neighborhood stabilization."  Its stated goals include to "minimize Fannie Mae's exposure to potential property damage and liability and remove any REO stigma from Fannie Mae-owned properties."

86.     The Homepath website also states that "Fannie Mae's property maintenance practices are part of its overall neighborhood stabilization efforts, which include prioritizing sales to owner occupants and selling properties in a timely manner to promote stability and minimize the impact to the local community."

87.     Fannie Mae has also maintained a "First Look" program throughout the time that Plaintiffs were conducting their REO investigation.  The First Look program allows owner-occupants and non-profits to purchase foreclosures for 20 days before they are made available to investors. The program was created at Fannie Mae to "promote homeownership and support neighborhood stabilization."

88.     Fannie Mae's statements and programs demonstrate its understanding that adequate REO maintenance and disposition are a critical component of neighborhood stabilization and recovery. They also establish Fannie Mae's knowledge that neglecting its REO properties and allowing them to deteriorate has a direct, negative effect on entire neighborhoods.

**C.  Defendant Has Engaged in a Pattern and Practice of Systemic Racial Discrimination In Each of the Cities Served by Plaintiffs.**

89.     In each of the 38 metropolitan areas throughout the United States investigated by Plaintiffs, the general pattern of discrimination and differing treatment based on the predominant race or national origin of neighborhoods is evident.

*Albuquerque, NM*

90.     Overall, REO properties in predominantly white neighborhoods in the Albuquerque, NM, metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such

deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race, the evidence that Plaintiffs gathered in the Albuquerque, NM metropolitan area shows:

    a.  66.7% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 27.8% of the Fannie Mae REO properties in communities of color had fewer than 5 deficiencies.

    b.  72.2% of the Fannie Mae REO properties in communities of color had 5 or more maintenance or marketing deficiencies, while only 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance or marketing deficiencies.

    c.  38.9% of the Fannie Mae REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

    d.  11.1% of the Fannie Mae REO properties in communities of color had trash visible on the property, while none of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

    e.  83.3% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery on the property, while only 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery on the property.

    f.  44.4% of the Fannie Mae REO properties in communities of color had unsecured or broken doors allowing unfettered access to the interior, while only 16.7% of

the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors allowing unfettered access to the interior.

g. 33.3% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

h. 66.7% of the Fannie Mae REO properties in communities of color displayed a no trespassing or warning sign on the property, while only 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods displayed a no trespassing or warning sign on the property.

i. 50.0% of the Fannie Mae REO properties in communities of color had peeled or chipped paint, while none of the Fannie Mae REO properties in predominantly white neighborhoods had peeled or chipped paint.

*Atlanta, GA*

91.     Overall, REO properties in predominantly white neighborhoods in the Atlanta, GA, metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Atlanta, GA metropolitan area shows:

a. 61.5% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 10.0% of the Fannie Mae REO properties in communities of color had fewer than 5 deficiencies.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

b. 90.0% of the Fannie Mae REO properties in communities of color had 5 or more maintenance or marketing deficiencies, while only 38.5% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance or marketing deficiencies.

c. 25.0% of the Fannie Mae REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 3.8% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

d. 17.5% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 3.8% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

e. 40.0% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery on the property, while only 11.5% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery on the property.

f. 32.5% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 15.4% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

g. 50.0% of the Fannie Mae REO properties in communities of color displayed a no trespassing or warning sign on the property, while only 26.9% of the Fannie Mae REO properties in predominantly white neighborhoods displayed a no trespassing or warning signs on the property.

h. 55.0% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while 26.9% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

*Baltimore, MD*

92.     Overall, REO properties in predominantly white neighborhoods in the Baltimore, MD, metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Baltimore, MD metropolitan area shows:

a. 31.4% of the Fannie Mae REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

b. 45.7% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

c. 37.1% of the Fannie Mae REO properties in communities of color had missing or out-of-place gutters, while only 13.3% of the Fannie Mae REO properties in predominantly white neighborhoods had missing or out-of-place gutters.

d. 17.1% of the Fannie Mae REO properties in communities of color had broken or hanging gutters, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or hanging gutters.

e. 62.9% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 26.7% of the Fannie Mae REO properties in predominantly white neighborhoods had dead or overgrown shrubbery

f. 40% of the Fannie Mae REO properties in communities of color had holes in the structure, while only 16.7% of the Fannie Mae properties in predominantly white neighborhoods had holes in the structure.

*Baton Rouge, LA*

93. Overall, REO properties in predominantly white neighborhoods in Baton Rouge, LA, were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Baton Rouge, LA shows:

a. 55.6% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance or marketing deficiencies, while none of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance or marketing deficiencies.

b. 44.4% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance or marketing deficiencies, while 100% of the Fannie Mae REO properties in communities of color had 5 or more maintenance or marketing deficiencies.

1        c. 63.6% of the Fannie Mae REO properties in communities of color had trash

2            visible in the property, while none of the Fannie Mae REO properties in

3            predominantly white neighborhoods had trash visible in the property.

4        d. 45.5% of the Fannie Mae REO properties in communities of color had damaged

5            siding, while only 11.1% of the Fannie Mae REO properties in predominantly

6            white neighborhoods had damaged siding.

7

8        e. 81.8% of the Fannie Mae REO properties in communities of color had 10%-50%

9            of the lawn covered in dead grass, while only 22.2% of the Fannie Mae REO

10           properties in predominantly white neighborhoods had 10%-50% of the lawn

11           covered in dead grass.

*Charleston, SC*

94.    Overall, REO properties in predominantly white neighborhoods in Charleston, SC, were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Charleston, SC shows:

        a. 77.8% of the Fannie Mae REO properties in predominantly white neighborhoods

            had fewer than 5 maintenance or marketing deficiencies, while only 25.0% of the

            Fannie Mae REO properties in communities of color had fewer than 5

            maintenance or marketing deficiencies.

        b. 50.0% of the Fannie Mae REO properties in communities of color had 10 or more

            maintenance or marketing deficiencies, while none of the Fannie Mae REO

properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 50.0% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while none of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

d. 50.0% of the Fannie Mae REO properties in communities of color had overgrown grass and leaves, while none of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown grass and leaves.

e. 50.0% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while none of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

f. 50.0% of the Fannie Mae REO properties in communities of color had wood rot, while only 22.2% of Fannie Mae REO properties in predominantly white neighborhoods had wood rot.

*Chicago, IL*

95.    Overall, REO properties in predominantly white neighborhoods in the Chicago, IL metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Chicago, IL metropolitan area shows:

a. 75.7% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 47.8% of the Fannie Mae REO

1   properties in predominantly white neighborhoods had 5 or more maintenance

2   deficiencies or problems.

3      b. 17.9% of the Fannie Mae REO properties in communities of color had damaged

4         steps and handrails, while only 7.2% of the Fannie Mae REO properties in

5         predominantly white neighborhoods had damaged steps and handrails.

6      c. 13.3% of the Fannie Mae REO properties in communities of color had utilities

7         that were exposed or tampered with, while only 7.8% of the Fannie Mae REO

8         properties in predominantly white neighborhoods had utilities that were exposed

9         or tampered with.

10

11     d. 11.6% of the Fannie Mae REO properties in communities of color had broken or

12        hanging gutters, while only 4.4% of the Fannie Mae REO properties in

13        predominantly white neighborhoods had broken or hanging gutters.

14     e. 36.4% of the Fannie Mae REO properties in communities of color had broken or

15        boarded windows, while only 15.0% of the Fannie Mae REO properties in

16        predominantly white neighborhoods had broken or boarded windows.

17

18   *Cleveland, OH*

19      96.   Overall, REO properties in predominantly white neighborhoods in Cleveland,

20   OH were far more likely to have a small number of maintenance deficiencies or problems than

21   REO properties in communities of color, while REO properties in communities of color were

22   far more likely to have large numbers of such deficiencies or problems than those in

23   predominantly white neighborhoods.  For example, and without listing all examples of differing

24   maintenance because of race or national origin, the evidence that Plaintiffs gathered in

25   Cleveland, OH shows:

26

27

28

a. 93.3% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 58.6% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

b. 40.0% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while only 6.9% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 80.0% of the Fannie Mae REO properties in communities of color had damaged siding, while only 34.5% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

d. 40.0% of the Fannie Mae REO properties in communities of color had wood rot, while only 13.8% of the Fannie Mae REO properties in predominantly white neighborhoods had wood rot.

e. 33.3% of the Fannie Mae REO properties in communities of color had holes in the structure, while only 17.2% of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure.

f. 53.3% of the Fannie Mae REO properties in communities of color had a damaged roof, while only 13.8% of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged roof.

g. 46.7% of the Fannie Mae REO properties in communities of color had trash on the property, while only 3.4% of the Fannie Mae REO properties in predominantly white neighborhoods had trash on the property.

*Columbus, OH*

97.     Overall, REO properties in predominantly white neighborhoods in Columbus, OH were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Columbus, OH shows:

a.  40.9% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while none of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b.  75.0% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while only 9.1% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c.  75.0% of the Fannie Mae REO properties in communities of color had holes in the structure, while none of the Fannie Mae REO properties in communities of color had holes in the structure.

d.  87.5% of the Fannie Mae REO properties in communities of color had wood rot, while only 4.5% of the Fannie Mae REO properties in predominantly white neighborhoods had wood rot.

e.  25.0% of the Fannie Mae REO properties in communities of color had 50% or more of the property covered in invasive plants, while none of the Fannie Mae

1    REO properties in predominantly white neighborhoods had 50% or more of the

2    property covered in invasive plants.

3    f.  12.5% of the Fannie Mae REO properties in communities of color had graffiti,

4    while none of the Fannie Mae REO properties in predominantly white

5    neighborhoods had graffiti.

6    g.  25.0% of the Fannie Mae REO properties in communities of color had broken on

7    hanging gutters, while none of the Fannie Mae REO properties in predominantly

8    white neighborhoods had broken or hanging gutters.

9

10   *Dallas, TX*

11   98.    Overall, REO properties in predominantly white neighborhoods in Dallas, TX

12   were far more likely to have a small number of maintenance deficiencies or problems than REO

13   properties in communities of color, while REO properties in communities of color were far

14   more likely to have large numbers of such deficiencies or problems than those in predominantly

15   white neighborhoods.  For example, and without listing all examples of differing maintenance

16   because of race or national origin, the evidence that Plaintiffs gathered in Dallas, TX shows:

17

18   a.  75.0% of the Fannie Mae REO properties in predominantly white neighborhoods

19   had fewer than 5 maintenance deficiencies or problems, while only 28.6% of the

20   Fannie Mae REO properties in communities of color had fewer than 5

21   maintenance deficiencies or problems.

22   b.  28.6% of the Fannie Mae REO properties in communities of color had trash

23   visible on the property, while none of the Fannie Mae REO properties in

24   predominantly white neighborhoods had trash visible on the property.

25

26

27

28

c. 33.3% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

d. 28.6% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

e. 33.3% of the Fannie Mae REO properties in communities of color had holes in the structure, while none of the Fannie Mae properties in predominantly white neighborhoods had holes in the structure.

f. 42.9% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 8.3% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

g. 61.9% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while only 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

*Dayton, OH*

99. Overall, REO properties in predominantly white neighborhoods in Dayton, OH were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Dayton, OH shows:

a. 47.6% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while none of the Fannie

Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 57.7% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while only 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 42.3% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while only 11.4% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

d. 63% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while only 15.9% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

e. 70.4% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while only 40.9% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

*Denver, CO*

100.    Overall, REO properties in predominantly white neighborhoods in the Denver, CO metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Denver, CO metropolitan area shows:

a. 71.4% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 15.8% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 84.2% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 28.6% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 42.1% of the Fannie Mae REO properties in communities of color had missing or out of place gutters, while none of the Fannie Mae REO properties in predominantly white neighborhoods had missing or out of place gutters.

d. 42.1% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

e. 15.8% of the Fannie Mae REO properties in communities of color had broken or discarded signage, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or discarded signage.

f. 21.1% of the Fannie Mae REO properties in communities of color had 50% or more of the lawn covered in dead grass, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 50% or more of the lawn covered in dead grass.

g. 21.1% of the Fannie Mae REO properties in communities of color had holes in the structure, while none of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure.

*Fort Worth, TX*

101.    Overall, REO properties in predominantly white neighborhoods in Fort Worth, TX were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Fort Worth, TX shows:

> a. 40.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 27.3% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

> b. 9.1% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

> c. 90.9% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while only 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

> d. 27.3% of the Fannie Mae REO properties in communities of color had damaged siding, while only 13.3% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

> e. 45.5% of the Fannie Mae REO properties in communities of color had holes in the structure, while only 26.7% of the Fannie Mae properties in predominantly white neighborhoods had holes in the structure.

*Gary, IN*

102.    Overall, REO properties in predominantly white neighborhoods in Gary, IN were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Gary, IN shows:

a. 60.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 30.0% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 70.0% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 40.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 40.0% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

d. 60.0% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

e. 40.0% of the Fannie Mae REO properties in communities of color had obstructed gutters, while only 13.3% of the Fannie Mae REO properties in predominantly white neighborhoods had obstructed gutters.

*Grand Rapids, MI*

103.    Overall, REO properties in predominantly white neighborhoods in Grand Rapids, MI were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Grand Rapids, MI shows:

a.  52.2% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 9.1% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b.  90.9% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 47.8% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c.  72.7% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 21.7% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d.  27.3% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while only 4.3% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

1
2
3

    e. 63.6% of the Fannie Mae REO properties in communities of color had overgrown grass and leaves, while only 26.1% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown grass and leaves.

4

*Greater Palm Beaches, FL*

5
6
7
8
9
10
11
12

    104.    Overall, REO properties in predominantly white neighborhoods in the Greater Palm Beaches, FL metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Greater Palm Beaches, FL metropolitan area shows:

13
14
15
16
17

    a. 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 16.7% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

18
19
20
21
22

    b. 83.3% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 66.7% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

23
24
25

    c. 33.3% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

26
27
28

d. 38.9% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while none of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

e. 11.1% of the Fannie Mae REO properties in communities of color had a damaged roof, while none of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged roof.

*Hartford, CT*

105.   Overall, REO properties in predominantly white neighborhoods in the Hartford, CT metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Hartford, CT metropolitan area shows:

a. 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 7.7% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 69.2% of the Fannie Mae REO properties in communities of color had more than 10 maintenance deficiencies or problems, while only 10.0% of the Fannie Mae REO properties in communities of color had more than 10 maintenance deficiencies or problems.

c. 46.2% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 53.8% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while only 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

*Indianapolis, IN*

106.    Overall, REO properties in predominantly white neighborhoods in Indianapolis, IN were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Indianapolis, IN show:

a. 50.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 11.8% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 88.2% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 50.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 58.8% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while 31.8% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

d. 64.7% of the Fannie Mae REO properties in communities of color had obstructed gutters, while only 27.3% of the Fannie Mae REO properties in predominantly white neighborhoods had obstructed gutters.

e. 35.3% of the Fannie Mae REO properties in communities of color had a damaged fence, while only 20.5% of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged fence.

*Kansas City, MO*

107.    Overall, REO properties in predominantly white neighborhoods in Kansas City, MO were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Kansas City, MO shows:

a. 72.7% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 25.0% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 75.0% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 27.3% of the Fannie Mae REO

properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 31.3% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

d. 46.9% of the Fannie Mae REO properties in communities of color had broken or hanging gutters, while 9.1% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or hanging gutters.

e. 56.3% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while only 18.2% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

*Las Vegas, NV*

108.    Overall, REO properties in predominantly white neighborhoods in Las Vegas, NV were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Las Vegas, NV shows:

a. 83.3% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while 75.0% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 40.6% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while only 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

c. 34.4% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

d. 9.4% of the Fannie Mae REO properties in communities of color had a damaged fence, while none of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged fence.

*Louisville, KY*

109. Overall, REO properties in predominantly white neighborhoods in Louisville, KY were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Louisville, KY shows:

a. 73.3% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 8.3% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 91.7% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 26.7% of the Fannie Mae REO

properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 58.3% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

d. 33.3% of the Fannie Mae REO properties in communities of color had mail accumulated, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had mail accumulated.

e. 58.3% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while only 20.0% of Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

*Memphis, TN*

110.    Overall, REO properties in predominantly white neighborhoods in Memphis, TN were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Memphis, TN shows:

a. 70.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 11.4% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 88.6% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 30.0% of the Fannie Mae REO

properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 54.3% of the Fannie Mae REO properties in communities of color had trash on the property, while none of the Fannie Mae REO properties in predominantly white neighborhoods had trash on the property

d. 68.6% of the Fannie Mae REO properties in communities of color had broken or boarded widows, while only 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

e. 34.3% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 10.0% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

*Miami, FL*

111.    Overall, REO properties in predominantly white neighborhoods in the Miami, FL metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Miami, FL metropolitan area shows:

a. 26.7% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 4.1% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 59.2% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while 26.7% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 42.9% of the Fannie Mae REO properties in communities of color had broken or boarded widows, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

d. 24.5% of the Fannie Mae REO properties in communities of color had a damaged roof, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged roof.

e. 67.3% of the Fannie Mae REO properties in communities of color had holes in the structure, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure.

*Milwaukee, WI*

112.    Overall, REO properties in predominantly white neighborhoods in Milwaukee, WI were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Milwaukee, WI shows:

a. 66.9% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 39.9% of the

Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 60.1% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 33.1% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 26.9% of the Fannie Mae REO properties in communities of color had visible trash on the property, while only 6.6% of the Fannie Mae properties in predominantly white neighborhoods had visible trash on the property.

d. 47.2% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while only 19.9% of the Fannie Mae properties in predominantly white neighborhoods had broken or boarded windows.

e. 31.6% of the Fannie Mae REO properties in communities of color had damaged siding, while only 15.4% of the Fannie Mae properties in predominantly white neighborhoods had damaged siding.

*Minneapolis, MN*

113.    Overall, REO properties in predominantly white neighborhoods in Minneapolis, MN were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Minneapolis, MN shows:

a. 66.7% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 13.6% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 86.4% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 54.5% of the Fannie Mae REO properties in communities of color had visible trash on the property, while none of the Fannie Mae properties in predominantly white neighborhoods had visible trash on the property.

d. 45.5% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while only 6.7% of the Fannie Mae properties in predominantly white neighborhoods had broken or boarded windows.

e. 72.7% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 13.3% of the Fannie Mae properties in predominantly white neighborhoods had overgrown or dead shrubbery.

f. 22.7% of the Fannie Mae REO properties in communities of color had a damaged fence, while none of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged fence.

*Muskegon, MI*

114.    Overall, REO properties in predominantly white neighborhoods in Muskegon, MI were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were

far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Muskegon, MI shows:

  a. 60.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 14.3% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

  b. 42.9% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

  c. 42.9% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while none of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

  d. 57.1% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

  e. 71.4% of the Fannie Mae REO properties in communities of color had damaged siding, while only 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

*New Orleans, LA*

115.   Overall, REO properties in predominantly white neighborhoods in New Orleans, LA were far more likely to have a small number of maintenance deficiencies or problems than

REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in New Orleans, LA shows:

a. 29.4% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while none of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 34.5% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while only 17.6% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 75.9% of the Fannie Mae REO properties in communities of color had visible trash on the property, while only 11.8% of the Fannie Mae properties in predominantly white neighborhoods had visible trash on the property.

d. 17.2% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

e. 51.7% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 17.6% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

*Newark, NJ*

116.     Overall, REO properties in predominantly white neighborhoods in the Newark, NJ metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Newark, NJ metropolitan area shows:

a. 81.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 16.2% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 37.8% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 54.1% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 4.8% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

d. 43.2% of the Fannie Mae REO properties in communities of color had damaged siding, while only 9.5% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

e. 70.3% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 19.0% of the Fannie Mae REO properties in predominantly white neighborhoods had dead or overgrown shrubbery

*Orlando, FL*

117.   Overall, REO properties in predominantly white neighborhoods in the Orlando, FL metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Orlando, FL metropolitan area shows:

a. 17.1% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 6.8% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 43.2% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 25.0% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while only 11.4% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

d. 38.6% of the Fannie Mae REO properties in communities of color had overgrown grass and/or accumulated dead leaves, while only 5.7% of the Fannie Mae REO

properties in predominantly white neighborhoods had overgrown grass and/or accumulated dead leaves.

e. 54.5% of the Fannie Mae REO properties in communities of color holes in the structure, while only 28.6% of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure.

*Philadelphia, PA*

118.    Overall, REO properties in predominantly white neighborhoods in the Philadelphia, PA metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Philadelphia, PA metropolitan area shows:

a. 57.1% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 31.7% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 68.3% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 42.9% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 54.0% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 27.0% of the Fannie Mae REO properties in communities of color had damaged siding, while only 11.4% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

e. 41.3% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

*Phoenix, AZ*

119.   Overall, REO properties in predominantly white neighborhoods in the Phoenix, AZ metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Phoenix, AZ metropolitan area shows:

a. 66.7% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 50.0% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 50.0% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 42.9% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 57.1% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

e. 35.7% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 8.3% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

*Providence, RI*

120.   Overall, REO properties in predominantly white neighborhoods in Providence, RI were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Providence, RI shows:

a. 70.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 20.0% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 20.0% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while none of the Fannie Mae REO

properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 60.0% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 10.0% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 80.0% of the Fannie Mae REO properties in communities of color had 10%-50% of the property covered in invasive plants, while only 30.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 10%-50% of the property covered in invasive plants.

e. 40.0% of the Fannie Mae REO properties in communities of color had damaged siding, while only 10.0% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

*Richmond and Oakland, CA*

121.   Overall, REO properties in predominantly white neighborhoods in Richmond and Oakland, CA were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Richmond and Oakland, CA shows:

a. 50.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 33.8% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

b. 66.2% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 50.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 35.1% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 21.4% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 32.4% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 14.3% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

e. 33.8% of the Fannie Mae REO properties in communities of color had holes in the structure of the home, while none of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure of the home.

f. 35.1% of the Fannie Mae REO properties in communities of color had no professional "for sale" sign marketing the home, while only 14.3% of the Fannie Mae REO properties in predominantly white neighborhoods had no professional "for sale" sign marketing the home.

g. 36.5% of the Fannie Mae REO properties in communities of color had damaged siding, while only 7.1% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

h. 20.3% of the Fannie Mae REO properties in communities of color had missing or out of place gutters, while only 7.1% of the Fannie Mae REO properties in predominantly white neighborhoods had missing or out of place gutters.

*Richmond, VA*

122.     Overall, REO properties in predominantly white neighborhoods in the Richmond, VA metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Richmond, VA metropolitan area shows:

a.  58.8% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 17.4% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b.  39.1% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c.  52.2% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 5.9% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

d.  43.5% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

e. 39.1% of the Fannie Mae REO properties in communities of color had holes in the structure of the home, while only 5.9% of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure of the home.

*San Diego, CA*

123.    Overall, REO properties in predominantly white neighborhoods in the San Diego, CA metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the San Diego, CA metropolitan area shows:

a. 42.9% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 25.0% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 15.0% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 45.0% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 14.3% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 30.0% of the Fannie Mae REO properties in communities of color had overgrown grass and leaves, while none of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown grass and leaves.

e. 25.0% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

*Toledo, OH*

124.    Overall, REO properties in predominantly white neighborhoods in Toledo, OH were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Toledo, OH shows:

a. 32.4% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 9.8% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 37.3% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while 13.5% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 31.4% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while only 12.2% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

1
2
3

     d. 25.5% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 5.4% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

4
5
6
7

     e. 78.4% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while 36.5% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

8
9
10

     f. 58.8% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while 29.7% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

11 *Tucson, AZ*

12
13
14
15
16
17
18

     125.    Overall, REO properties in predominantly white neighborhoods in Tucson, AZ were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Tucson, AZ shows:

19
20
21
22
23

     a. 76.9% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 50.0% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

24
25
26
27

     b. 50.0% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 23.1% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

28

c. 36.4% of the Fannie Mae REO properties in communities of color had damaged siding, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

d. 9.1% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while none of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

e. 27.3% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 15.4% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

*Vallejo, CA*

126.    Overall, REO properties in predominantly white neighborhoods in the Vallejo, CA metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Vallejo, CA metropolitan area shows:

a. 47.4% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 34.7% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 12.2% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while none of the Fannie Mae REO

properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 38.8% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 10.5% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 22.4% of the Fannie Mae REO properties in communities of color had 10% to 50% of the property covered in invasive plants, while only 10.5% of the Fannie Mae REO properties in predominantly white neighborhoods had 10% to 50% of the property covered in invasive plants.

e. 10.2% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

f. 8.2% of the Fannie Mae REO properties in communities of color had a damaged roof, while none of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged roof.

g. 22.4% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while 10.5% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

h. 30.6% of the Fannie Mae REO properties in communities of color had holes in the structure of the home, while only 15.8% of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure of the home.

i. 30.6% of the Fannie Mae REO properties in communities of color had damaged siding, while only 15.8% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

*Washington, D.C. & Prince George's County, MD*

127.   Overall, REO properties in predominantly white neighborhoods in Washington, D.C. & Prince George's County, MD were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods.  For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Washington, D.C. & Prince George's County, MD shows:

a.  80.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 27.3% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b.  72.7% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c.  30.9% of the Fannie Mae REO properties in communities of color had trash visible on the property, while none of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d.  49.1% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while none of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

e. 27.3% of the Fannie Mae REO properties in communities of color had broken or hanging gutters, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or hanging gutters.

f. 36.4% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

g. 32.7% of the Fannie Mae REO properties in communities of color had a damaged fence, while none of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged fence.

**D. Fannie Mae's REO Maintenance Policies and Practices Cause A Disproportionate Adverse Impact on Communities of Color.**

128.    Fannie Mae has designed a national practice and policy of having its lower-level agents and employees determine whether to conduct an REO exterior maintenance task and how to conduct it. Fannie Mae's practice thus gave these agents and employees the ability to exercise high levels of discretion with minimal input from Fannie Mae. Fannie Mae's practice and policy of committing REO exterior maintenance decisions to the subjective and unguided discretion of its lower-level agents and employees have caused a disproportionately adverse impact on communities of color.

129.    Fannie Mae's discretionary exterior maintenance practice and policy allows agents to discriminate in the exercise of their maintenance duties. For example, Fannie Mae did not provide specific requirements regarding how often exterior REO maintenance should be performed by its agents or employees. In contrast, Fannie Mae provided detailed instructions to its agents with regard to other REO services, including directing them to perform tasks on a monthly basis.

130.     Moreover, Fannie Mae relied almost exclusively on the reports of its lower-level agents to ensure that REO properties were being maintained in a proper manner. Unless the lower-level agents requested a bid or payment for conducting an exterior maintenance task, then Fannie Mae's business practice allowed for little (if any) independent knowledge of whether the property actually required exterior maintenance. Notably, upon information and belief, during the relevant time period, Fannie Mae performed independent quality checks on as few as 10% of its properties on an annual basis. A 2015 report by the Office of Inspector General of the Federal Housing Finance Agency criticized Fannie Mae's quality control protocol, noting that there was "significant risk" that it would be insufficient to assess the quality of REO maintenance activities over a sustained period of time.

131.     The exercise of the agents and employees' subjective and unguided discretion (and Fannie Mae's policy allowing for this discretion without appropriate quality control) resulted in REO properties in communities of color receiving less exterior maintenance than REO properties in predominantly white neighborhoods. The observed disparities persist even after a regression analysis for non-racial factors.

132.     Data further establishes that the exterior maintenance of REO properties under Fannie Mae's maintenance practices and policies varied based on the age and/or the value of the properties.

133.     Policies and practices based on the age or value of residential property can result in an adverse impact on homeowners in communities of color. As early as 1994, the U.S. Department of Housing and Urban Development and other federal financial regulatory agencies noted that housing policies that vary based on the age or value of properties can have a disproportionate effect on minority communities. Fannie Mae's maintenance practices and

policies that are linked to the REO property age and/or value cause inferior maintenance to occur disproportionately in communities of color.

134.     Separately and in combination, Fannie Mae's maintenance policies and practices are a cause of inferior and inadequate maintenance disproportionately occurring in communities of color.

**E. Fannie Mae's Discriminatory Maintenance of REO Properties Perpetuates Segregation.**

135.     Each of the cities in which Defendant's maintenance of REO properties was investigated except Vallejo, CA is moderately or highly segregated under the dissimilarity index measure.

136.     The "dissimilarity index" is a well-recognized standard for evaluating a community's level of segregation. The index measures whether one particular racial group is distributed across census tracts in the metropolitan area in the same way as another racial group. A high dissimilarity index indicates that the two groups tend to live in different tracts. The index ranges from 0 to 100. A value of 60 or more is considered a very high level of segregation. It means that 60% (or more) of the members of one group who reside in the area would need to move to a different tract within that area in order for the two groups to be equally distributed. Values of between 40 and 50 demonstrate a moderate level of segregation, and values of 30 or below indicate a low level of segregation.

137.     The cities investigated by Plaintiffs are located in metropolitan areas that have the following dissimilarity indices:

| Metropolitan Area | 2010 Black-White Dissimilarity Index | 2010 Hispanic-White Dissimilarity Index |
|---|---|---|
| Albuquerque, New Mexico | 40.0 | 36.4 |
| Atlanta, Georgia | 74.1 | 46.6 |
| Baltimore, Maryland | 71.8 | 39.8 |
| Baton Rouge, Florida | 73.1 | 32.7 |

| | | |
|---|---|---|
| Charleston, South Carolina | 54.1 | 39.8 |
| Chicago, Illinois | 83.6 | 56.3 |
| Cleveland, Ohio | 79.7 | 52.3 |
| Columbus, Ohio | 66.9 | 41.5 |
| Dallas, Texas | 66.1 | 61.1 |
| Dayton, Ohio | 73.9 | 27.3 |
| Denver, Colorado | 66.2 | 48.8 |
| Fort Worth, Texas | 55.0 | 49.9 |
| Gary, Indiana | 87.9 | 43.7 |
| Grand Rapids, Michigan | 44.0 | 53.9 |
| Greater Palm Beaches, Florida | 64.8 | 57.4 |
| Hartford, Connecticut | 69.5 | 58.4 |
| Indianapolis, Indiana | 75.5 | 47.3 |
| Kansas City, Missouri | 72.7 | 44.4 |
| Las Vegas, Nevada | 47.4 | 42.0 |
| Louisville, Kentucky | 68.6 | 38.7 |
| Memphis, Tennessee | 72.2 | 50.7 |
| Miami, Florida | 75.8 | 57.4 |
| Milwaukee, Wisconsin | 84.4 | 57.0 |
| Minneapolis, Minnesota | 64.5 | 42.5 |
| Muskegon, Michigan | 72.2 | 50.4 |
| New Orleans, Louisiana | 74.7 | 38.3 |
| Newark, New Jersey | 83.4 | 62.6 |
| Oakland, California | 51.9 | 66.9 |
| Orlando, Florida | 60.0 | 40.2 |
| Philadelphia, Pennsylvania | 73.4 | 62.0 |
| Phoenix, Arizona | 49.1 | 49.3 |
| Providence, Rhode Island | 53.5 | 60.1 |
| Richmond, California | 51.1 | 50.6 |
| Richmond, Virginia | 62.9 | 44.9 |
| San Diego, California | 54.6 | 57.8 |
| Toledo, Ohio | 72.9 | 31.4 |
| Tucson, Arizona | 44.2 | 46.2 |
| Vallejo, California | 24.0 | 28.0 |
| Washington, D.C. & Prince George's County, MD | 66.2 | 48.3 |

138.    From the 1990s through 2008, many financial institutions in the country engaged in persistent discrimination and reverse redlining to target minority neighborhoods for high-priced, high risk mortgages. These predatory practices contributed to the financial crisis—indeed, analyses have shown that segregation was a significant cause of the foreclosure crisis—and resulted in the concentration of foreclosures, and thus bank-owned REOs, in minority

neighborhoods.  The high concentration of foreclosures in minority neighborhoods served to exacerbate the existing high levels of residential segregation in many communities.  All of this was or should have been known to Fannie Mae.

139.    By failing to maintain REO dwellings in communities of color according to the same standards as it maintains REO dwellings in predominantly white neighborhoods, Fannie Mae perpetuates racial segregation.  These communities of color "have long suffered the harsh consequences of segregated housing patterns." *Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.,* 135 S. Ct. 2507, 2525 (2015). Fannie Mae's behavior is the type of "covert and illicit stereotyping", *id*. at 2522, that stigmatizes communities of color as less desirable than predominantly white neighborhoods.  The prospects for integration in the affected neighborhoods are reduced because white buyers are deterred from purchasing homes in neighborhoods with poorly maintained REO properties, leaving the existing segregated racial composition of these neighborhoods unchanged or worsened.

140.    The existence of poorly maintained REO dwellings in a neighborhood diminishes home values for surrounding homeowners. According to the U.S. Department of Housing and Urban Development, vacant properties become a problem "when the property owner abandons the basic responsibilities of ownership, such as routine maintenance . . . ." *See Vacant and Abandoned Properties: Turning Liabilities Into Assets*, available at https://www.huduser.gov/portal/periodicals/em/winter14/highlight1.html. Vacant and abandoned properties have negative spillover effects that affect neighboring properties and, when concentrated, entire communities and cities. Research links foreclosed, vacant, and abandoned properties with reduced property values, increased crime, increased risk to public health and welfare, and increased costs for municipal governments. *Id.* The Appraisal Institute cautions that such "external obsolescence" can lower neighboring home values by 5 to 10%.

1   The reduction in home values in predominantly minority neighborhoods necessarily reduces the

2   equity minority homeowners can use to buy a new home, thereby restricting the ability of

3   minority homeowners to move to other, less segregated neighborhoods.  Allowing REO

4   properties in neighborhoods of color to deteriorate has the necessary and foreseeable

5   consequence of perpetuating segregation by re-entrenching the vestiges of historically

6   discriminatory practices.

7               **V.      INJURY CAUSED BY DEFENDANT'S BEHAVIOR**

8                   *a.      Injury to All Plaintiffs*

9

10      141.    The unlawful discriminatory practices of Defendant have proximately caused

11  actual injury to each of the Plaintiffs.

12      142.    The particularized and concrete injuries suffered by Plaintiffs are intimately

13  connected to the conduct that the Fair Housing Act prohibits. Specifically, Defendant's housing

14  practices have injured Plaintiffs by: (a) undermining Plaintiffs' education, advocacy, and

15  training programs designed to promote fair housing and fair lending; (b) requiring Plaintiffs to

16  divert scarce resources away from their usual activities and instead to devote substantial time to

17  evaluating properties, reviewing data, interviewing witnesses, engaging in a counteractive

18

19  education and outreach campaign, and developing educational materials to identify and address

20  Defendant's racially discriminatory maintenance practices; (c) frustrating Plaintiffs' missions of

21  increasing fair and equal access to housing for all Americans and in all neighborhoods,

22  regardless of race, color, or national origin; (d) frustrating Plaintiffs' missions to eliminate racial

23  segregation in their communities; (e) harming the communities that Plaintiffs serve; and (f)

24  impeding Plaintiffs' community investment programs designed to stabilize neighborhoods of

25  color and increase homeownership for all people in these same neighborhoods.

26

27

28

143.   By requiring Plaintiffs to expend substantial time and resources investigating and counteracting Defendant's unlawful conduct, Defendant has harmed Plaintiffs economically by forcing Plaintiffs to divert scarce resources away from their usual education, counseling, investigation, and capacity-building activities and services.  As Defendant's discriminatory practices persist, addressing and counteracting Defendant's discriminatory conduct will continue to require a substantial diversion of resources by Plaintiffs away from their usual activities.

144.   In order to identify and counteract Defendant's discriminatory conduct, Plaintiffs had to divert scarce resources and time away from other projects and programs.  These expenditures were not initially included in Plaintiffs' budgets.  As a result, each Plaintiff had to pull resources away from other planned and budgeted projects in order to garner the resources necessary to counteract Fannie Mae's behavior. New grant applications had to be refocused from longstanding needs to address the immediate problem caused by Fannie Mae's failure to maintain its REO properties.

145.   Because of the measures Plaintiffs were forced to take to identify and counteract Defendant's discriminatory practices, Plaintiffs were forced to delay, suspend, or forgo other existing programs or projects.  For example, NFHA had to forgo conducting sales investigations to combat racial steering because staff was needed to conduct REO investigations of Fannie Mae across the country.  Despite this impact on Plaintiffs' other programs and services, Plaintiffs nevertheless diverted resources to these counteractive measures because, if left unaddressed, Fannie Mae's discriminatory policies would have a significant harmful effect on Plaintiffs' communities and the constituents they serve.

146.   Defendant's discriminatory conduct has also injured Plaintiffs economically by hindering Plaintiffs' community investment efforts.  Over the past three years, Plaintiffs have

provided over $18 million to 13 fair housing organizations so they could provide services and grants to local housing non-profit organizations and neighborhood investment funds in 13 communities included within this Complaint. Plaintiffs also provided more than $8 million in 6 neighborhoods in cities that are also part of this complaint to conduct education and outreach around REO best practices and to foster homeownership, to assist with rebuilding predominantly African-American and Latino neighborhoods affected by the foreclosure crisis, and to promote diverse, inclusive communities.  These funds have been leveraged to obtain an additional $17.3 million in corporate and foundation grants for the same communities. They have allowed 790 homeowners to remain in their homes through foreclosure prevention or home repair grants, rehabilitated 685 abandoned or blighted dwellings, and made 182 housing units accessible to persons with disabilities.

147.    These financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the same communities.

148.    In efforts to address and attempt to counteract the effects of Defendant's discriminatory conduct, prior to the filing of this action, each of the Plaintiffs engaged in community outreach and public efforts to raise awareness of these discriminatory practices in the communities each Plaintiff serves.

149.    The diversion and expenditure of financial resources and staff time, included, but was not limited to: time and costs associated with drafting and distributing educational materials; mailing costs and graphic design expenses; travel time and expenses; and staff hours diverted from other work to conduct these outreach activities.  In addition to implementing these counteractive measures, Plaintiffs were required to spend additional time designing and preparing counteractive strategies specifically targeted toward addressing the impact of

1    Defendant's unlawful behavior.  Thus, Plaintiffs not only diverted scarce time and resources

2    away from routine tasks and activities to conducting education and outreach, but also to

3    preparing the education and outreach strategy and materials on REO maintenance.

4        150.    These injuries have caused Plaintiffs to incur costs that are above and beyond the

5    operational activities and costs normally expended by Plaintiffs.

6                    **b.    *Injuries to Individual Plaintiffs***

7        151.    Each Plaintiff has suffered particularized and concrete injuries caused by

8    
9    Defendant's discriminatory behavior.

10                        **National Fair Housing Alliance**

11        152.    Over the course of five years, Plaintiff National Fair Housing Alliance has

12    conducted hundreds of inspections of Fannie Mae REO properties across the nation. NHFA has

13    also conducted joint inspections with many of the Plaintiffs listed below. In total, NFHA has

14    expended close to 4,000 hours on its investigation into Fannie Mae's discriminatory

15    maintenance and marketing.

16    
17        153.    As a result of this expenditure of time and resources, NHFA was forced to divert

18    resources and time away from other intended projects and programs, and to delay, suspend, or

19    even cancel such programming. Defendant's discriminatory conduct caused NFHA to forgo

20    opportunities including executing new fair housing advocacy projects or investigations,

21    conducting additional consulting and training of housing providers, applying for new grants and

22    funding sources, attending conferences, and professional staff development.

23    
24        154.    In addition, NFHA engaged in significant community outreach and public

25    education efforts in order to address and attempt to counteract the effects of Defendant's

26    conduct. NFHA's efforts include: meeting with local, state, and federal government officials

27    (including the Federal Reserve Board, state House of Representatives, and at least 10 local

28

governments/jurisdictions); authoring and distributing at least three reports about discrimination in maintenance of REO properties, which were subsequently mailed to local and state governments; conducting numerous fair housing trainings regarding REO maintenance to real estate professionals and bank employees; planning and sponsoring a conference on REO maintenance; serving as keynote speaker and presenting on numerous panels regarding the economic impact of discriminatory REO maintenance; and authoring a book chapter regarding discrimination in REO maintenance.

155.     Defendant's actions have also frustrated the mission and purpose of NFHA. As described in greater detail above, NFHA's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

156.     Finally, NFHA has expended at least $3.4 million of its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts across the nation. NFHA's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in those communities.

**Fair Housing Advocates of Northern California**
**(formerly Fair Housing of Marin)**

157.     Plaintiff Fair Housing Advocates of Northern California conducted inspections of Fannie Mae REO properties across the greater Solano and Contra Costa counties, expending over 310 hours throughout the course of this investigation.

158.     As a result of this expenditure of time and resources, FHANC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused

Plaintiff to forgo opportunities including: consulting opportunities, professional staff development, coalition meetings, and new or additional funding applications.

159.     In addition, FHANC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: meeting with local government officials regarding REO maintenance, including visits to senators and representatives on Capitol Hill; meeting with local service providers such as Housing and Economic Rights Advocates; creating and distributing public service announcements and conducting radio campaigns; publishing advertisements in local newspapers; sending specialized mailings to neighbors of REO properties; participating in community events; and engaging with media to raise awareness of REO-related issues.

160.     Defendant's actions have also frustrated the mission and purpose of FHANC. As described in greater detail above, FHANC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

161.     Finally, FHANC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Solano and Contra Costa counties.

<strong>Central Ohio Fair Housing Association</strong>

162.     Plaintiff Central Ohio Fair Housing Association conducted inspections of Fannie Mae REO properties, expending over 75 hours throughout the course of this investigation.

163.     As a result of this expenditure of time and resources, COFHA was forced to divert resources and time away from other intended projects and programs, and to delay,

suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including: community and coalition meetings, professional staff development, and new funding applications.

164.     In addition, COFHA engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: organizing and conducting outreach and trainings for real estate agents in the greater Columbus metropolitan region; providing educational materials and meeting with local code or government officials regarding REO maintenance; preparing and publishing brochures/reports; creating public service announcements and advertising in local print and radio; designing targeted websites and specialized mailings; participating in community events, including presentations to Habitat for Humanity Mid-Ohio, Somali Community Association of Ohio, Legal Aid Society of Columbus, and Columbus Realtists Association; engaging with media to raise awareness of REO-related issues; and meeting with officials from the City of Columbus and Franklin County, Ohio.

165.     Defendant's actions have also frustrated the mission and purpose of COFHA. As described in greater detail above, COFHA's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

166.     Finally, COFHA has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Columbus metropolitan region.

**Connecticut Fair Housing Center**

167.     Plaintiff Connecticut Fair Housing Center, Inc. conducted inspections of Fannie Mae's REO properties throughout Connecticut, expending over 30 hours throughout the course of this investigation.

168.     As a result of this expenditure of time and resources, CFHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including but not limited to developing new or additional fair housing investigations, community and coalition meetings, consulting and training opportunities, new funding applications, and professional staff development.

169.     In addition, CFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: conducting classes for more than 100 real estate agents on their obligations to maintain REO properties in a non-discriminatory manner; testifying at legislative hearings at the Connecticut legislature on blight bills to raise awareness of the problems caused by differential treatment of REO properties; meeting with the Mayor of New Haven to highlight problems with REO properties in her city; and discussing REO maintenance with Connecticut's Congressional delegation during meetings on fair housing problems in Connecticut.

170.     Defendant's actions have also frustrated the mission and purpose of CFHC. As described in greater detail above, CFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

**Denver Metro Fair Housing Center**

171.    Plaintiff Denver Metro Fair Housing Center conducted inspections of Fannie Mae REO properties across the greater Denver metropolitan area, expending over 185 hours throughout the course of this investigation.

172.    As a result of this expenditure of time and resources, DMFHC was forced to divert limited resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including consulting and training opportunities, new funding applications, professional staff development, and new or additional fair housing investigations.

173.    In addition, DMFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. DMFHC's efforts include: organizing and conducting trainings regarding REO maintenance for housing providers, municipal housing employees, HUD housing counseling agency staff, and the general public in the greater Denver Metro region; meeting with local government officials regarding REO issues, including the Denver Regional Council of Governments, City and County of Denver, City of Aurora, and the State of Colorado Division of Housing; preparing and publishing brochures/reports; creating public service announcements and advertising; designing specialized mailings; participating in community events, including the Montbello 50th Anniversary Fair; and engaging with media to raise awareness for REO-related issues.

174.    Defendant's actions have also frustrated the mission and purpose of DMFHC. As described in greater detail above, DMFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

175.    Finally, DMFHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Denver metropolitan region.

**Fair Housing Center of Central Indiana**

176.    Plaintiff Fair Housing Center of Central Indiana, Inc. conducted inspections of Fannie Mae REO properties across the greater Indianapolis metropolitan region, expending 150 hours throughout the course of this investigation.

177.    As a result of this expenditure of time and resources, FHCCI was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including: fair housing training opportunities, new funding applications, professional staff development, and expanded forms of education and outreach.

178.    In addition, FHCCI engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. FHCCI's efforts include organizing and conducting trainings for community development and neighborhood organizations in the greater Indianapolis region; meeting with local community development organizations and government officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; creating public service announcements for local print and radio; designing specialized mailings; and engaging with media to raise awareness of REO-related issues and answer media related inquiries.

179.    Defendant's actions have also frustrated the mission and purpose of FHCCI. As described in greater detail above, FHCCI's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

180.    Finally, FHCCI has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Indianapolis metropolitan region.

**Fair Housing Center of Greater Palm Beaches**

181.    Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc. conducted inspections of Fannie Mae REO properties across the greater Palm Beach metropolitan region and expended over 90 hours over the course of this investigation.

182.    As a result of this expenditure of time and resources, FHCGPB was forced to divert resources and time away from other intended projects and programs, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including fair housing education and consulting opportunities with housing providers and municipalities and new funding applications.

183.    In addition, FHCGPB engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: over a dozen workshops to community service providers and local housing providers regarding REO maintenance; disseminating anti-discrimination literature; and counseling citizens of the greater Palm Beach metropolitan region on their fair housing rights under federal, Florida, and local fair housing laws.

184.    Defendant's actions have also frustrated the mission and purpose of FHCGPB. As described in greater detail above, FHCGPB's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

**Fair Housing Center of West Michigan**

185.    Plaintiff Fair Housing Center of West Michigan conducted inspections of Fannie Mae's REO properties across the western Michigan region, expending over 200 hours throughout the course of this investigation.

186.    As a result of this expenditure of time and resources, FHCWM was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including community meetings and collaborative efforts, consulting opportunities, conferences and staff development, other systemic investigations, and funding applications.

187.    In addition, FHCWM engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: holding workshops regarding REO issues at its Fair Housing Luncheon & Workshop Series; meeting with local code or government officials regarding REO maintenance; meeting with local service providers, stakeholders and community groups; preparing and publishing newsletters; participating in community events; and engaging with media to raise awareness of REO-related issues.

188.    Defendant's actions have also frustrated the mission and purpose of FHCWM. As described in greater detail above, FHCWM's mission is to ensure equal housing

- 95 -

opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

189.   Finally, FHCWM has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the western Michigan region.

## Fair Housing Continuum

190.   The Fair Housing Continuum, Inc. conducted inspections of Fannie Mae REO properties in the central Florida region, expending approximately 564 hours throughout the course of this investigation.

191.   As a result of this expenditure of time and resources, the Continuum was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including: new or additional fair housing investigations, individual complaint enforcement, fair housing training opportunities, and professional staff development.

192.   In addition, the Continuum engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include 141 presentations or speaking engagements related to REO issues from July 2013 through Sept. 2016 as well as engaging with media to raise awareness of REO-related issues.

193.   Defendant's actions have also frustrated the mission and purpose of the Continuum. As described in greater detail above, the Continuum's mission is to ensure equal

1    housing opportunities and to fight unlawful discrimination and segregation. Defendant's

2    discriminatory maintenance directly impedes its efforts and frustrates its mission.

3                    **Greater New Orleans Fair Housing Action Center**

4          194.    Plaintiff Greater New Orleans Fair Housing Action Center conducted inspections

5    of Fannie Mae REO properties across the New Orleans metropolitan area, expending over 100

6    hours throughout the course of this investigation.

7
8          195.    As a result of this expenditure of time and resources, GNOFHAC was forced to

9    divert resources and time away from other intended projects and programs, and to delay or

10   suspend such programming. Defendant's discriminatory conduct caused Plaintiff to forgo

11   opportunities including presenting fair housing courses and to delay work related to its annual

12   outreach and education events as well as for planned investigations.

13         196.    In addition, GNOFHAC engaged in significant community outreach and public

14   efforts in order to address and attempt to counteract the effects of Defendant's conduct.

15   GNOFHAC's efforts include: organizing and conducting trainings to groups of service

16
17   providers in the Greater New Orleans area, including meeting with BlightsOut, an organization

18   dedicated to eradicating blight; meeting with government officials regarding REO maintenance;

19   creating public service announcements and advertising in local print and radio; participating in

20   community events, including the Mission Possible Conference with over 100 conference

21   attendees, and engaging with media to raise awareness of REO-related issues.

22
23         197.    Defendant's actions have also frustrated the mission and purpose of GNOFHAC.

24   As described in greater detail above, GNOFHAC's mission is to ensure equal housing

25   opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory

26   maintenance directly impedes its efforts and frustrates its mission.

27

28

198.   Finally, GNOFHAC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater New Orleans metropolitan region.

### HOPE Fair Housing Center

199.   Plaintiff  H.O.P.E. Inc d/b/a HOPE Fair Housing Center conducted inspections of Fannie Mae REO properties across the greater Chicago metropolitan region, expending over 550 hours throughout the course of this investigation.

200.   As a result of this expenditure of time and resources, HOPE was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including: consulting opportunities, new funding applications, professional staff development, and community and coalition meetings.

201.   In addition, HOPE engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: organizing and conducting trainings for a regional coalition of housing providers, non-profit service providers and government staff in the greater Chicago metropolitan region; meeting with local code or government officials regarding REO maintenance in Elgin and other local municipalities; meeting with local service providers and real estate trade organizations; preparing and publishing brochures/reports; designing targeted websites and specialized mailings; participating in community events, including the Chicago Urban League Homebuyers Fair, among others; and engaging with media to raise awareness of REO-related issues.

202.     Defendant's actions have also frustrated the mission and purpose of HOPE. As described in greater detail above, HOPE's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

203.     HOPE has also expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Chicago metropolitan region.

**Housing Opportunities Made Equal of Virginia**

204.     Plaintiff Housing Opportunities Made Equal of Virginia conducted inspections of Fannie Mae's REO properties in Virginia, expending 165 hours throughout the course of this investigation.

205.     As a result of this expenditure of time and resources, HOME of Virginia was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including education and outreach activities that would have furthered its mission, training on volunteer recruitment, fair housing planning consulting work, community meetings, and collaborative efforts, and the delay of its internal strategic planning exercises.

206.     In addition, HOME of Virginia engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: corresponding with City officials regarding REO maintenance and ongoing costs to the localities; meeting with community development corporations; and engaging with media to raise awareness of REO-related issues.

207.     Defendant's actions have also frustrated the mission and purpose of HOME of Virginia. As described in greater detail above, HOME of Virginia's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

**Housing Opportunities for Excellence (HOPE Inc.)**

208.     Plaintiff Housing Opportunities Project for Excellence, Inc., conducted inspections of Fannie Mae REO properties across the state of Florida and expended over 110 hours throughout the course of this investigation.

209.     As a result of this expenditure of time and resources, HOPE, Inc. was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including resource development, public policy advocacy, identifying opportunities to educate underserved and un-served populations, utilizing research and technology to identify discriminatory trends in housing, and furtherance of the organization's Strategic Plan.

210.     In addition, HOPE, Inc. engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include:  preparation and publication of newsletter articles promoting community awareness; engagement with media engagement to raise awareness of REO-related issues; and development of educational presentations inclusive of REO-related topics, including homebuyer/foreclosure prevention workshops, housing provider trainings, and local (Miami-Dade and Broward County) and statewide (Florida) fair housing workshops.

211.     Defendant's actions have also frustrated the mission and purpose of HOPE, Inc. As described in greater detail above, HOPE Inc.'s mission is to ensure equal housing

opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

### Housing Research & Advocacy Center

212.    Plaintiff Housing Research & Advocacy Center conducted inspections of Fannie Mae REO properties across the greater Cleveland metropolitan area, expending over 140 hours over the course of this investigation.

213.    As a result of this expenditure of time and resources, HRAC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such activities. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including production of an annual report, Racial and Ethnic Disparities in Mortgage Lending.

214.    In addition, HRAC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. HRAC's efforts include: the discussion of REO maintenance issues in more than 200 presentations to housing providers and real estate agents in Northeast Ohio; meeting with local code or government officials regarding REO maintenance; meeting with local service providers; sharing investigation's findings with the community; and engaging with media to raise awareness of REO-related issues.

215.    Defendant's actions have also frustrated the mission and purpose of HRAC. As described in greater detail above, HRAC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

**Miami Valley Fair Housing Center**

216.    Plaintiff Miami Valley Fair Housing Center conducted inspections of Fannie Mae REO properties across the greater Miami Valley region, expending over 130 hours throughout the course of this investigation.

217.    As a result of this expenditure of time and resources, MVFHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including: consulting and training opportunities, community and coalition meetings, new funding applications, and professional staff development.

218.    In addition, MVFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: organizing and conducting trainings for real estate agents, property managers, municipal government employees, and the general public in the greater Miami Valley region; meeting with local code or government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures/reports; creating public service announcements and advertising in local print and radio; designing targeted websites and specialized mailings; participating in community events (including presentations to the Latino Connection, the Dayton Area Realtists, Catholic Social Services, the Dayton Mortgage Broker's Association, and the Ahiska Turkish American Community Center); and engaging with media to raise awareness of REO-related issues.

219.    Finally, MVFHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of

- 102 -

1   deteriorating and poorly maintained Fannie Mae REO properties in the greater Miami Valley

2   region.

3        220.    Defendant's actions have also frustrated the mission and purpose of MVFHC. As

4   described in greater detail above, MVFHC's mission is to ensure equal housing opportunities

5   and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance

6   directly impedes its efforts and frustrates its mission.

7                              **Metro Fair Housing Services**

8

9        221.    Plaintiff Metro Fair Housing Services, Inc. conducted inspections of Fannie Mae

10  REO properties across the greater Atlanta metropolitan region, expending over 325 hours

11  throughout the course of this investigation.

12       222.    As a result of this expenditure of time and resources, Metro was forced to divert

13  resources and time away from other intended projects and programs, and to delay, suspend, or

14  even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo

15  opportunities including consulting and training opportunities, new funding applications,

16  professional staff development, and new or additional fair housing investigations.

17

18       223.    In addition, Metro engaged in significant community outreach and public

19  education efforts in order to address and attempt to counteract the effects of Defendant's

20  conduct. Plaintiff's efforts include: organizing and conducting trainings for local jurisdictional

21  staffs, private and public housing providers, real estate agents and consumers in the greater

22  Atlanta metropolitan region; meeting with local code or government officials regarding REO

23  maintenance; preparing and publishing brochures/reports; participating in community events,

24  including the agency's annual fair housing events, partnership fairs and workshops and

25  professional education and outreach activities; and engaging with media to raise awareness for

26  REO-related issues.

27

28

224.     Defendant's actions have also frustrated the mission and purpose of Metro. As described in greater detail above, Metro's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

225.     Finally, Metro has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Atlanta metropolitan region.

**North Texas Fair Housing Center**

226.     Plaintiff North Texas Fair Housing Center conducted inspections of Fannie Mae REO properties across the greater Dallas-Fort Worth metropolitan region, expending over 135 hours throughout the course of the investigation.

227.     As a result of this expenditure of time and resources, NTFHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including expanded forms of outreach and coalition-building, professional staff development, and new funding applications.

228.     In addition, NTFHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: organizing and conducting trainings for social service providers and property management personnel in the Dallas-Fort Worth region; meeting with local government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures; creating public service announcements and advertising in

1 local print and radio; designing specialized mailings; participating in community events,

2 including community resource fairs; and engaging with media to raise awareness of REO-

3 related issues.

4      229.     Defendant's actions have also frustrated the mission and purpose of NTFHC. As

5 described in greater detail above, NTFHC's mission is to ensure equal housing opportunities

6 and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance

7 directly impedes its efforts and frustrates its mission.

8

9      230.     NTFHC has also spent its own funds to engage in community development,

10 homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial

11 investments have been and are continuing to be undermined by the existence of deteriorating

12 and poorly maintained Fannie Mae REO properties in the greater Dallas-Fort Worth region.

13 **Metro Milwaukee Fair Housing Council**

14

15      231.     Plaintiff Metropolitan Milwaukee Fair Housing Council conducted inspections of

16 Fannie Mae REO properties across the greater Milwaukee metropolitan area, expending over

17 400 hours throughout the course of this investigation.

18      232.     As a result of this expenditure of time and resources, MMFHC was forced to

19 divert resources and time away from other intended projects and programs, and to delay,

20 suspend, or even cancel such programming. Defendant's discriminatory conduct caused

21 Plaintiff to forgo opportunities including fair lending outreach and education, fair housing

22 outreach and education, fair housing investigations, data collection activities, and housing

23 industry trainings.

24

25      233.     In addition, MMFHC engaged in significant community outreach and public

26 education efforts in order to address and attempt to counteract the effects of Defendant's

27 conduct. Plaintiff's efforts include conducting REO-related presentations and meetings with

28

1    government officials, community organizations, academic institutions, housing providers,

2    individual realtors and realtors' associations, neighborhood associations, lending institutions,

3    community activists, faith-based institutions, and homeowners and residents of neighborhoods

4    affected by discriminatory REO maintenance and marketing practices.

5        234.    Defendant's actions have also frustrated the mission and purpose of MMFHC.

6    As described in greater detail above, MMFHC's mission is to ensure equal housing

7    opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory

8    maintenance directly impedes its efforts and frustrates its mission

9

10                          **Open Communities**

11       235.    Plaintiff Open Communities conducted inspections of Fannie Mae REO

12   properties in the greater Chicago metropolitan region, expending over 262 hours throughout the

13   course of this investigation.

14       236.    As a result of this expenditure of time and resources, Open Communities was

15   forced to divert resources and time away from other intended projects and programs, and to

16   delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused

17   Plaintiff to forgo opportunities including conducting fair housing testing and investigations,

18

19   holding landlord and tenant mediation services, performing community outreach and

20   professional staff development.

21       237.    Defendant's actions have also frustrated the mission and purpose of Open

22   Communities. As described in greater detail above, Open Communities' mission is to ensure

23   equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's

24   discriminatory maintenance directly impedes its efforts and frustrates its mission.

25

26

27

28

COMPLAINT
National Fair Housing Alliance, *et al.* v. Federal National Mortgage Association

## South Suburban Housing Center

238.    Plaintiff South Suburban Housing Center conducted inspections of Fannie Mae REO properties across the greater Chicago metropolitan area, expending over 329 hours throughout the course of this investigation.

239.    As a result of this expenditure of time and resources, SSHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including additional fair housing complaint intakes and investigations, fair housing presentations for the general public and housing providers, counseling and advocacy on behalf of mortgage-distressed discrimination victims, and expanded forms of outreach and coalition-building.

240.    In addition, SSHC has engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct.  Plaintiff's efforts include conducting REO-related presentations and meetings with municipal and county officials, community organizations, housing providers, individual realtors and realtors' associations, lending institutions, community service agencies, faith-based institutions, and homeowners and residents of communities  affected by discriminatory REO maintenance and marketing practices.

241.    Defendant's actions have also frustrated the mission and purpose of SSHC. As described in greater detail above, SSHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

242.    Finally, SSHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts, including

down payment assistance and mortgage distress assistance programs. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Chicago metropolitan area.

### Toledo Fair Housing Center

243.    Plaintiff, The Toledo Fair Housing Center, conducted inspections of Fannie Mae REO properties across the greater Toledo metropolitan area, expending over 316 hours throughout the course of this investigation.

244.    As a result of this expenditure of time and resources, TFHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including providing fair housing training to community partners, attending conferences and other forms of professional staff development, and advocating for housing discrimination victims.

245.    In addition, TFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: organizing and conducting trainings for housing industry professionals and the general public in the Northwest Ohio region; meeting with government officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; participating in community events and meetings; engaging with media to raise awareness of REO-related issues; interviewing neighbors; and participating in neighborhood beautification and revitalization efforts.

246.    Defendant's actions have also frustrated the mission and purpose of TFHC. As described in greater detail above, TFHC's mission is to ensure equal housing opportunities and

1   to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance

2   directly impedes its efforts and frustrates its mission.

3        247.    Finally, TFHC has expended its own funds to engage in community

4   development, homeownership promotion, neighborhood stabilization, foreclosure prevention

5   and beautification efforts. Plaintiff's financial investments have been and are continuing to be

6   undermined by the existence of deteriorating and poorly maintained Fannie Mae REO

7   properties in the greater Toledo metropolitan region.

8
9                 c. *Injuries to Neighborhood Residents and Communities*

10       248.    The damaging effect of Defendant's discriminatory conduct extends beyond

11   Plaintiffs, also harming the communities Plaintiffs serve.  Defendant's failure to maintain REO

12   properties in communities of color has created deteriorating eye sores and depressed property

13   values in communities of color, undermining neighborhood stabilization, and curtailing

14   economic recovery.

15
16       249.    Where REO properties are not maintained, their effects on the neighborhood and

17   the community can be powerful. They can diminish the value of surrounding properties and

18   destabilize economic and social conditions in the neighborhood. Several academic and

19   government reports acknowledge the negative effects of neglected vacant properties on

20   neighboring homeowners, whole neighborhoods, and local governments. For example, the

21   Government Accountability Office issued very detailed findings on the negative effects of

22   abandoned foreclosures in 2010 in its Report "Mortgage Foreclosures: Additional Mortgage

23   Servicer Actions Could Help Reduce the Frequency and Impact of Abandoned Foreclosures,"

24   GAO-11-93, available at http://www.gao.gov/new.items/d1193.pdf.  Vacant and abandoned

25   properties often deteriorate quickly and can result in structural damage, mold, broken windows,

26   accumulated trash and debris, overgrown grass, among other things. *Id.* at 29-31. They can also

27
28

create public safety concerns, and pose significant public health, safety, and welfare issues at the local level. *Id.* at 31-32. These harmful effects are well-known to Fannie Mae, and this GAO report was provided to Fannie Mae for comment prior to its final release in November 2010. *See also* Government Accountability Office, "Vacant Properties: Growing Number Increases Communities' Costs and Challenges," GAO-12-34 (Nov. 4, 2011), at 27-48, available at http://www.gao.gov/products/GAO-12-34 ; Woodstock Institute, Deciphering Blight: Vacant Buildings Data Collection in the Chicago Six County Region (June 2013) at 2 (citing studies), available at

http://www.woodstockinst.org/sites/default/files/attachments/decipheringblight_buitrago_june2 013.pdf.

250.    Poorly maintained REO properties strip neighboring homeowners of wealth through decreased equity in their homes.  Research shows that living on the same block as a foreclosed property or a blighted property can result in significant decreases in one's home value and equity. This problem is particularly acute in communities of color. Moreover, residents in the affected neighborhoods are often required to expend their own labor and money to maintain Fannie Mae's REO properties, but cannot do so in a comprehensive and sufficient manner.

251.    Poorly maintained REO properties affect the health and safety of surrounding residents. The stress related to living near a neglected, vacant property has been documented to contribute to increased high blood pressure rates for neighboring homeowners. Properties that are vacant and boarded up increase a sense of social isolation and anxiety for the residents living in those neighborhoods. Increased criminal activity and arson and accidental injuries from fires, as well as injuries related to unsecure and unstable structures, are more likely to occur in

neighborhoods with vacant and neglected REOs. Blighted properties also pose health and safety

for neighbors due to rodent and insect infestation, decay, and vulnerability to crime.

252.    Allowing REO properties in communities of color to deteriorate has the

necessary and foreseeable consequence of perpetuating segregation by re-entrenching the

vestiges of historically discriminatory practices engaged in by private and government actors.

By failing to maintain REO dwellings in communities of color according to the same standards

as it maintains REO dwellings in predominantly white neighborhoods, Fannie Mae stigmatizes

communities of color as less desirable than predominantly white neighborhoods.  Vacant and

foreclosed properties are well known to depress surrounding home values; poor maintenance

can only exacerbate that effect. And as shoddy maintenance and neglect result in deteriorating

appearances and physical conditions for REO properties, their availability for sale is adversely

affected, constraining housing options in impacted communities. The prospects for integration

in the affected neighborhoods are reduced because white buyers are deterred from purchasing

homes in neighborhoods with poorly maintained REO properties, leaving the existing

segregated racial composition of these neighborhoods unchanged. As a consequence, potential

home buyers, as well as existing homeowners, are being deprived of the social, professional,

business and economic, political, and aesthetic benefits of living in integrated communities free

of housing discrimination.

253.    Lower home values in communities of color also restrict the ability of minority

homeowners to move to majority white or integrated neighborhoods by reducing the equity they

can use to buy a new home. Poor maintenance of REO properties significantly reduces the

number of potential buyers in the housing market, deflecting sales prices downward. At the

same time, research has shown that white homeowners in predominantly minority

neighborhoods with high concentrations of foreclosed properties have greater resources to leave

those neighborhoods, and the presence of poorly maintained REO properties increases their incentive to move out.

254.    Poorly maintained properties are also much more likely to be purchased by an investor as opposed to an owner-occupant. Because Defendant's poorly maintained properties are more heavily concentrated in African-American and Latino communities, communities of color that formerly thrived with high owner-occupancy rates are increasingly becoming investor-owned rental communities. Predatory investor ownership occurs most often in low-income communities of color and can include bulk purchasing of homes with the intention of renting them out with little or no maintenance or rehabilitation.

255.    Finally, Fannie Mae's failure to maintain REO properties in communities of color also harms governments.  Local municipalities are forced to shoulder heavy costs for each vacant, poorly maintained property within their jurisdiction, and these costs can increase when the particular local jurisdiction has a high rate of foreclosures. When large scale property owners, such as Fannie Mae, neglect their assets, many of the related expenses become the burden of the local government. In addition, a significant reduction in property values directly injures municipalities by diminishing their tax base, thus threatening their ability to bear the costs of local government and provide services.

### d.    The Injuries Caused by Defendant's Conduct Continues

256.    Until remedied, Defendant's unlawful, discriminatory actions will continue to injure Plaintiffs by, *inter alia*:

a. interfering with Plaintiffs' efforts and programs intended to bring about equality of opportunity in housing;

b. requiring the commitment of scarce resources, including substantial staff time and funding, to counteract Defendant's discriminatory conduct in the communities

identified above, thus diverting those resources away from Plaintiffs' usual

activities and services, such as education, outreach, and counseling;

   c.  frustrating Plaintiffs' missions and purposes of promoting the equal availability of

housing to all persons without regard to any protected category, including race

and the racial composition of a neighborhood;

   d.  frustrating Plaintiffs' missions and purposes of promoting racial integration and

eliminating racial segregation in their communities; and

   e.  impeding the accomplishments of Plaintiffs' community investment programs.

257.    All of these injuries flow directly from Defendant Fannie Mae's conduct. They

are fairly traceable to Defendant Fannie Mae's discriminatory behavior in Plaintiffs'

communities, and they are likely to be redressed by a favorable judicial decision. They are

directly related to the zone of interests protected by the Fair Housing Act.

## VI.    VIOLATIONS OF THE FAIR HOUSING ACT

258.    Plaintiffs adopt and re-allege the allegations of paragraphs 1 through 257 of this

Complaint.

259.    The REO properties investigated by Plaintiffs are "dwelling[s]" within the

meaning of 42 U.S.C. § 3602(b).

260.    Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make

unavailable or deny, a dwelling to any person because of race [or] national origin[.]" 42 U.S.C.

§ 3604(a). HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race

[or] national origin … to discourage or obstruct choices in a community, neighborhood or

development." 24 C.F.R. 100.70(a). Such acts "include, but are not limited to: (1) Discouraging

any person from inspecting, purchasing, or renting a dwelling  . . . because of the race [or]

national origin . . . of persons in a community, neighborhood or development." 24 C.F.R.

100.70(c)(1). The discriminatory provision of maintenance services to REO properties in communities of color creates significant barriers to the sale or purchase of those properties, making them otherwise unavailable. Accordingly, Defendant has discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of 42 U.S.C. § 3604(a).

261.    Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin. 42 U.S.C. §3604(b). The maintenance of REO properties constitutes "the provision of services" in connection with dwellings. HUD's regulations implementing this section specify that "[p]rohibited actions under this section include, but are not limited to…[f]ailing or delaying maintenance or repairs of sale or rental dwellings" because of race or national origin. 24 C.F.R. § 100.65. Accordingly, Defendant has discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of 42 U.S.C. § 3604(b).

262.    In addition, sales transactions involving poorly maintained REOs in communities of color result in the transfer of title to the dwelling under less favorable "terms" and "conditions" that place on buyers the responsibility of catching up on delayed maintenance and cleaning up the property to avoid code violations. Accordingly, Defendant has discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. § 3604(b).

263.    Section 805 of the Fair Housing Act makes it unlawful for any entity "whose business includes engaging in residential real-estate-related transactions" to discriminate against

1  any person in making available such a transaction because of race or national origin. 42 U.S.C.

2  § 3605. The discriminatory provision of maintenance services to REO properties in

3  communities of color creates significant barriers to the sale or purchase of those properties.

4  Accordingly, Defendant has discriminated in the marketing and sale of, or otherwise made

5  unavailable or denied, dwellings to persons because of race or national origin in violation of 42

6  U.S.C. § 3605.

7        264.    Section 818 of the Fair Housing Act makes it unlawful, among other things, to

8  "interfere with any person in the exercise or enjoyment of . . . any right granted or protected by"

9  other provisions of the Act. 42 U.S.C. § 3617. People living in the communities adversely

10  affected by Defendant's practices, who are predominantly people of color, have seen their

11  property values and enjoyment of their homes diminished because of race. By failing to

12  maintain REO properties in predominantly minority communities, Defendant has interfered with

13  the rights of neighboring residents and homeowners to use and enjoy their homes and

14  communities.  The health and safety risks created by Fannie Mae's REO properties in

15  communities of color and the deleterious effects of those properties on their surrounding

16  neighborhoods create a hostile living environment for their neighbors, in violation of 42 U.S.C.

17  § 3617.

18        265.    Defendant has violated the above provisions of the Fair Housing Act by

19  engaging in the actions and developing, implementing, and maintaining practices that have the

20  purpose and effect of discriminating on the basis race and national origin and that have the

21  effect of perpetuating housing segregation. Accordingly, Defendant's perpetuation and

22  encouragement of patterns of racial segregation violate the Fair Housing Act, 42 U.S.C. § 3601,

23  *et seq.*

24

25

26

27

28

- 115 -

## VII.   JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

### VIII.   PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs pray that this Court grant judgment in their favor, and against Defendant, as follows:

a.  Declare, pursuant to 28 U.S.C. § 2201, that the conduct of Defendant in its maintenance of its REO properties, as alleged herein, is in violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and the applicable regulations;

b.  Enjoin, pursuant to 42 U.S.C. § 3613(c), Defendant, its officers, directors, employees, agents, successors, assigns, and all other persons in active concert or participation with any of them, both temporarily during the pendency of this action and permanently from violating the Fair Housing Act;

c.  Award such damages as would fully compensate Plaintiffs for their injuries incurred as a result of Defendant's discriminatory housing practices and conduct pursuant to 42 U.S.C. § 3613(c);

d.  Award such punitive damages against Defendant as is proper under law pursuant to 42 U.S.C. § 3613(c);

e.  Award Plaintiffs their costs and attorneys' fees incurred herein pursuant to 42 U.S.C. § 3613(c); and

f.  Award Plaintiffs such other relief as this Court deems just and proper.

DATED this 5th day of December, 2016

Respectfully Submitted,

/s/ Glenn Schlactus
Glenn Schlactus (CA Bar # 208414)
D. Scott Chang (CA Bar # 146403)
Stephen M. Dane*
Yiyang Wu*
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
schang@relmanlaw.com

*Attorneys for all Plaintiffs*

Morgan Williams*
NATIONAL FAIR HOUSING ALLIANCE
1101 Vermont Ave., N.W., Suite 710
Washington, D.C. 20005
(202) 898-1661
mwilliams@nationalfairhousing.org

*Attorney for Plaintiff National Fair Housing Alliance*

Casey Epp (CA Bar # 284139)
Fair Housing Advocates of Northern California
1314 Lincoln Ave. Suite A,
San Rafael, CA 94901
(415) 457-5025
casey@fairhousingnorcal.org

*Attorney for Plaintiff Fair Housing Advocates of Northern California*

*\* Application for Admission Pro Hac Vice To Be Filed*

- 117 -