1   STEPHEN M. DANE*
    YIYANG WU*
2   SASHA SAMBERG-CHAMPION*
    LAURA GAZTAMBIDE-ARANDES
3   #298373
    RELMAN, DANE & COLFAX PLLC
4   1225 19th St. NW, Suite 600
    Washington, D.C. 20036
5   Telephone: (202) 728-1888
    sdane@relmanlaw.com
6
    *Attorneys for Plaintiffs*
7
    MORGAN WILLIAMS*
8   NATIONAL FAIR HOUSING ALLIANCE
    1101 Vermont Ave., N.W., Suite 710
9   Washington, D.C. 20005
    Telephone: (202) 898-1661
10  mwilliams@nationalfairhousing.org

11  *Attorney for Plaintiff NFHA*

CASEY EPP # 284139
FAIR HOUSING ADVOCATES
OF NORTHERN CALIFORNIA
1314 Lincoln Ave., Suite A,
San Rafael, CA 94901
Telephone: (415) 457-5025
casey@fairhousingnorcal.org

*Attorney for Plaintiff Fair Housing Advocates
of Northern California*

*Appearing Pro Hac Vice*

12

13                    UNITED STATES DISTRICT COURT FOR THE
                         NORTHERN DISTRICT OF CALIFORNIA

14

15  **NATIONAL FAIR HOUSING**                 )
    **ALLIANCE; FAIR HOUSING**                )
16  **ADVOCATES OF NORTHERN**                 )
    **CALIFORNIA; CENTRAL OHIO FAIR**         )
17  **HOUSING ASSOCIATION;**                  )
    **CONNECTICUT FAIR HOUSING**              )   **FIRST AMENDED COMPLAINT**
18  **CENTER; DENVER METRO FAIR**             )   **AND**
    **HOUSING CENTER; FAIR HOUSING**          )
19  **CENTER OF CENTRAL INDIANA;**            )   **JURY DEMAND**
    **FAIR HOUSING CENTER OF THE**            )
20  **GREATER PALM BEACHES; FAIR**            )   Case No. 4:16-cv-06969
    **HOUSING CENTER OF WEST**                )
21  **MICHIGAN; FAIR HOUSING**                )
    **CONTINUUM, INC.; GREATER NEW**          )
22  **ORLEANS FAIR HOUSING ACTION**           )
    **CENTER; HOPE FAIR HOUSING**             )
23  **CENTER; HOUSING**                       )
    **OPPORTUNITIES MADE EQUAL OF**           )
24  **VIRGINIA;**                             )
    **HOUSING OPPORTUNITIES**                 )
25  **PROJECT FOR EXCELLENCE, INC.;**         )
    **HOUSING RESEARCH & ADVOCACY**           )
26  **CENTER; MIAMI VALLEY FAIR**             )
    **HOUSING CENTER; METRO FAIR**            )

27

28

<table>
<tr><td>1</td><td rowspan="4"><b>HOUSING SERVICES, INC.;<br>METROPOLITAN MILWAUKEE FAIR<br>HOUSING COUNCIL; NORTH TEXAS<br>FAIR HOUSING CENTER; OPEN<br>COMMUNITIES; SOUTH SUBURBAN<br>HOUSING CENTER; AND TOLEDO<br>FAIR HOUSING CENTER;</b></td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td></tr>
<tr><td>2</td></tr>
<tr><td>3</td></tr>
<tr><td>4</td></tr>
</table>

1
2
3
4
5   Plaintiffs,
6   v.
7   **FEDERAL NATIONAL MORTGAGE**
   **ASSOCIATION ("FANNIE MAE");**
8    Defendant.
9
10            **I.    INTRODUCTION AND SUMMARY OF CLAIMS**

11        1.    This First Amended Complaint is filed under the Fair Housing Act of 1968, as
12  amended, 42 U.S.C. § 3601, *et seq.* ("Fair Housing Act"), for compensatory and injunctive
13  relief arising out of the Defendant's racially discriminatory behavior in communities of color
14  throughout the country. Plaintiffs' claims are based on intentional discrimination, including
15  Defendant's intentional discriminatory acts, Defendant's responsibility for the intentional acts
16  of its agents, and Defendant's deliberate indifference to the discriminatory effect of its and/or
17  its agents' acts, and based on disparate impact on the grounds that Defendant's policies and
18  practices have a disparate impact because of race.
19        2.    Plaintiffs are private, non-profit fair housing organizations dedicated to ending
20  housing discrimination and promoting residential integration in their communities and around
21  the nation. Plaintiffs work throughout the United States to eliminate housing discrimination
22  and to ensure equal opportunity for all people through leadership, education, outreach,
23  membership services, public policy initiatives, advocacy, investigation of fair housing
24  violations, investment in community development and stabilization projects, and enforcement.
25
26
27
28

3.      Between July 2011 and October 2015 Plaintiffs conducted a comprehensive investigation of Defendant's real estate related activities in communities of color, including predominantly African-American and Latino neighborhoods, and predominantly white neighborhoods[1] in 38 metropolitan areas throughout the United States. The purpose of the investigation was to determine if Defendant or its agents were discriminating based on the predominant race or national origin of the residents of neighborhoods in the routine maintenance of dwellings it came to own after foreclosures. Over the course of four years, Plaintiffs investigated over 2,300 properties owned and maintained by Defendant, collected evidence on over 35 aspects of the maintenance of each property investigated, and accumulated over 49,000 photographs.

4.      Defendant Federal National Mortgage Association ("Fannie Mae") is a corporation chartered by the U.S. Congress to promote access to residential mortgage credit throughout the nation. Fannie Mae's primary purpose and business activity is to purchase and guarantee home mortgages. When a home mortgage owned by Fannie Mae goes into default and foreclosure, Fannie Mae obtains title to the dwelling securing the mortgage. A dwelling owned by Fannie Mae after a completed foreclosure is referred to as a "Real Estate Owned" or "REO" dwelling. As a consequence of the recent mortgage foreclosure crisis, Fannie Mae has obtained title to a significant number of REO dwellings covered by the Fair Housing Act.

5.      Once a dwelling becomes an REO property, Fannie Mae assumes all duties and responsibilities of ownership, including ordinary maintenance, while it markets the dwelling for sale to the general public. Through a small number of agents with which it contracts, Fannie Mae conducts such maintenance to preserve the dwelling so it can be sold and can

---

[1]      For purposes of this Complaint and the statistical facts set forth below, "predominantly white neighborhoods" refers to those census block groups with more than 50% non-Hispanic white residents, and "communities of color" refer to all other census block groups.

recover the highest and best market price. Fannie Mae's stated strategic goal for its REO properties is to secure and maintain them so that they are appealing to prospective buyers and ready for sale. Specifically, Fannie Mae's strategy is to "maintain each property in [its] inventory at a level of market-readiness both inside and outside of the property, supporting neighborhood stabilization." The stated mission of the Fannie Mae Property Maintenance team is "to ensure the quality of our REO property maintenance services, consistently producing best-in-class, market-ready properties and maintaining them until removal from our inventory."

6.     Fannie Mae's routine exterior maintenance of REO dwellings includes, but is not limited to: regular mowing, edging of walkways and driveways, weeding, trimming shrubs and trees trimming, removing snow, removing trash and debris, eliminating overgrown grass and shrubbery, securing doors and windows, securing or replacing loose handrails and steps, and covering any holes in the dwelling such as dryer vents. These routine maintenance functions are intended to be readily and regularly met with respect to every REO property, regardless of the condition of the property at the time of foreclosure. These basic maintenance duties do not vary from region to region or from city to city.

7.     Fannie Mae is required, under the Fair Housing Act, to maintain all REO properties, regardless of their location, without regard to race, color, religion, sex, handicap, familial status, or national origin. Plaintiffs investigated Fannie Mae's treatment of REO properties in neighborhoods of differing racial and ethnic compositions



FIRST AMENDED COMPLAINT
Case No. 4:16-cv-06969-JSW: National Fair Housing Alliance, *et al.* v. Federal National Mortgage Association

according to Fannie Mae's own specific maintenance norms, which are standard in the REO maintenance industry. Plaintiffs' investigation involved identifying whether certain routine exterior maintenance tasks were completed and taking photographic evidence of the property's exterior maintenance. Using traditional fair housing testing methodologies, Plaintiffs compared the quality of routine maintenance in properties located in a metropolitan area's communities of color with the quality of maintenance in properties located in the same metropolitan area's predominantly white neighborhoods.

8.     The data and pictures collected in Plaintiffs' investigation demonstrate that Fannie Mae and its agents have failed to conduct routine exterior maintenance and marketing of REO properties in communities of color, thereby leaving those REO properties in a state of neglect, while satisfactorily conducting routine exterior maintenance and marketing of its REO properties in predominantly white neighborhoods, thereby leaving those REO properties in a materially better condition. The documentation of differing treatment supports an inference that Defendant and/or its agents' behavior is intentional, Defendant is deliberately indifferent to the discriminatory consequence of its actions, and that Defendant's policies and practices have a disparate impact upon communities of color, because of race. Under established Fair Housing Act doctrine, any intentional discrimination by Fannie Mae's agents is imputed to Fannie Mae. It therefore is immaterial whether discriminatory intent to provide substandard maintenance in predominantly minority neighborhoods came from Fannie Mae headquarters or whether, instead, it originated with the small number of agents that maintained Fannie Mae's REO properties during this time period and was then improperly tolerated by Fannie Mae.

9.     The evidence Plaintiffs have accumulated so far and set forth below clearly illustrates that Fannie Mae or its agents have acted with intent, with deliberate indifference to the consequences of their actions, or with reckless disregard for whether their behavior violated

- 5 -

FIRST AMENDED COMPLAINT
Case No. 4:16-cv-06969-JSW: National Fair Housing Alliance, *et al.* v. Federal National Mortgage Association

the Fair Housing Act. Many of the factual indicia of a discriminatory motive are present here, including: The differing treatment of similarly situated comparators (¶¶ 63-78, 79-155); the departures from the Defendant's normal or substantive criteria (¶¶ 54-56); behavior that is inconsistent with the Defendant's legitimate business purposes and its goals to maximize resale value (¶¶ 53, 54-56, 163-166); behavior that is inconsistent with industry norms (¶¶ 157, 171); the pronounced disparate impact and segregative effect of the defendant's actions (¶¶ 63-78, 173, 174-186); and the Defendant's knowledge that its behavior and the behavior of its agents was very likely in violation of the Fair Housing Act by causing discrimination in neighborhoods of color as compared to predominantly white neighborhoods, but not changing its behavior (¶¶ 157-166, 172).

10.     Across the over 2,300 properties investigated by Plaintiffs in 38 metropolitan areas, Fannie Mae's REO properties in predominantly white neighborhoods have far fewer exterior maintenance deficiencies, while REO properties in communities of color have far more exterior maintenance deficiencies. In predominantly white neighborhoods, the average number of deficiencies was 4.8. In communities of color, however, the average number was 7.2, *i.e.*, 50% higher than in white areas. Moreover, Plaintiffs documented significant differing treatment based on the predominant race or national origin of the neighborhood in many of the objective maintenance factors evaluated.

11.     A few examples of differing maintenance based on the predominant race or national origin of a neighborhood include:

a.     Nationwide, 24% of the Fannie Mae REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 6% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

- 6 -

b. 39.0% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 14.9% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

c. 24.9% of the Fannie Mae REO properties in communities of color had unsecured or broken doors, while only 11.1% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors.

d. 41.5% of the Fannie Mae REO properties in communities of color had damaged, boarded, or unsecured windows, while only 19.1% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged, boarded, or unsecured windows.

12. The disparity between Fannie Mae's treatment of REO properties in communities of color and predominantly white neighborhoods can only be explained by race. Having documented differences in treatment based on neighborhood racial composition, and to rule out non-racial causes for Defendant's behavior, Plaintiffs conducted a regression analysis taking into account non-racial factors such as prior sales dates and prices, additional property transfer history, local crime statistics based on FBI standards, local housing market data, property age, dwelling size, lot size, how long properties have been in Fannie Mae's REO inventory at the time of the site visit, and property values. The results show that the exterior maintenance deficiencies existing at Fannie Mae REO properties in communities of color remain higher by a statistically significant margin as compared to the maintenance deficiencies at Fannie Mae REO properties in predominantly white neighborhoods, thus supporting the conclusion that Defendant's behavior can only be the result of intentional racial discrimination, and/or the result of policies and practices that have a disparate impact based on race.

1   13.   For example, 60% of the difference in the average number of deficiencies cannot

2   be explained by the many non-racial factors included in Plaintiffs' regression analyses.

3   Likewise 65% of the difference in the likelihood that a property had ten or more deficiencies

4   likewise cannot be explained by the non-racial factors. Moreover, the same agents were

5   responsible for maintaining properties in predominantly white and predominantly minority

6   neighborhoods in each geographical area.

7
8   14.   Defendant's and its agents' racially discriminatory differing treatment of REO

9   properties is prevalent throughout the country. The repetitive pattern of differing

10   maintenance—across 2,300 properties, 38 metropolitan areas, and over four years—indicates

11   that this differing treatment is caused by Defendant's policies and practices set at a level of

12   Defendant's management with responsibility for Defendant's policies nationwide.

13   15.   Defendant's racially discriminatory treatment of REO properties is continuous

14   throughout the period of Plaintiffs' investigation. Whether analyzed on a year-to-year basis or

15   over the entire period of investigation, the same pattern of discriminatory treatment is evident.

16   From July 2011 to October 2015, Defendant's continuous practice had the purpose and effect

17   of providing inferior exterior maintenance to REO properties in communities of color, while

18
19   providing better maintenance to REO properties in predominantly white neighborhoods. Upon

20   information and belief, Defendant's discriminatory policies and practices are ongoing.

21

22

23

24

25

26

27

28

16. There are no valid business purposes served by, or valid excuses for, Defendant's differing maintenance of REO properties based on neighborhood composition. Fannie Mae has a financial interest in maintaining and securing its inventory of REO properties in order to preserve the value of each property until it is sold.



Figure 2: Fannie Mae REO in AA neighborhood in Washington, D.C.

17. In the wake of the 2008 mortgage foreclosure crisis, many financial lenders, including Fannie Mae, found themselves the new owners of a significant number of properties and homes that had been dispossessed through foreclosure. Plaintiff National Fair Housing Alliance became aware that Defendant and other lenders were engaging in discriminatory maintenance of those properties based on the racial composition of the neighborhood in which the REO properties were located.

18. Plaintiff National Fair Housing Alliance conducted an initial investigation of Defendant's REO properties to determine whether it had properly maintained homes in communities of color. Subsequently, beginning in the summer of 2009, the National Fair Housing Alliance on behalf of itself and its member organizations engaged in a series of meetings over many months with Fannie Mae officials, including staff from Fannie Mae's REO division, to discuss discriminatory exterior maintenance of REO properties in the lending industry. Plaintiff National Fair Housing Alliance advised Fannie Mae that it and several of its members had conducted an investigation of Fannie Mae's properties and provided addresses of properties and dates the properties were investigated, as well as photographic evidence of the

failed exterior maintenance in communities of color. The National Fair Housing Alliance provided numerous suggestions for correcting the differing levels of maintenance, including identifying the handful of agents responsible for the discriminatory maintenance and the weaknesses in Fannie Mae's supervision of those agents that permitted this discriminatory treatment to persist. Nonetheless, Fannie Mae intentionally, recklessly, or with deliberate indifference continued to engage in its pattern and practice of differing treatment in the exterior maintenance of thousands of properties it owned.

19.     As Plaintiffs' investigation of Fannie Mae's maintenance of REO properties continued, but prior to the initiation of this litigation, Plaintiffs met numerous times with Fannie Mae officials, including its REO division staff, informed them that their company was still engaging in the discriminatory maintenance of REO properties, and asked them to take appropriate action.

20.     Despite Plaintiffs' efforts to get Fannie Mae to voluntarily comply with the Fair Housing Act, Fannie Mae did not change its behavior. With discriminatory intent and deliberate indifference to the discriminatory purpose and effects of its policies and practices, Fannie Mae continued to maintain its REO properties differently because of the predominant race and national origin of neighborhoods. That is to say, Fannie Mae made the intentional decision not to change conduct that it knew full well was causing harm to predominantly minority neighborhoods, even though it could have ended this discriminatory conduct readily. This deliberate indifference to the known consequences of its actions is a violation of the Fair Housing Act.

21.     Fannie Mae's discriminatory exterior maintenance of REO properties in communities of color violates the rights of homeowners and residents in those neighborhoods,

1  and causes particularized and concrete injury to those homeowners and residents. The proper

2  maintenance of REO dwellings is vital to the

3  stability of neighborhoods and to the economic,

4  social, and physical well-being of their residents.

5  REO properties that are poorly maintained have

6  significant, negative outcomes to a

7  neighborhood, affecting the health and safety of

8

9  **Figure 3: Fannie Mae REO in AA**    surrounding residents and otherwise
   **neighborhood in Oakland, CA.**

10  interfering with the rights of homeowners in

11  communities of color to exercise the right to enjoy their homes in a manner free from

12  discrimination. The stress related to living near a neglected, vacant property contributes to

13  increased high blood pressure rates for neighboring homeowners. Properties that are vacant and

14  boarded up increase a sense of social isolation and anxiety for the residents living in those

15  neighborhoods. Several academic and government reports acknowledge the negative effects of

16  neglected vacant properties on nearby homeowners, neighborhoods, and local governments.

17  *See, e.g.*, Government Accountability Office, Vacant Properties: Growing Number Increases

18  Communities' Costs and Challenges, GAO-12-34 (Nov. 4, 2011), at pp. 27-48 (available

19  at http://www.gao.gov/products/GAO-12-34).

20

21

22

23

24

25

26

27

28

22.     The cities investigated by Plaintiffs—with just one exception—are all located in metropolitan areas that are moderately or highly segregated. Allowing REO properties in communities of color to deteriorate has the necessary and foreseeable consequence of perpetuating segregation by re-entrenching historically discriminatory practices, sometimes with governmental support, the "vestiges [of which] remain today." *Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2515 (2015).

23.     The existence of poorly maintained REO dwellings in a neighborhood diminishes home values for surrounding homeowners. When REO dwellings are poorly maintained, the price of homes for sale in their vicinity decrease. Lower home



**Figure 4: Fannie Mae REO in AA neighborhood in Temple Hills, MD.**

values in communities of color restrict the ability of minority homeowners to move to majority-white or integrated neighborhoods by reducing the equity they can use to buy a new home.

24.     By failing to maintain REO dwellings in communities of color according to the same standards as it maintains REO dwellings in predominantly white neighborhoods, Fannie Mae stigmatizes communities of color as less desirable than predominantly white neighborhoods. The prospects for integration in the affected neighborhoods are reduced

1   because white buyers are deterred from becoming owner-occupants in neighborhoods with

2   poorly maintained REO properties, leaving the existing segregated racial composition of these

3   neighborhoods unchanged. At the same time, research has shown that white homeowners in

4    predominantly minority neighborhoods

5   with high concentrations of foreclosed

6   properties have greater resources to leave

7   those neighborhoods, and the presence of

8   poorly maintained REO properties

9   increases their incentive to move out.

10  Neighborhood residents are therefore

11  **Figure 5: Fannie Mae REO in AA neighborhood in Vallejo, CA.**

12  deprived of the social, economic, and

13  professional benefits of living in an integrated community. The U.S. Supreme Court has

14  recognized the harms to neighborhood residents and municipalities "flowing from the realities

15  of a racially segregated community" caused by housing practices that perpetuate racial

16

17  segregation. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 111 (1979).

18      25.    Defendant's systematic and continuing violations of the Fair Housing Act have

19  thwarted Congressional efforts to eradicate housing discrimination and eliminate segregated

20  housing patterns. As the Supreme Court has noted, Congress has delegated private attorney

21  general status to private organizations like Plaintiffs to achieve these purposes. *See Trafficante*

22  *v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211 (1972); *Havens Realty Corp v. Coleman*, 455

23  U.S. 363, 379 (1982).

24

25

26

27

28

26.     Defendant's conduct has caused particularized and concrete injury to the Plaintiffs. Defendant's discriminatory REO maintenance practices have interfered with Plaintiffs' activities and programs designed to promote compliance with fair housing laws, and have frustrated Plaintiffs' missions by perpetuating the very unlawful discrimination and segregation that they are dedicated to dismantling. Plaintiffs' purposes and interests fall squarely within the zone of interests protected by the Fair Housing Act. Defendant's discriminatory behavior has caused Plaintiffs to divert substantial time and resources away from their usual activities and instead to detecting, investigating, and counteracting Defendant's unlawful conduct, and engaging in outreach and education efforts to address Defendant's ongoing discrimination. These efforts are above and beyond the operational activities and costs normally expended by Plaintiffs.



Figure 6: Fannie Mae REO in AA neighborhood in Oakland, CA.

## II.     JURISDICTION AND VENUE

27.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, and 42 U.S.C. § 3613(a).

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendant does business in this district, the Defendant is subject to personal jurisdiction in this district, a substantial part of the events giving rise to these claims occurred in this district, and a substantial part of the property that is the subject of these claims is located in this district.

- 14 -

29.     Intradistrict assignment in the San Francisco and Oakland Division is proper under Civil Local Rule 3.2(c) because a substantial part of the events giving rise to the claims occurred in Alameda County and Contra Costa County.

### III.     PARTIES

**A. Plaintiffs**

30.     Plaintiff National Fair Housing Alliance, Inc. ("NFHA") is a national, nonprofit public service organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business at 1101 Vermont Avenue NW, Suite 710, Washington, D.C. 20005. NFHA is a nationwide alliance of private, nonprofit, fair housing organizations, including organizations in 28 states. NFHA is the only national organization dedicated solely to ending housing discrimination and promoting residential integration. NFHA works throughout the United States to eliminate housing discrimination and to ensure equal opportunity for all people through leadership, education and outreach, membership services, public policy initiatives, advocacy, investigation of fair housing violations, investment in community development and stabilization projects, and enforcement. One of NFHA's goals is the elimination of segregation in housing and the promotion of residential integration. NFHA has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. NFHA implemented a community development program using grants to homeowners and people living in rental properties to make homes accessible to people with disabilities and to senior homeowners in Washington, D.C.'s African-American neighborhoods to bring their homes up to code, so that their homes could qualify for replacement coverage from homeowners insurance companies. Its most recent program, the Inclusive Communities grant

program, provides grants to ameliorate some of the adverse effects of discriminatory practices during the foreclosure crisis. Focusing on predominantly African-American and Latino neighborhoods and clients, these grants promote homeownership through direct down payment and closing cost assistance, invest in emergency repairs and foreclosure prevention measures to preserve existing homeownership, and implement housing repair programs and other blight reducing activities. The grants also provide accessible housing opportunities and facilitate general quality of life improvements to support greenspace development and fresh food access. The Inclusive Communities Grant Program is being implemented by NFHA in 6 metropolitan areas: Baltimore, Maryland; Charleston, South Carolina; Philadelphia, Pennsylvania, Prince George's County, Maryland; Washington, D.C.; and Oakland, California.

31.     Plaintiff Fair Housing Advocates of Northern California (formerly Fair Housing of Marin) ("FHANC") is a nonprofit fair housing organization incorporated under the laws of the State of California with its principal place of business in San Rafael, California in the Northern District of California. FHANC's primary objectives are to promote equal opportunity in the renting, purchasing, financing and advertising of housing; to educate people regarding federal and state fair housing laws; to promote racially integrated communities and neighborhood diversity; and to eliminate discriminatory housing practices. It is engaged in several different activities to further its mission of promoting equal housing opportunities, including: education programs in schools and in the community regarding fair housing and diversity, training programs for real estate professionals, research regarding housing discrimination in the community, pre-purchase education for homebuyers, advocacy for affordable housing, and foreclosure prevention and fair housing counseling.

32.     Plaintiff Central Ohio Fair Housing Association ("COFHA") is a private, nonprofit corporation based in Columbus, Ohio. COFHA recognizes the importance of "home"

- 16 -

as a component of the American dream and seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under state or local laws. One of COFHA's goals is the elimination of segregation in housing and the promotion of residential integration. COFHA has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

33.    Plaintiff Connecticut Fair Housing Center ("CFHC") is a nonprofit organization dedicated to ensuring that all people have equal access to housing opportunities in Connecticut. CFHC provides investigative and legal services to those who believe that they have been the victims of housing discrimination and additionally works with state and local government, as well as housing providers, to promote compliance with federal fair housing laws. One of CFHC's goals is the elimination of segregation in housing and the promotion of residential integration. CFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

34.    Plaintiff Denver Metro Fair Housing Center ("DMFHC") established in 2012, is a private, nonprofit fair housing enforcement agency serving six Denver Metro Counties: Adams, Arapahoe, Broomfield, Denver, Douglas, and Jefferson. DMFHC is dedicated to eliminating housing discrimination and promoting housing choice for all through education, advocacy, and enforcement of fair housing laws. One of DMFHC's goals is the elimination of segregation in housing and the promotion of residential integration. DMFHC has launched multiple educational campaigns to address housing discrimination designed to teach both

- 17 -

consumers and housing professionals about equality of treatment of neighborhoods, the

negative consequences that flow from racial steering, and the benefits of residential diversity.

35.    Plaintiff Fair Housing Center of Central Indiana ("FHCCI") is a private,

nonprofit fair housing organization based in Indianapolis, Indiana and primarily serves 24

counties in Central Indiana. FHCCI's mission is to ensure equal housing opportunities by

eliminating housing discrimination through advocacy, enforcement, education and outreach.

One of FHCCI's goals is the elimination of segregation in housing and the promotion of

residential integration. FHCCI has launched multiple educational campaigns to address

housing discrimination designed to teach both consumers and housing professionals about

equality of treatment of neighborhoods, the negative consequences that flow from racial

steering, and the benefits of residential diversity.

36.    Plaintiff Fair Housing Center of the Greater Palm Beaches ("FHCGPB") is a

nonprofit corporation dedicated to ensuring fair and affordable housing opportunities for all

people, by promoting culturally diverse communities, through open housing and the

elimination of all barriers to that goal. The FHCGPB's primary purpose is the elimination of

housing discrimination on the basis of race, color, national origin, religion, sex, familial status,

disability, marital status, age, sexual orientation, and gender identity or expression throughout

the Greater Palm Beaches area. The FHCGPB seeks the eradication and elimination of direct

and indirect obstacles that limit full access to the housing market throughout Florida and seeks

to end unlawful housing discrimination through enforcement, education, public awareness, and

helping victims enforce their rights. One of FHCGPB's goals is the elimination of segregation

in housing and the promotion of residential integration. FHCGPB has launched multiple

educational campaigns to address housing discrimination designed to teach both consumers

and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

37.   Plaintiff Fair Housing Center of West Michigan ("FHCWM") is a private, non-profit organization established in 1980 to ensure equal housing opportunity as guaranteed under federal, state, and local fair housing laws. Based in Grand Rapids, Michigan, FHCWM works cooperatively throughout Michigan with governmental and community-based agencies to further fair housing goals. In particular, FHCWM investigates claims of illegal housing discrimination; assists claimants in litigation and/or administrative enforcement actions; conducts testing to determine compliance with federal and state laws; and provides practical education to rental, sales, and lending professionals, any organization or professional with a role in the housing industry, and home-seekers.

38.   Plaintiff Fair Housing Continuum, Inc. is a private, nonprofit fair housing agency dedicated entirely to the elimination of housing discrimination in Florida. Fair Housing Continuum serves Brevard, Indian River, Seminole, Osceola, Orange, and Volusia Counties. One of Fair Housing Continuum's goals is the elimination of segregation in housing and the promotion of residential integration. Fair Housing Continuum has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

39.   Plaintiff Greater New Orleans Fair Housing Action Center ("GNOFHAC") is a private, nonprofit civil rights organization established in 1995. For more than 15 years, GNOFHAC has been dedicated to eradicating housing discrimination throughout Southeast Louisiana. GNOFHAC has been responsible for fighting housing discrimination that has arisen in the wake of Hurricane Katrina and, in recent years, from the effects of the economic

1   recession. One of GNOFHAC's goals is the elimination of segregation in housing and the

2   promotion of residential integration. GNOFHAC has launched multiple educational campaigns

3   to address housing discrimination designed to teach both consumers and housing professionals

4   about equality of treatment of neighborhoods, the negative consequences that flow from racial

5   steering, and the benefits of residential diversity.

6        40.     Plaintiff HOPE Fair Housing Center ("HOPE"), established in 1968, is the oldest

7   fair housing center in Illinois. HOPE is based in Wheaton, Illinois and represents 30 counties in

8   Northern and North Central Illinois. HOPE works to end the hurt and devastation of housing

9   discrimination and segregation because of race, color, religion, national origin, sex, disability,

10  familial status, or any other characteristics protected under state or local laws. One of HOPE's

11  goals is the elimination of segregation in housing and the promotion of residential integration.

12  HOPE has launched multiple educational campaigns to address housing discrimination

13  designed to teach both consumers and housing professionals about equality of treatment of

14  neighborhoods, the negative consequences that flow from racial steering, and the benefits of

15  residential diversity.

16       41.     Plaintiff Housing Opportunities Made Equal of Virginia ("HOME of Virginia")

17  is a fair housing and housing counseling organization founded in 1971 to fight discrimination

18  in housing access. HOME of Virginia offers a variety of programs and services designed to

19  ensure equal access to housing for all Virginians. One of HOME's goals is the elimination of

20  segregation in housing and the promotion of residential integration. HOME has launched

21  multiple educational campaigns to address housing discrimination designed to teach both

22  consumers and housing professionals about equality of treatment of neighborhoods, the

23  negative consequences that flow from racial steering, and the benefits of residential diversity.

- 20 -

42.     Plaintiff Housing Opportunities Project for Excellence, Inc. ("HOPE, Inc.") is the first nonprofit fair housing agency organized in the state of Florida and has been responsible for bringing fair housing discriminatory issues out of the hidden corners of the housing industry. HOPE, Inc.'s mission to fight housing discrimination in Miami-Dade and Broward Counties and to ensure equal housing opportunities throughout Florida. One of HOPE's goals is the elimination of segregation in housing and the promotion of residential integration. HOPE has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

43.     Plaintiff Housing Research & Advocacy Center ("HRAC") is a private, non-profit organization, incorporated under the laws of Ohio and located in Cleveland, Ohio. Its mission is to eliminate housing discrimination and assure choice in Northeast Ohio by providing those at risk with effective information, intervention, and advocacy. In furthering this goal, HRAC provides counseling, guidance and support to individuals who encounter discrimination in their search for housing. This may include investigation of their complaints. HRAC also engages in activities designed to encourage fair housing practices by educating consumers of their rights and professionals of their responsibilities under the FHA, identifying barriers to fair housing in order to counteract and eliminate discriminatory housing practices, and by working with elected and government representatives to protect and improve fair housing laws. HRAC also conducts research into housing and lending patterns, and related fair housing matters, throughout Northeast Ohio in order to educate government officials, individuals who work in the housing industry, and the public as a whole regarding housing discrimination and segregation.

44.     Plaintiff Miami Valley Fair Housing Center ("MVFHC") is a private, nonprofit corporation based in Dayton, Ohio. MVFHC recognizes the importance of "home" as a component of the American dream and seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under state or local laws. One of MVFHC's goals is the elimination of segregation in housing and the promotion of residential integration. MVFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

45.     Plaintiff Metro Fair Housing Services, Inc. ("Metro") is a private, nonprofit fair housing organization whose primary purpose is to prevent housing discrimination in the metropolitan Atlanta area and throughout the state of Georgia. Metro was founded in 1974 to promote social justice and eliminate housing and lending inequities for all people, including those with disabilities, through leadership, education and outreach, public policy advocacy, and enforcement. One of Metro's goals is the elimination of segregation in housing and the promotion of residential integration. Metro has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

46.     Plaintiff Metropolitan Milwaukee Fair Housing Council ("MMFHC"), established in 1977, is a private, nonprofit organization that operates a full-service fair housing program. MMFHC serves numerous counties in Wisconsin and works to combat illegal housing discrimination by creating and maintaining racially and economically integrated housing patterns. MMFHC has won numerous awards for its work to eliminate housing

discrimination. One of MMFHC's goals is the elimination of segregation in housing and the promotion of residential integration. MMFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

47.     Plaintiff North Texas Fair Housing Center ("NTFHC") is a nonprofit organization dedicated to eliminating housing discrimination in North Texas. The organization provides counseling, discrimination complaint investigation, and outreach and education programs with the goal of ensuring that all persons have the opportunity to secure the housing they desire and can afford. One of NTFHC's goals is the elimination of segregation in housing and the promotion of residential integration. NTFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

48.     Plaintiff Open Communities is a nonprofit corporation that serves 17 north suburban communities in the Chicago, Illinois area. Open Communities works to promote economically and culturally diverse communities that are welcoming to all in north suburban Chicago. Open Communities educates, advocates, and organizes in the name of social justice. One of Open Communities' goals is the elimination of segregation in housing and the promotion of residential integration. Open Communities has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

49.     Plaintiff South Suburban Housing Center ("SSHC") is a nonprofit community organization that primarily serves the south metropolitan Chicago area including underserved areas of northwest Indiana. SSHC is dedicated to eliminating all forms of discrimination in the housing market through the operation of fair housing enforcement and affirmative housing counseling programs to foster stable, racially and economically, diverse communities. SSHC's primary goal is the elimination of segregation in housing and the promotion of residential integration through expanding housing and mortgage lending choices. SSHC has launched multiple educational activities to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

50.     Plaintiff Toledo Fair Housing Center ("TFHC") is a public service agency operated by Fair Housing Opportunities of Northwest Ohio, Inc., a non-profit corporation organized under the laws of the State of Ohio, with its principal place of business in Toledo, Ohio. The purposes of the TFHC are to identify and eliminate all forms of unlawful discrimination in housing in the greater Toledo area, including discriminatory advertising, marketing, and sales practices; to educate the public about housing discrimination laws, discriminatory housing practices, and the availability of legal remedies for such discriminatory practices; to provide counseling and referral services to the public with respect to housing discrimination matters; and to expand equal housing opportunities for all persons.

51.     All Plaintiffs are "aggrieved persons" within the meaning of the Fair Housing Act, and are authorized to commence litigation to obtain appropriate relief against Defendant Fannie Mae. 42 U.S.C. §3602, 3612, 3613. All Plaintiffs fall within the zone of interests protected by the Fair Housing Act. All Plaintiffs have suffered concrete and particularized

- 24 -

injuries in fact that are fairly traceable to Defendant Fannie Mae's conduct in their communities, and that are likely to be redressed by a favorable judicial decision.

**B. Defendant**

52.     Defendant Federal National Mortgage Association ("Fannie Mae") is a publicly traded company that operates under a congressional charter directing it to increase the availability and affordability of homeownership for low-, moderate- and middle-income Americans. 12 U.S.C. §1716 et seq. Fannie Mae's primary purpose and business activity is to purchase and guarantee home mortgages that meet its funding criteria. Fannie Mae maintains offices throughout the country, including a Regional Office in the State of California.

53.     When a mortgage owned by Fannie Mae goes into default and foreclosure, Fannie Mae eventually obtains title to the dwelling securing the mortgage. The property is thereafter referred to as a "Real Estate Owned" or "REO" dwelling. Once a dwelling becomes an REO property, Fannie Mae assumes all duties and responsibilities of ownership, including ordinary maintenance, while it attempts to market the dwelling for sale to the general public. Fannie Mae conducts routine maintenance to preserve the dwelling so it can be sold and can recover the highest and best market price. REO properties are "dwellings" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602.

**IV.     FACTS**

**A. Defendant Fannie Mae and Its Agents Have Discriminated Against Communities of Color Throughout the Country.**

*a. Fannie Mae's Maintenance of REO Properties*

54.     Once Fannie Mae takes title to a REO property, its stated goal is to perform basic and routine maintenance services on the property that are standard in the REO maintenance industry. Fannie Mae conducts such routine maintenance to preserve the dwelling so it can be

- 25 -

FIRST AMENDED COMPLAINT
Case No. 4:16-cv-06969-JSW: National Fair Housing Alliance, *et al.* v. Federal National Mortgage Association

sold at the highest and best market price. Through its maintenance of its REO properties, Fannie Mae seeks to ensure that they are appealing to prospective buyers and are ready for sale. As Fannie Mae states, its strategy is to "maintain each property in [its] inventory at a level of market-readiness both inside and outside of the property, supporting neighborhood stabilization." Fannie Mae is also required to perform maintenance to ensure that each REO property complies with local codes. To achieve these goals, Fannie Mae has developed its own REO maintenance checklist.

55.    The routine exterior maintenance that Fannie Mae is supposed to perform on all REO properties is objectively measurable, verifiable, and externally visible. Such maintenance activities include, but are not limited to, mowing, weeding, and edging; trimming shrubs and trees; removing snow, trash, and debris; securing doors and windows; repairing or replacing loose handrails and steps; and covering any holes into the dwelling. Under Fannie Mae's policies, these routine exterior maintenance functions are supposed to be met readily and regularly at every REO property, regardless of the condition or location of the property.

56.    During the period of Plaintiffs' investigation, Fannie Mae employed only a small number of agents to perform most of these maintenance functions throughout the entire country. For example, during the year 2013, Fannie Mae contracted with only three companies—Safeguard Properties Management, LLC; Cyprexx Services, LLC; Asset Management Specialists, Inc.—to conduct REO maintenance functions in 47 states. In 2014 the number of REO maintenance agents increased to five, serving all 50 states. According to Fannie Mae's own published standards, all of Fannie Mae's REO maintenance agents are supposed to apply its REO maintenance policies equally across the country, regardless of property location or racial composition of the neighborhood in which the REO property is located.

**b. Plaintiffs' Investigation of Fannie Mae's Exterior Maintenance of REO**

**Properties**

57.     In one of the most comprehensive fair housing investigations conducted under the Fair Housing Act, Plaintiffs investigated Defendant's maintenance of REO properties throughout the country from July 2011 to October 2015. The investigation included over 2,300 residential dwellings covered by the Fair Housing Act.

58.     Plaintiffs' investigation focused on the following metropolitan areas:

| Metropolitan Area | Metropolitan Area |
|---|---|
| Albuquerque, New Mexico | Louisville, Kentucky |
| Atlanta, Georgia | Memphis, Tennessee |
| Baltimore, Maryland | Miami, Florida |
| Baton Rouge, Louisiana | Milwaukee, Wisconsin |
| Charleston, South Carolina | Minneapolis, Minnesota |
| Chicago, Illinois | Muskegon, Michigan |
| Cleveland, Ohio | New Orleans, Louisiana |
| Columbus, Ohio | Newark, New Jersey |
| Dallas, Texas | Orlando, Florida |
| Dayton, Ohio | Philadelphia, Pennsylvania |
| Denver, Colorado | Phoenix, Arizona |
| Ft. Worth, Texas | Providence, Rhode Island |
| Gary, Indiana | Richmond & Oakland, California |
| Grand Rapids, Michigan | Richmond, Virginia |
| Greater Palm Beaches, Florida | San Diego, California |
| Hartford, Connecticut | Toledo, Ohio |
| Indianapolis, Indiana | Tucson, Arizona |
| Kansas City, Missouri | Vallejo, California |
| Las Vegas, Nevada | Washington, D.C. & Prince George's County, Maryland |

59.     In each of these 38 metropolitan areas, Plaintiffs identified the zip codes in a given metropolitan area with the highest foreclosure rates that were racially concentrated (*i.e.* were predominantly African-American, Latino, non-white, or white). Plaintiffs then inspected all (100%) of Fannie Mae's REO properties in those zip codes within the same relative time

period, unless the properties were already occupied or work appeared to be underway at the time of the site visits.

60.     Fannie Mae's ownership of properties was determined by using county property records, records kept by the clerk of courts, RealtyTrac, Fannie Mae's Homepath website, and other database sources. The data was also crosschecked with other records in order to verify the ownership of the homes.

61.     Plaintiffs evaluated Defendant's treatment of these properties according to specific exterior maintenance requirements set forth on Fannie Mae's REO maintenance checklist, which are standard in the REO maintenance industry.[2] According to Fannie Mae's own requirements, all REO properties must be secured within 5-7 calendar days of vacancy; initial lawn maintenance and shrub maintenance must be completed within 10 calendar days of vacancy; and there is no legitimate reason for failing to perform this maintenance for more than a minimal period of time after foreclosure.

62.     Plaintiffs' investigators observed, recorded, and photographed the maintenance condition of Fannie Mae's REO properties with respect to over three dozen exterior factors, such as accumulation of trash and mail, overgrown grass and shrubbery, unsecured doors, damaged steps and handrails, windows and fences, and broken or missing signage. Plaintiffs' investigators recorded their observations. To ensure consistency, investigators utilized a specific glossary of terminology, using samples to illustrate the components being evaluated. The glossary accounted for and illustrated variations in severity. The investigators also photographed the exterior maintenance factors observed. The investigators' reports and pictures were uploaded into a central database, and each property was assigned a neighborhood

---

[2]     *See* sample Fannie Mae Maintenance Checklist, attached as Exhibit A.

1    designation based on racial or ethnic makeup of the Census block group in which the address

2    was located.

3         **c. The Results of Plaintiffs' Investigation of Fannie Mae's Maintenance of REO**

4              **Properties (National Findings)**

5         63.    Plaintiffs' investigation of Fannie Mae's REO properties across the nation

6    establishes that Defendant and its agents knowingly and purposefully treated properties

7    differently depending on the racial composition of the neighborhoods in which the properties

8    were located. In each of the metropolitan areas visited, the REO properties located in

9

10   predominantly white neighborhoods were better maintained and exhibited fewer maintenance

11   deficiencies than the REO properties located in communities of color. Moreover, the severity

12   of the exterior maintenance deficiencies observed in communities of color were significantly

13   worse than for those observed in predominantly white neighborhoods.

14

15        64.    Overall, Plaintiffs documented significant differing treatment in many of the

16   objective factors evaluated. Plaintiffs' observations support an inference that the differences in

17   exterior maintenance in predominantly African-American and Latino communities and

18   predominantly white communities were not the result of chance or happenstance, but rather

19   were caused by the Defendant's and/or its REO maintenance agents' intent to treat

20   predominantly African-American and Latino neighborhoods differently. Fannie Mae was

21   provided photographic evidence from the Plaintiffs clearly showing the failed maintenance in

22   specific neighborhoods of color compared with standard maintenance in White neighborhoods

23   in the same cities/metro areas—and even within the same census tracts—and still refused to

24

25   change its policies or practices. And regardless of Defendant's and/or its agents' intent,

26   Plaintiffs' observations support a finding that Defendant's and/or its agents' policies and

27

28

practices are the proximate cause of the resulting discriminatory effects experienced by neighborhoods of color. For example:

a. 52.8% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 23.6% of the Fannie Mae REO properties in communities of color had fewer than 5 deficiencies.

b. 39.0% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 14.9% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

c. 24.9% of the Fannie Mae REO properties in communities of color had unsecured or broken doors, while only 11.1% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors.

d. 18.3% of the Fannie Mae REO properties in communities of color had damaged steps and handrails on the property, while only 8.9% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails on the property.

e. 41.5% of the Fannie Mae REO properties in communities of color had damaged, boarded, or unsecured windows, while only 19.1% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged, boarded, or unsecured windows.

f. 15.3% of the Fannie Mae REO properties in communities of color had broken or hanging gutters, while only 7.0% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or hanging gutters.

1
2
3
4

65.     Statistical analysis of Plaintiffs' evidence shows a large difference in the average number of deficiencies between communities of color and predominantly white neighborhoods. The average number of deficiencies in communities of color is 7.2, but the average in predominantly white neighborhoods is only 4.8.

5
6
7
8
9
10
11
12
13
14



15
16
17
18

66.     Similarly, the average number of deficiencies in neighborhoods that are over 75% minority is 7.4, while the average in neighborhoods that are less than 25% minority is only 4.7.

19
20
21
22
23
24
25
26
27
28



67.     Further demonstrating the outsized role of race in connection with Fannie Mae's REO maintenance efforts, properties with a large number of deficiencies were disproportionately concentrated in communities of color. 24% of properties in communities of color—but only 6% of those in predominantly white neighborhoods—had ten or more deficiencies.

## 10 or More Deficiencies



68.     All of the disparities identified in paragraphs 63 through 65 are statistically significant at a 99% confidence level ($p<0.01$).[3]

69.     These disparities in treatment are not explained or caused by any other non-racial factors. To the contrary, a regression analysis of the data collected by Plaintiffs confirms that the disparities in Fannie Mae's REO maintenance are attributable to neighborhood racial composition, not to non-racial factors, and that the role of race in determining the difference in disparities is statistically significant.

70.     Plaintiffs' regression analysis incorporated publicly available data from across the country in locations where Plaintiffs investigated Fannie Mae's maintenance practices. The

---

[3] This is based on a two-tailed t test.

data concerned both the individual properties and the areas in which they are located. Specifically, the data included prior sales dates and prices; additional property transfer history; local crime statistics based on FBI standards; local housing market data; property age; dwelling size; lot size; how long properties had been in Fannie Mae's REO inventory at the time of the site visit; and property values.

71.     The results of the regression analyses establish that even after taking into account these non-racial factors, the maintenance deficiencies existing at Fannie Mae REO properties in communities of color remain greater than the maintenance deficiencies existing at Fannie Mae REO properties in predominantly white communities, and that the differences remain statistically significant.

72.     With respect to the average number of deficiencies at Fannie Mae's REO properties in communities of color and predominantly white neighborhoods, respectively, 60% of the difference cannot be explained by the many non-racial factors included in Plaintiffs' regression analyses.

73.     With respect to the average number of deficiencies at properties in neighborhoods that are over 75% minority and less than 25% minority, respectively, 59% of the difference cannot be explained by the non-racial factors.

74.     Similarly, 65% of the difference in the likelihood that a property in a communities of color had ten or more deficiencies, as compared to a property in a predominantly white neighborhood, is unexplained by the non-racial factors in Plaintiffs' regression analyses.

75.     These examples of statistical disparities are merely representative of the numerous forms of data establishing the differential treatment of communities of color as compared to predominantly white neighborhoods.

76.     Plaintiffs' regression analyses demonstrate that the remaining disparities identified in paragraphs 70 to 72 are attributable to neighborhood racial composition. These remaining disparities due to neighborhood race are statistically significant at a 99% or higher confidence level ($p<0.01$).

77.     As explained more fully below, the evidence accumulated by Plaintiffs establishes that the disparity between Fannie Mae's treatment of communities of color and white neighborhoods can only be explained by race.

78.     The differences in maintenance at Defendant's REO properties is consistent in metropolitan areas regardless of their location in the country. They are consistent regardless of which of Defendant's agents was contractually responsible for maintenance in that metropolitan area. Whether analyzed on a national or a metropolitan area basis, the same pattern of discriminatory treatment is evident. The consistent and repetitive pattern of discriminatory treatment across cities and over the span of time indicates that Defendant's practices are the intended and purposeful result of its REO maintenance agents' intentional behavior, and/or the result of policies and practices set at a management level with responsibility for Defendant's policies nationwide.

79.     Defendant's different treatment of REO properties based on the predominant race or ethnicity of neighborhoods is consistent and continuous throughout the period of Plaintiffs' investigation. Whether analyzed on a year-to-year basis or over the entire period of investigation, the same pattern of differential treatment is evident and constitutes a continuing violation of the Fair Housing Act.

**B. Defendant Has Engaged in a Pattern and Practice of Systemic Racial Discrimination In Each of the Cities Served by Plaintiffs.**

80.    In 38 metropolitan areas, Plaintiffs examined Fannie Mae REO properties that were similarly situated, that were observed during the same time period, and that were serviced by the same servicer, but were nevertheless strikingly different in the level of maintenance they received. This pattern remained the same across all 38 metropolitan areas. Taken together, it is clear that Defendant maintained and treated such properties differently based on the racial composition of the neighborhood. In each of the 38 metropolitan areas throughout the United States investigated by Plaintiffs, the general pattern of discrimination and differing treatment based on the predominant race or national origin of neighborhoods is evident. In each of the 38 metropolitan areas investigated by Plaintiffs, a comparison of similarly situated REO properties shows that the Defendant maintained and treated such properties differently based on the racial composition of the neighborhood.

*Albuquerque, NM*

81.    In Albuquerque, NM:

a.    On July 19, 2015, Plaintiffs visited Defendant's REO property located at 4508 Holiday Breeze Pl NE, Albuquerque, NM 87111. This property is located in a census block group with a white population of 65.69%. This property had 1 maintenance deficiency: a bird's nest in a gutter.

b.    On July 19, 2015, Plaintiffs visited Defendant's REO property located at 7605 Blue Avena Ave SW, Albuquerque, NM 87121. This property is located in a census block group with a Hispanic population of 87.25%. This property had 11 maintenance deficiencies, including: a missing for sale sign, dead shrubbery, graffiti

- 35 -

outside and inside property, a boarded window, invasive plants, overgrown weeds, debris/trash, and a damaged fence.

   c. At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Truly Noble Services.

  82. The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties are just some examples of the evidence of Defendant's behavior adduced by Plaintiffs in Albuquerque, NM. Overall, REO properties in predominantly white neighborhoods in the Albuquerque, NM, metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race, the evidence that Plaintiffs gathered in the Albuquerque, NM metropolitan area shows:

   a. 66.7% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 27.8% of the Fannie Mae REO properties in communities of color had fewer than 5 deficiencies.

   b. 72.2% of the Fannie Mae REO properties in communities of color had 5 or more maintenance or marketing deficiencies, while only 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance or marketing deficiencies.

   c. 38.9% of the Fannie Mae REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while none of the Fannie Mae REO

- 36 -

properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

d. 11.1% of the Fannie Mae REO properties in communities of color had trash visible on the property, while none of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

e. 83.3% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery on the property, while only 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery on the property.

f. 44.4% of the Fannie Mae REO properties in communities of color had unsecured or broken doors allowing unfettered access to the interior, while only 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors allowing unfettered access to the interior.

g. 33.3% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

h. 66.7% of the Fannie Mae REO properties in communities of color displayed a no trespassing or warning sign on the property, while only 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods displayed a no trespassing or warning sign on the property.

i. 50.0% of the Fannie Mae REO properties in communities of color had peeled or chipped paint, while none of the Fannie Mae REO properties in predominantly white neighborhoods had peeled or chipped paint.

*Atlanta, GA*

83. In Atlanta, GA:

a. On October 27, 2014, Plaintiffs visited Defendant's REO property located at 410 Utoy Circle, Atlanta, GA 30331. This property is located in a census block group with an African-American population of 96.32%. This property exhibited the following maintenance deficiencies: an insect infestation, obstructed and broken gutters, missing steps and handrails, an overgrown backyard, a damaged soffit, graffiti, and a broken mailbox.

b. On November 1, 2014, Plaintiffs visited Defendant's REO property located at 3493 Canadian Way, Tucker, GA 30084. This property is located in a census block group with a white population of 55.3%. This property exhibited only 1 maintenance deficiency: accumulated mail.

c. At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Asset Management Specialists, Inc.

84. The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Atlanta, GA. Overall, REO properties in predominantly white neighborhoods in the Atlanta, GA, metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities

of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Atlanta, GA metropolitan area shows:

a. 61.5% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 10.0% of the Fannie Mae REO properties in communities of color had fewer than 5 deficiencies.

b. 90.0% of the Fannie Mae REO properties in communities of color had 5 or more maintenance or marketing deficiencies, while only 38.5% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance or marketing deficiencies.

c. 25.0% of the Fannie Mae REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 3.8% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

d. 17.5% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 3.8% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

e. 40.0% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery on the property, while only 11.5% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery on the property.

f. 32.5% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 15.4% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

g. 50.0% of the Fannie Mae REO properties in communities of color displayed a no trespassing or warning sign on the property, while only 26.9% of the Fannie Mae REO properties in predominantly white neighborhoods displayed a no trespassing or warning signs on the property.

h. 55.0% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while 26.9% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

*Baltimore, MD*

85. In Baltimore, MD:

a. On October 14, 2014, Plaintiffs visited Defendant's REO property located at 3134 Northway Drive, Parkville, MD 21234. This property is located in a census block group with a white population of 57.29%. This property had 3 maintenance deficiencies: telephone books left on the porch, overgrown grass, and a broken mailbox.

- 40 -

b.   On October 14, 2014, Plaintiffs visited Defendant's REO property located at

1842 Loch Shiel Rd, Parkville, MD 21234. This property is

located in a census block group with a majority non-white

population of 51.08%. This property exhibited 8 maintenance

deficiencies: a missing for sale sign, overgrown grass, an

uncovered hole in the front door, litter/trash, a code violation

notice for weeds/grass, and a dead tree branch leaning on roof.

c.   At the time of Plaintiffs' investigation, both of these properties were

maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties

Management, LLC.

86.     The foregoing facts showing differing maintenance and differing treatment based

on neighborhood racial composition of otherwise similarly situated REO properties is just one

example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Baltimore,

MD. Overall, REO properties in predominantly white neighborhoods in the Baltimore, MD

metropolitan area were far more likely to have a small number of maintenance deficiencies or

problems than REO properties in communities of color, while REO properties in communities

of color were far more likely to have large numbers of such deficiencies or problems than those

in predominantly white neighborhoods. For example, and without listing all examples of

differing maintenance because of race or national origin, the evidence that Plaintiffs gathered

in the Baltimore, MD metropolitan area shows:

a.   31.4% of the Fannie Mae REO properties in communities of color had 10 or

more maintenance or marketing deficiencies, while only 16.7% of the Fannie Mae REO

properties in predominantly white neighborhoods had 10 or more maintenance or

marketing deficiencies.

- 41 -

b.   45.7% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

c.   37.1% of the Fannie Mae REO properties in communities of color had missing or out-of-place gutters, while only 13.3% of the Fannie Mae REO properties in predominantly white neighborhoods had missing or out-of-place gutters.

d.   17.1% of the Fannie Mae REO properties in communities of color had broken or hanging gutters, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or hanging gutters.

e.   62.9% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 26.7% of the Fannie Mae REO properties in predominantly white neighborhoods had dead or overgrown shrubbery

f.   40% of the Fannie Mae REO properties in communities of color had holes in the structure, while only 16.7% of the Fannie Mae properties in predominantly white neighborhoods had holes in the structure.

*Baton Rouge, LA*

87.   In Baton Rouge, LA:

a.   On March 11, 2013, Plaintiffs visited Defendant's REO property located at 4048 Clayton Drive, Baton Rouge, LA 70805. This property is located in a census block group with an African-American population of 94.89%. This property had 12 maintenance deficiencies, including: overgrown grass, dead grass, accumulated mail, invasive plants,



- 42 -

1    loose/hanging siding, trash, boarded windows, overgrown weeds, damaged steps, and

2    an overgrown front walkway.

3        b.   On March 13, 2013, Plaintiffs visited Defendant's REO property located at

4    36447 Crestway Ave., Prairieville, LA 70769. This

5    property is located in a census block group with a

6    white population of 78.52%. This property had only 1

7    maintenance deficiency: a damaged wooden platform

8    left in the backyard.

9

10       c.   At the time of Plaintiffs' investigation, both of these properties were

11   maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties

12   Management, LLC.

13   88.    The foregoing facts showing differing maintenance and differing treatment based

14   on neighborhood racial composition of otherwise similarly situated REO properties is just one

15   example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Baton

16   Rouge, LA. Overall, REO properties in predominantly white neighborhoods in Baton Rouge,

17   LA, were far more likely to have a small number of maintenance deficiencies or problems than

18   REO properties in communities of color, while REO properties in communities of color were

19   far more likely to have large numbers of such deficiencies or problems than those in

20   predominantly white neighborhoods. For example, and without listing all examples of differing

21   maintenance because of race or national origin, the evidence that Plaintiffs gathered in Baton

22   Rouge, LA shows:

23

24

25       a.  55.6% of the Fannie Mae REO properties in predominantly white neighborhoods

26           had fewer than 5 maintenance or marketing deficiencies, while none of the

27           Fannie Mae REO properties in communities of color had fewer than 5

28

- 43 -

maintenance or marketing deficiencies.

b. 44.4% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance or marketing deficiencies, while 100% of the Fannie Mae REO properties in communities of color had 5 or more maintenance or marketing deficiencies.

c. 63.6% of the Fannie Mae REO properties in communities of color had trash visible in the property, while none of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible in the property.

d. 45.5% of the Fannie Mae REO properties in communities of color had damaged siding, while only 11.1% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

e. 81.8% of the Fannie Mae REO properties in communities of color had 10%-50% of the lawn covered in dead grass, while only 22.2% of the Fannie Mae REO properties in predominantly white neighborhoods had 10%-50% of the lawn covered in dead grass.

*Charleston, SC*

89.  In Charleston, SC:

a.   On July 17, 2012, Plaintiffs visited Defendant's REO property located at 5906 Hagood Avenue, Hanahan, SC 29410. This property is located in a census block group with a white population of 60.38%. This property had only 2 maintenance deficiencies: dead grass and a small amount of mold.

b.   On July 17, 2012, Plaintiffs visited Defendant's REO property located at

2226 Bailey Drive, North Charleston SC 29405. This property is located in a census

block group with an African-American population of

90.55%. This property had 10 maintenance

deficiencies: overgrown grass, an overgrown

shrubbery, damaged doors, boarded windows, a

boarded foundation, wood rot, holes in the structure

of the home, peeling and chipped paint, damaged siding, and a small amount of mold.

c.   At the time of Plaintiffs' investigation, both of these properties were

maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties

Management, LLC.

90.   The foregoing facts showing differing maintenance and differing treatment based

on neighborhood racial composition of otherwise similarly situated REO properties is just one

example of the evidence of Defendant's differing treatment adduced by Plaintiffs in

Charleston, SC. Overall, REO properties in predominantly white neighborhoods in Charleston,

SC, were far more likely to have a small number of maintenance deficiencies or problems than

REO properties in communities of color, while REO properties in communities of color were

far more likely to have large numbers of such deficiencies or problems than those in

predominantly white neighborhoods. For example, and without listing all examples of differing

maintenance because of race or national origin, the evidence that Plaintiffs gathered in

Charleston, SC shows:

a. 77.8% of the Fannie Mae REO properties in predominantly white neighborhoods

had fewer than 5 maintenance or marketing deficiencies, while only 25.0% of the

- 45 -

Fannie Mae REO properties in communities of color had fewer than 5 maintenance or marketing deficiencies.

b.  50.0% of the Fannie Mae REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c.  50.0% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while none of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

d.  50.0% of the Fannie Mae REO properties in communities of color had overgrown grass and leaves, while none of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown grass and leaves.

e.  50.0% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while none of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

f.  50.0% of the Fannie Mae REO properties in communities of color had wood rot, while only 22.2% of Fannie Mae REO properties in predominantly white neighborhoods had wood rot.

*Chicago, IL*

91.    In the Chicago, IL metropolitan area:

a.   On October 31, 2014, Plaintiffs visited Defendant's REO property located at

16740 Oleander Ave, Tinley Park, IL 60477. This

property is located in a census block group with a white

population of 87.75%. This property had only 1

maintenance deficiency: a hole in the fence.



b.   On October 31, 2014, Plaintiffs visited Defendant's REO property located at

7351 S University Ave, Chicago, IL 60619. This property is located in a census block

group with an African-American population of 96.93%. This property had 13

maintenance deficiencies: trash, an extremely

overgrown back yard, boarded front and back doors,

obstructed gutters, broken gutters, it was marketed as a

distressed home, dead branches and leaves, invasive

plants, and weeds.



c.   At the time of Plaintiffs' investigation, both of these properties were

maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties

Management, LLC.

92.    The foregoing facts showing differing maintenance and differing treatment based

on neighborhood racial composition of otherwise similarly situated REO properties is just one

example of the evidence of Defendant's differing treatment adduced by Plaintiffs in the

Chicago metropolitan area. Overall, REO properties in predominantly white neighborhoods in

the Chicago, IL metropolitan area were far more likely to have a small number of maintenance

deficiencies or problems than REO properties in communities of color, while REO properties

- 47 -

1   in communities of color were far more likely to have large numbers of such deficiencies or

2   problems than those in predominantly white neighborhoods. For example, and without listing

3   all examples of differing maintenance because of race or national origin, the evidence that

4   Plaintiffs gathered in the Chicago, IL metropolitan area shows:

5
6       a. 75.7% of the Fannie Mae REO properties in communities of color had 5 or more
7           maintenance deficiencies or problems, while 47.8% of the Fannie Mae REO
8           properties in predominantly white neighborhoods had 5 or more maintenance
9           deficiencies or problems.

10      b. 17.9% of the Fannie Mae REO properties in communities of color had damaged
11          steps and handrails, while only 7.2% of the Fannie Mae REO properties in
12          predominantly white neighborhoods had damaged steps and handrails.

13      c. 13.3% of the Fannie Mae REO properties in communities of color had utilities
14          that were exposed or tampered with, while only 7.8% of the Fannie Mae REO
15          properties in predominantly white neighborhoods had utilities that were exposed
16          or tampered with.
17

18      d. 11.6% of the Fannie Mae REO properties in communities of color had broken or
19          hanging gutters, while only 4.4% of the Fannie Mae REO properties in
20          predominantly white neighborhoods had broken or hanging gutters.

21
22      e. 36.4% of the Fannie Mae REO properties in communities of color had broken or
23          boarded windows, while only 15.0% of the Fannie Mae REO properties in
24          predominantly white neighborhoods had broken or boarded windows.

25
26
27
28

*Cleveland, OH*

93.  In Cleveland, OH:

a.  On October 8, 2014, Plaintiffs visited Defendant's REO property located at 12418 Garland Ave., Cleveland, OH 44125. This property is located in a census block group with a white population of 65.83%. This property had only 1 maintenance deficiency: broken window panel on garage.

b.  On October 8, 2014, Plaintiffs visited Defendant's REO property located at 381 East 160th Street, Cleveland, OH 44110. This property is located in a census block group with an African-American population of 85.29%. This property had 11 maintenance deficiencies: unsecured doors, broken windows, tree falling in back yard, damaged gutters, damaged steps, peeling paint, discoloration, and mold on foundation.

c.  At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties Management, LLC.

94.  The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Cleveland, OH. Overall, REO properties in predominantly white neighborhoods in Cleveland, OH were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing

- 49 -

maintenance because of race or national origin, the evidence that Plaintiffs gathered in Cleveland, OH shows:

a. 93.3% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 58.6% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

b. 40.0% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while only 6.9% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 80.0% of the Fannie Mae REO properties in communities of color had damaged siding, while only 34.5% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

d. 40.0% of the Fannie Mae REO properties in communities of color had wood rot, while only 13.8% of the Fannie Mae REO properties in predominantly white neighborhoods had wood rot.

e. 33.3% of the Fannie Mae REO properties in communities of color had holes in the structure, while only 17.2% of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure.

f. 53.3% of the Fannie Mae REO properties in communities of color had a damaged roof, while only 13.8% of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged roof.

g. 46.7% of the Fannie Mae REO properties in communities of color had trash on

the property, while only 3.4% of the Fannie Mae REO properties in

predominantly white neighborhoods had trash on the property.

*Columbus, OH*

95.    In Columbus, OH:

a.   On October 8, 2014, Plaintiffs visited Defendant's REO property located at 150 Yehlshire Dr., Galloway, OH 43119. This property is located in a census block group with a white population of 80.21%. This property had only 2 maintenance deficiencies: warning sign and missing gate.

b.   On October 8, 02014, Plaintiffs visited Defendant's REO property located at 941 S. 22nd St., Columbus, OH 43206. This property is located in a census block group with an African-American population of 64.55%. This property had 15 maintenance deficiencies: missing for sale sign, a boarded side door, boarded windows, a damaged fence, trash, overgrown shrubs, invasive plants, a broken mailbox, and uncovered holes in structure and on the porch.

c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties Management, LLC.

96.    The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Columbus, OH. Overall, REO properties in predominantly white neighborhoods in Columbus, OH were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far

more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Columbus, OH shows:

a.  40.9% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while none of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b.  75.0% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while only 9.1% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c.  75.0% of the Fannie Mae REO properties in communities of color had holes in the structure, while none of the Fannie Mae REO properties in communities of color had holes in the structure.

d.  87.5% of the Fannie Mae REO properties in communities of color had wood rot, while only 4.5% of the Fannie Mae REO properties in predominantly white neighborhoods had wood rot.

e.  25.0% of the Fannie Mae REO properties in communities of color had 50% or more of the property covered in invasive plants, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 50% or more of the property covered in invasive plants.

f.  12.5% of the Fannie Mae REO properties in communities of color had graffiti, while none of the Fannie Mae REO properties in predominantly white neighborhoods had graffiti.

g.  25.0% of the Fannie Mae REO properties in communities of color had broken on hanging gutters, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or hanging gutters.

*Dallas, TX*

97.   In Dallas, TX:

a.   On June 10, 2014, Plaintiffs visited Defendant's REO property located at 1909 Water Fall Way, Wylie, TX 75098. This property is located in a census block group with a white population of 67.19%. This property had only 2 maintenance deficiencies: dead grass and a trespassing or warning sign.



b.   On June 12, 2014, Plaintiffs visited Defendant's REO property located at 6407 Lovett Avenue, Dallas, TX 75227. This property is located in a census block group with a Hispanic population of 84.76%. This property had 12 maintenance deficiencies: accumulated mail, overgrown shrubbery, dead grass, invasive plants, an unsecured door, a broken window, a damaged roof, a dilapidated shed, no professional "for sale" sign marketing the home, peeling and chipped paint, a damaged carport pole, and a small amount of mold.



- 53 -

c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Asset Management Specialists, Inc.

98.     The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Dallas, TX. Overall, REO properties in predominantly white neighborhoods in Dallas, TX were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Dallas, TX shows:

a. 75.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 28.6% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 28.6% of the Fannie Mae REO properties in communities of color had trash visible on the property, while none of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

c. 33.3% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

d. 28.6% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

e. 33.3% of the Fannie Mae REO properties in communities of color had holes in the structure, while none of the Fannie Mae properties in predominantly white neighborhoods had holes in the structure.

f. 42.9% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 8.3% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

g. 61.9% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while only 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

*Dayton, OH*

99.   In Dayton, OH:

a.   On October 6, 2014, Plaintiffs visited Defendant's REO property located at 3495 Cottage Point Way, Dayton, OH 43449. This property is located in a census block group with a white population of 83.46%. This property had only 1 maintenance deficiency: damage to siding.



b.   On October 6, 2014, Plaintiffs visited Defendant's REO property located at 451 Grafton Ave, Dayton, OH 43406. This property is located in a census block group with a majority non-white population of 78.9%. This property had 13 maintenance deficiencies: a missing for sale



- 55 -

sign, a boarded window, an unsecured door, trash, uncovered holes, obstructed gutters, dead grass, overgrown shrubbery, and a damaged fence.

      c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties Management, LLC.

100.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Dayton, OH. Overall, REO properties in predominantly white neighborhoods in Dayton, OH were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Dayton, OH shows:

      a. 47.6% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while none of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

      b. 57.7% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while only 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

- 56 -

c. 42.3% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while only 11.4% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

d. 63% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while only 15.9% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

e. 70.4% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while only 40.9% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

*Denver, CO*

101. In Denver, CO:

a. On March 6, 2013, Plaintiffs visited Defendant's REO property located at 6232 South Spotswood Street, Centennial, CO 80210. This property is located in a census block group with a white population of 85.12%. This property had only 3 maintenance deficiencies: accumulated mail, no trespassing sign and damaged siding.

b. On March 6, 2013, Plaintiffs visited Defendant's REO property located at 2249 Macon St, Aurora, CO 80010. This property is located in a census block group with a majority non-white population of 78.02%. This property had 12 maintenance deficiencies: a damaged fence, uncovered holes, broken windows, boarded windows, dead shrubbery, broken downspout, missing shutters, dead grass, and trash.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

       c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties Management, LLC.

     102.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in the Denver, CO metropolitan area. Overall, REO properties in predominantly white neighborhoods in the Denver, CO metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Denver, CO metropolitan area shows:

       a.   71.4% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 15.8% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

       b.   84.2% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 28.6% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

       c.   42.1% of the Fannie Mae REO properties in communities of color had missing or out of place gutters, while none of the Fannie Mae REO properties in predominantly white neighborhoods had missing or out of place gutters.

- 58 -

d. 42.1% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

e. 15.8% of the Fannie Mae REO properties in communities of color had broken or discarded signage, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or discarded signage.

f. 21.1% of the Fannie Mae REO properties in communities of color had 50% or more of the lawn covered in dead grass, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 50% or more of the lawn covered in dead grass.

g. 21.1% of the Fannie Mae REO properties in communities of color had holes in the structure, while none of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure.

*Fort Worth, TX*

103.   In Ft. Worth, TX:

a.   On July 22, 2014, Plaintiffs visited Defendant's REO property located at 8513 Minturn Drive, Fort Worth, TX 76131. This property is located in a census block group with a white population of 50.74%. This property had 5 maintenance deficiencies: accumulated mail, dead shrubbery, a trespassing or warning sign, a broken gutter, and a damaged utility cover.

b.   On July 22, 2014, Plaintiffs visited Defendant's REO property located at 2921 Livingston Avenue, Fort Worth, TX 76110. This property is located in a census block group with a Hispanic population of 62.08%. This property had 13 maintenance deficiencies: trash and debris, accumulated mail, dead leaves, overgrown and dead shrubbery, dead grass, invasive plants, an unsecured door, a boarded window, a damaged fence, holes in the structure of



the home, trespassing or warning signs, peeling and chipped paint, and damaged siding.

c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Asset Management Specialists, Inc.

104.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Ft. Worth, TX. Overall, REO properties in predominantly white neighborhoods in Fort Worth, TX were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Fort Worth, TX shows:

a. 40.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 27.3% of the

Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 9.1% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

c. 90.9% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while only 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

d. 27.3% of the Fannie Mae REO properties in communities of color had damaged siding, while only 13.3% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

e. 45.5% of the Fannie Mae REO properties in communities of color had holes in the structure, while only 26.7% of the Fannie Mae properties in predominantly white neighborhoods had holes in the structure.

*Gary, IN*

105.    In Gary, IN:

a.    On September 11, 2014, Plaintiffs visited Defendant's REO property located at 930 N. Lakeview Dr., Lowell, IN 46356. This property is located in a census block group with a white population of 95.1%. This property had 3 maintenance deficiencies: overgrown shrubbery, damaged soffit/siding, and holes where the soffit was damaged.

b.    On September 11, 2014, Plaintiffs visited Defendant's REO property located at 2330 Pierce St., Gary, IN 46403. This property is located in a census block group with a majority non-white population of 99.49%. This property had 9 maintenance deficiencies: missing for sale sign, missing basement window pane slate, trash/litter,

overgrown grass, dead cutting on lawn, damaged steps, missing handrails, and damaged siding.

      c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties Management, LLC.

106.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Gary, IN. Overall, REO properties in predominantly white neighborhoods in Gary, IN were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Gary, IN shows:

      a. 60.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 30.0% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

      b. 70.0% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 40.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 40.0% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

d. 60.0% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

e. 40.0% of the Fannie Mae REO properties in communities of color had obstructed gutters, while only 13.3% of the Fannie Mae REO properties in predominantly white neighborhoods had obstructed gutters.

*Grand Rapids, MI*

107.   In Grand Rapids, MI:

a.   On August 29, 2012, Plaintiffs visited Defendant's REO property located at 1701 Bridge Street Northwest, Grand Rapids MI 49504. This property is located in a census block group with a white population of 86.27%. This property had only 1 maintenance deficiency: peeling and chipped paint.

b.   On August 27, 2012, Plaintiffs visited Defendant's REO property located at 1142 Kalamazoo Avenue, Grand Rapids, MI 49507. This property is located in a census block group with an African-American population of 72.75%. This property had 10 maintenance deficiencies: trash, overgrown grass, overgrown shrubbery, missing screens, unsecured doors, broken and boarded windows, a damaged fence, a dilapidated garage, damaged siding, and exposed or tampered-with utilities.

c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Asset Management Specialists, Inc.

108.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Grand Rapids, MI. Overall, REO properties in predominantly white neighborhoods in Grand Rapids, MI were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Grand Rapids, MI shows:

a.  52.2% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 9.1% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b.  90.9% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 47.8% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c.  72.7% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 21.7% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 27.3% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while only 4.3% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

e. 63.6% of the Fannie Mae REO properties in communities of color had overgrown grass and leaves, while only 26.1% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown grass and leaves.

*Greater Palm Beaches, FL*

109.   In the Greater Palm Beaches, FL, metropolitan area:

a.   On October 23, 2014, Plaintiffs visited Defendant's REO property located at 180 Cordoba Circle, West Palm Beach, FL 33411. This property is located in a census block group with a white population of 51.74%. This property had only 3 maintenance deficiencies: trash and debris, a damaged fence, and no professional "for sale" sign marketing the home.

b.   On October 27, 2014, Plaintiffs visited Defendant's REO property located at 5912 Bimini Circle West, West Palm Beach, FL 33407. This property is located in a census block group with an African-American population of 82.64%. This property had 13 maintenance deficiencies: trash and debris, overgrown grass and dead leaves, dead grass, a broken mailbox, wasp nests, boarded windows, a damaged fence, holes in the structure of the home, a dilapidated shed, wood rot, no professional "for sale" sign marketing the home, pervasive mold, and exposed or tampered-with utilities.

- 65 -

c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Cyprexx Services, LLC.

110.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in in the Greater Palm Beaches, FL metropolitan area. Overall, REO properties in predominantly white neighborhoods in the Greater Palm Beaches, FL metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Greater Palm Beaches, FL metropolitan area shows:

a.  33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 16.7% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b.  83.3% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 66.7% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c.  33.3% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

d. 38.9% of the Fannie Mae REO properties in communities of color had overgrown

or dead shrubbery, while none of the Fannie Mae REO properties in

predominantly white neighborhoods had overgrown or dead shrubbery.

e. 11.1% of the Fannie Mae REO properties in communities of color had a damaged

roof, while none of the Fannie Mae REO properties in predominantly white

neighborhoods had a damaged roof.

*Hartford, CT*

111.   In Hartford, CT:

a.   On July 18, 2013, Plaintiffs visited Defendant's REO property located at 39 Heather Lane, Manchester CT 06040. This property is located in a census block group with a white population of 80.02%. This property had 4 maintenance deficiencies: accumulated mail, no professional "for sale" sign marketing the home, peeling and chipped paint, and a small amount of mold.

b.   On July 15, 2013, Plaintiffs visited Defendant's REO property located at 19 Wade Street, Hartford, CT 06002. This property is located in a census block group with an African-American population of 78.70%. This property had 13 maintenance deficiencies: accumulated mail, overgrown grass and dead leaves, overgrown shrubbery, invasive plants, a dead groundhog, damaged steps, a damaged roof, wood rot, a damaged awning, no professional "for sale" sign marketing the home, peeling and chipped paint, missing gutters, and hanging gutters.

- 67 -

c.  At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Cyprexx Services, LLC.

112.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Hartford, CT. Overall, REO properties in predominantly white neighborhoods in the Hartford, CT metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Hartford, CT metropolitan area shows:

a.  20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 7.7% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b.  69.2% of the Fannie Mae REO properties in communities of color had more than 10 maintenance deficiencies or problems, while only 10.0% of the Fannie Mae REO properties in communities of color had more than 10 maintenance deficiencies or problems.

c.  46.2% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 53.8% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while only 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

*Indianapolis, IN*

113.    In Indianapolis, IN:

a.   On October 29, 2014, Plaintiffs visited Defendant's REO property located at 5334 Montavia Lane, Indianapolis, IN 46239. This property is located in a census block group with a white population of 85.40%. This property had only 1 maintenance deficiency: a trespassing or warning sign.

b.   On October 28, 2014, Plaintiffs visited Defendant's REO property located at 3839 North Campbell Avenue, Indianapolis, IN 46226. This property is located in a census block group with an African-American population of 93.65%. This property had 8 maintenance deficiencies: overgrown shrubbery, missing handrails, broken and boarded windows, a damaged fence, a broken screen door, trespassing or warning signs, obstructed gutters, and a small amount of mold.

c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties Management, LLC.

114.    The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Indianapolis, IN. Overall, REO properties in predominantly white neighborhoods in Indianapolis, IN were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities

- 69 -

of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Indianapolis, IN show:

    a. 50.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 11.8% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

    b. 88.2% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 50.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

    c. 58.8% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while 31.8% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

    d. 64.7% of the Fannie Mae REO properties in communities of color had obstructed gutters, while only 27.3% of the Fannie Mae REO properties in predominantly white neighborhoods had obstructed gutters.

    e. 35.3% of the Fannie Mae REO properties in communities of color had a damaged fence, while only 20.5% of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged fence.

*Kansas City, MO*

115.   In Kansas City, MO:

   a.   On March 5, 2014, Plaintiffs visited Defendant's REO property located at 23304 West 90th Terrace, Lenexa, KS 66227. This property is located in a census block group with a white population of 88.42%. This property had 2 maintenance deficiencies: a trespassing or warning sign and no professional "for sale" sign marketing the home.

   b.   On March 5, 2014, Plaintiffs visited Defendant's REO property located at 6835 College Avenue, Kansas City, MO 64132. This property is located in a census block group with an African-American population of 94.45%. This property had 9 maintenance deficiencies: trash and debris, overgrown grass and dead leaves, invasive plants, an unsecured shed, damaged handrails, a damaged fence, trespassing or warning signs, no professional "for sale" sign marketing the home, and broken gutters.

   c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Cyprexx Services, LLC.

116.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Kansas City, MO. Overall, REO properties in predominantly white neighborhoods in Kansas City, MO were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing

maintenance because of race or national origin, the evidence that Plaintiffs gathered in Kansas City, MO shows:

   a. 72.7% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 25.0% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

   b. 75.0% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 27.3% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

   c. 31.3% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

   d. 46.9% of the Fannie Mae REO properties in communities of color had broken or hanging gutters, while 9.1% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or hanging gutters.

   e. 56.3% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while only 18.2% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

*Las Vegas, NV*

   117.   In Las Vegas, NV:

       a.   On October 17, 2012, Plaintiffs visited Defendant's REO property located at 11110 Alora Street, Las Vegas, NV 89141. This property is located in a census block

group with a white population of 55.88%. This property had no maintenance deficiencies.

      b.  On October 16, 2012, Plaintiffs visited Defendant's REO property located at 750 Capaldi Drive, Las Vegas, NV 89110. This property is located in a census block group with a non-white population of 68.37%. This property had 8 maintenance deficiencies: dead shrubbery, dead grass, wood rot, a trespassing or warning sign, peeling and chipped paint, standing water, obstructed gutters, and exposed or tampered-with utilities.

      c.  At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Cyprexx Services, LLC.

118.  The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Las Vegas, NV. Overall, REO properties in predominantly white neighborhoods in Las Vegas, NV were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Las Vegas, NV shows:

      a. 83.3% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while 75.0% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 40.6% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while only 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

c. 34.4% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

d. 9.4% of the Fannie Mae REO properties in communities of color had a damaged fence, while none of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged fence.

*Louisville, KY*

119.  In Louisville, KY:

a.  On September 21, 2015, Plaintiffs visited Defendant's REO property located at 5312 Georgia Lane, Louisville, KY 40219. This property is located in a census block group with a white population of 73.13%. This property had 3 maintenance deficiencies: accumulated mail, a trespassing or warning sign, and peeling and chipped paint.

b.  On September 22, 2015, Plaintiffs visited Defendant's REO property located at 131 North 38th Street, Louisville, KY 40212. This property is located in a census block group with an African-American population of 85.01%. This property had 11 maintenance deficiencies: trash and debris, overgrown and dead shrubbery, a broken mailbox, unsecured and boarded

- 74 -

1    doors, damaged and broken windows, a dilapidated shed, trespassing or warning signs,

2    graffiti, damaged siding, missing gutters, and a small amount of mold.

3         c.   At the time of Plaintiffs' investigation, both of these properties were

4    maintained by the same Fannie Mae subcontractor/agent, Cyprexx Services, LLC.

5    120.   The foregoing facts showing differing maintenance and differing treatment based

6    on neighborhood racial composition of otherwise similarly situated REO properties is just one

7    example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Louisville,

8    KY. Overall, REO properties in predominantly white neighborhoods in Louisville, KY were

9    far more likely to have a small number of maintenance deficiencies or problems than REO

10   properties in communities of color, while REO properties in communities of color were far

11   more likely to have large numbers of such deficiencies or problems than those in

12   predominantly white neighborhoods. For example, and without listing all examples of differing

13   maintenance because of race or national origin, the evidence that Plaintiffs gathered in

14   Louisville, KY shows:

15        a. 73.3% of the Fannie Mae REO properties in predominantly white neighborhoods

16            had fewer than 5 maintenance deficiencies or problems, while only 8.3% of the

17            Fannie Mae REO properties in communities of color had fewer than 5

18            maintenance deficiencies or problems.

19        b. 91.7% of the Fannie Mae REO properties in communities of color had 5 or more

20            maintenance deficiencies or problems, while only 26.7% of the Fannie Mae REO

21            properties in predominantly white neighborhoods had 5 or more maintenance

22            deficiencies or problems.

- 75 -

c. 58.3% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

d. 33.3% of the Fannie Mae REO properties in communities of color had mail accumulated, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had mail accumulated.

e. 58.3% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while only 20.0% of Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

*Memphis, TN*

121.   In Memphis, TN:

a.   On May 23, 2013, Plaintiffs visited Defendant's REO property located at 2304 Lovitt Drive, Memphis, TN 38119. This property is located in a census block group with a white population of 76.80%. This property had only 2 maintenance deficiencies: dead grass and a damaged fence.



b.   On May 22, 2013, Plaintiffs visited Defendant's REO property located at 4027 University Street, Memphis, TN 38127. This property is located in a census block group with an African-American population of 90.48%. This property had 10 maintenance deficiencies: trash and debris, overgrown grass and leaves, overgrown shrubbery, an unsecured door, a damaged fence, wood rot, a dilapidated

shed, no professional "for sale" sign marketing the home, peeling and chipped paint, and a small amount of mold.

       c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties Management, LLC.

     122.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Memphis, TN. Overall, REO properties in predominantly white neighborhoods in Memphis, TN were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Memphis, TN shows:

       a.  70.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 11.4% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

       b.  88.6% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 30.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 54.3% of the Fannie Mae REO properties in communities of color had trash on

the property, while none of the Fannie Mae REO properties in predominantly

white neighborhoods had trash on the property

d. 68.6% of the Fannie Mae REO properties in communities of color had broken or

boarded widows, while only 20.0% of the Fannie Mae REO properties in

predominantly white neighborhoods had broken or boarded windows.

e. 34.3% of the Fannie Mae REO properties in communities of color had overgrown

or dead shrubbery, while only 10.0% of the Fannie Mae REO properties in

predominantly white neighborhoods had overgrown or dead shrubbery.

*Miami, FL*

123.   In the Miami, FL metropolitan area:

a.   On October 17, 2014, Plaintiffs visited Defendant's REO property located at

9746 Darlington Place, Ft. Lauderdale, 33328. This property is located in a census

block group with a white population of 60.66%. This property had 2 maintenance

deficiencies: litter around the shrubs and a missing for sale sign.

b.   On October 28,2014, Plaintiffs

visited Defendant's REO property located at

17311 NW 29 Pl, Opa Locka, FL 33056. This

property is located in a census block group

with an African-American population of



75.78%. This property exhibited 16 maintenance deficiencies, including: unsecured

pool area, overgrown grass, unlocked doors, invsaive plants, trash, accumulated mail,

dead shrubbery, uncovered holes, damaged soffet, damaged fence, warning sign, and

water damage/discoloration.

- 78 -

c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Cyprexx Services, LLC.

124.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in the Miami, FL metropolitan area. Overall, REO properties in predominantly white neighborhoods in the Miami, FL metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Miami, FL metropolitan area shows:

a. 26.7% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 4.1% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 59.2% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while 26.7% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 42.9% of the Fannie Mae REO properties in communities of color had broken or boarded widows, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had broken or boarded windows.

d. 24.5% of the Fannie Mae REO properties in communities of color had a damaged roof, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged roof.

e. 67.3% of the Fannie Mae REO properties in communities of color had holes in the structure, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure.

*Milwaukee, WI*

125. In Milwaukee, WI:

a. On March 24, 2015, Plaintiffs visited Defendant's REO property located at 1971 S. 77th Street, Milwaukee, WI 53219. This property is located in a census block group with a white population of 80.33%. This property had only 1 maintenance deficiency: dead shrubbery.



b. On March 24, 2015, Plaintiffs visited Defendant's REO property located at 1302 S. 25th Street Milwaukee, WI 53204. This property is located in a census block group with a majority non-white population of 82.92%. This property had 5 maintenance deficiencies: accumulated mail, trash, graffiti, missing for sale sign, and peeling paint.



c. At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Cyprexx Services, LLC.

126. The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in the

- 80 -

Milwaukee, WI metropolitan area. Overall, REO properties in predominantly white neighborhoods in Milwaukee, WI were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Milwaukee, WI shows:

a. 66.9% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 39.9% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 60.1% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 33.1% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 26.9% of the Fannie Mae REO properties in communities of color had visible trash on the property, while only 6.6% of the Fannie Mae properties in predominantly white neighborhoods had visible trash on the property.

d. 47.2% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while only 19.9% of the Fannie Mae properties in predominantly white neighborhoods had broken or boarded windows.

e. 31.6% of the Fannie Mae REO properties in communities of color had damaged siding, while only 15.4% of the Fannie Mae properties in predominantly white neighborhoods had damaged siding.

*Minneapolis, MN*

127.   In Minneapolis, MN:

a.   On October 29, 2014, Plaintiffs visited Defendant's REO property located at 824 24th Ave NE, Minneapolis, MN 55418. This property is located in a census block group with a white population of 75.93%. This property had only1 maintenance deficiencies: no trespassing sign.

b.   On October 29, 2014, Plaintiffs visited Defendant's REO property located at 3338 Fremont Ave N, Minneapolis, MN 55412. This property is located in a census block group with an African-American population of 71.23%. This property had 9 maintenance deficiencies: missing for sale sign, boarded windows, a boarded door, dead leaves covering property, uncovered holes, obstructed gutters, broken unsecured garage door, and overgrown shrubbery.

c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties Management, LLC.

128.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Minneapolis, MN. Overall, REO properties in predominantly white neighborhoods in Minneapolis, MN were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of

differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Minneapolis, MN shows:

    a. 66.7% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 13.6% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

    b. 86.4% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

    c. 54.5% of the Fannie Mae REO properties in communities of color had visible trash on the property, while none of the Fannie Mae properties in predominantly white neighborhoods had visible trash on the property.

    d. 45.5% of the Fannie Mae REO properties in communities of color had broken or boarded windows, while only 6.7% of the Fannie Mae properties in predominantly white neighborhoods had broken or boarded windows.

    e. 72.7% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 13.3% of the Fannie Mae properties in predominantly white neighborhoods had overgrown or dead shrubbery.

    f. 22.7% of the Fannie Mae REO properties in communities of color had a damaged fence, while none of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged fence.

*Muskegon, MI*

129.   In Muskegon, MI:

    a.   On October 22, 2014, Plaintiffs visited Defendant's REO property located at 2293 Moon Street, Muskegon, MI 49441. This property is located in a census block group with a white population of 86.57%. This property had only 2 maintenance deficiencies: damaged steps and an undrained pool.

    b.   On October 22, 2014, Plaintiffs visited Defendant's REO property located at 3221 6th Street, Muskegon, MI 49444. This property is located in a census block group with an African-American population of 68.61%. This property had 11 maintenance deficiencies: dead leaves, a bird's nest, boarded doors, boarded windows, a damaged roof, wood rot, damaged garage, peeling and chipped paint, damaged siding, water damage, and a small amount of mold.

    c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, GTJ Consulting, LLC.

130.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Muskegon, MI. Overall, REO properties in predominantly white neighborhoods in Muskegon, MI were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Muskegon, MI shows:

a. 60.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 14.3% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 42.9% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 42.9% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while none of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

d. 57.1% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 6.7% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

e. 71.4% of the Fannie Mae REO properties in communities of color had damaged siding, while only 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

*New Orleans, LA*

131.   In New Orleans, LA:

a.   On January 17, 2014, Plaintiffs visited Defendant's REO property located at 513 Mare Ct, Covington, LA 70435. This property is located in a census block group with a white population of 86.32%. This property had only 2 maintenance deficiencies: accumulated mail and a coke can stuck in garage door.

- 85 -

b.   On January 17, 2014, Plaintiffs visited Defendant's REO property located at 73381 Hwy 59, Covington, LA 70458. This property is located in a census block group with a majority non-white population of 55.78%. This property had 7 maintenance deficiencies: missing for sale sign, warning no trespassing sign, damaged siding, trash, holes in structure, leaves covering back yard, and overgrown weeds.

c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties Management, LLC.

132.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in New Orleans, LA. Overall, REO properties in predominantly white neighborhoods in New Orleans, LA were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in New Orleans, LA shows:

a. 29.4% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while none of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 34.5% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while only 17.6% of the Fannie Mae REO

properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c.  75.9% of the Fannie Mae REO properties in communities of color had visible trash on the property, while only 11.8% of the Fannie Mae properties in predominantly white neighborhoods had visible trash on the property.

d.  17.2% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

e.  51.7% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 17.6% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

*Newark, NJ*

133.  In the Newark, NJ metropolitan area:

a.  On August 5, 2015, Plaintiffs visited Defendant's REO property located at 620 Larch Street, Roselle Park, NJ 07204. This property is located in a census block group with a white population of 65.33%. This property had only 2 maintenance deficiencies: peeling and chipped paint, and damaged siding.

1

2

3

4

5

6

7

8

9

     b.   On August 6, 2015, Plaintiffs visited Defendant's REO property located at 42 Westcott Street, East Orange, NJ 07017. This property is located in a census block group with an African-American population of 86.86%. This property had 11 maintenance deficiencies: trash and debris, accumulated mail, overgrown shrubbery, dead grass, invasive plants, an unsecured window, a damaged fence, a leaning "for sale" sign, damaged siding, missing gutters, and a small amount of mold.



10

11

     c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, First Allegiance, LLC.

12

13

14

15

16

17

18

19

20

21

22

23

134.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in the Newark, NJ metropolitan area. Overall, REO properties in predominantly white neighborhoods in the Newark, NJ metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Newark, NJ metropolitan area shows:

24

25

26

27

     a. 81.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 16.2% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

28

b. 37.8% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 54.1% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 4.8% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

d. 43.2% of the Fannie Mae REO properties in communities of color had damaged siding, while only 9.5% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

e. 70.3% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 19.0% of the Fannie Mae REO properties in predominantly white neighborhoods had dead or overgrown shrubbery

*Orlando, FL*

135.  In the Orlando, FL metropolitan area:

a.  On August 12, 2015, Plaintiffs visited Defendant's REO property located at 1694 Sarong Place, Winter Park, FL 32792. This property is located in a census block group with a white population of 70.73%. This property had only 2 maintenance deficiencies: accumulated mail and an insect nest.

b.   On August 12, 2015 Plaintiffs visited Defendant's REO property located at

1002 Emeralda Road, Orlando, FL 32808. This property is

located in a census block group with a majority non-white

population of 78.73%. This property had 15 maintenance

deficiencies: a broken mailbox, trash, dead grass, a damaged

fence, broken windows, obstructed gutters, exposed utilities,

uncovered holes in soffits and structure, and overgrown

shrubbery.



c.   At the time of Plaintiffs' investigation, both of these properties were

maintained by the same Fannie Mae subcontractor/agent, Cyprexx Services, LLC.

136.   The foregoing facts showing differing maintenance and differing treatment based

on neighborhood racial composition of otherwise similarly situated REO properties is just one

example of the evidence of Defendant's differing treatment adduced by Plaintiffs in the

Orlando, FL metropolitan area. Overall, REO properties in predominantly white neighborhoods

in the Orlando, FL metropolitan area were far more likely to have a small number of

maintenance deficiencies or problems than REO properties in communities of color, while

REO properties in communities of color were far more likely to have large numbers of such

deficiencies or problems than those in predominantly white neighborhoods. For example, and

without listing all examples of differing maintenance because of race or national origin, the

evidence that Plaintiffs gathered in the Orlando, FL metropolitan area shows:

a. 17.1% of the Fannie Mae REO properties in predominantly white neighborhoods

had fewer than 5 maintenance deficiencies or problems, while only 6.8% of the

Fannie Mae REO properties in communities of color had fewer than 5

maintenance deficiencies or problems.

b. 43.2% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 25.0% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while only 11.4% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

d. 38.6% of the Fannie Mae REO properties in communities of color had overgrown grass and/or accumulated dead leaves, while only 5.7% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown grass and/or accumulated dead leaves.

e. 54.5% of the Fannie Mae REO properties in communities of color holes in the structure, while only 28.6% of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure.

*Philadelphia, PA*

137. In the Philadelphia, PA metropolitan area:

a. On October 12, 2015, Plaintiffs visited Defendant's REO property located at 209 Leon Avenue, Norwood, PA 19074. This property is located in a census block group with a white population of 94.11%. This property had only 2 maintenance deficiencies: invasive plants and a missing gutter.

b.   On October 12, 2015, Plaintiffs visited Defendant's REO property located at 6569 North Lambert Street, Philadelphia, PA 19138. This property is located in a census block group with an African-American population of 94.35%. This property had 9 maintenance deficiencies: trash and debris, overgrown shrubbery, invasive plants, broken windows, wood rot, holes in the structure of the home, graffiti, peeling and chipped paint, and damaged siding.



c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Assero Services, LLC.

138.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in the Philadelphia, PA metropolitan area. Overall, REO properties in predominantly white neighborhoods in the Philadelphia, PA metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Philadelphia, PA metropolitan area shows:

a. 57.1% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 31.7% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

- 92 -

b. 68.3% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 42.9% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 54.0% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 27.0% of the Fannie Mae REO properties in communities of color had damaged siding, while only 11.4% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

e. 41.3% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

*Phoenix, AZ*

139.   In the Phoenix, AZ metropolitan area:

a.   On November 8, 2011, Plaintiffs visited Defendant's REO property located at 8776 West Dreyfus Drive, Peoria, AZ 85381. This property is located in a census block group with a white population of 76.47%. This property had only 1 maintenance deficiency: a broken sign.

b.   On November 9, 2011, Plaintiffs visited Defendant's REO property located at 6805 West Cypress Street, Phoenix, AZ 85035. This property is located in a census block group with a Hispanic population of 83.85%. This property had 15 maintenance deficiencies: trash and debris, accumulated mail, overgrown grass, overgrown and dead shrubbery, dead grass, boarded doors, boarded windows, a damaged roof, a damaged fence, wood rot, holes in the structure of the home, no professional "for sale" sign marketing the home, peeling and chipped paint, damaged siding, and exposed or tampered-with utilities.



c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, which upon information and belief was Safeguard Properties Management, LLC.

140.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in the Phoenix, AZ metropolitan area. Overall, REO properties in predominantly white neighborhoods in the Phoenix, AZ metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Phoenix, AZ metropolitan area shows:

a. 66.7% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 50.0% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 50.0% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 33.3% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 42.9% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 57.1% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while 16.7% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

e. 35.7% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 8.3% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

*Providence, RI*

141.   In Providence, RI:

a.   On July 8, 2015, Plaintiffs visited Defendant's REO property located at 56 Alfred Avenue, Johnston, RI 02919. This property is located in a census block group with a white population of



- 95 -

1    90.78%. This property had only 2 maintenance deficiencies: accumulated mail and an

2    undrained pool.

3        b.   On July 8, 2015, Plaintiffs visited Defendant's REO property located at 6

4    Seton Street, Providence, RI 02909. This property is

5    located in a census block group with a non-white

6    population of 56.10%. This property had 7

7    maintenance deficiencies: accumulated mail,

8    overgrown grass, overgrown shrubbery, invasive

9

10   plants, an unsecured door, no professional "for sale" sign marketing the home, and

11   damaged siding.

12        c.   At the time of Plaintiffs' investigation, both of these properties were

13   maintained by the same Fannie Mae subcontractor/agent, Cityside Management Corp.

14   142.   The foregoing facts showing differing maintenance and differing treatment based

15   on neighborhood racial composition of otherwise similarly situated REO properties is just one

16   example of the evidence of Defendant's differing treatment adduced by Plaintiffs in

17   Providence, RI. Overall, REO properties in predominantly white neighborhoods in Providence,

18   RI were far more likely to have a small number of maintenance deficiencies or problems than

19   REO properties in communities of color, while REO properties in communities of color were

20   far more likely to have large numbers of such deficiencies or problems than those in

21   predominantly white neighborhoods. For example, and without listing all examples of differing

22

23   maintenance because of race or national origin, the evidence that Plaintiffs gathered in

24   Providence, RI shows:

25        a. 70.0% of the Fannie Mae REO properties in predominantly white neighborhoods

26        had fewer than 5 maintenance deficiencies or problems, while only 20.0% of the

27

28

- 96 -

Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 20.0% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 60.0% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 10.0% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 80.0% of the Fannie Mae REO properties in communities of color had 10%-50% of the property covered in invasive plants, while only 30.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 10%-50% of the property covered in invasive plants.

e. 40.0% of the Fannie Mae REO properties in communities of color had damaged siding, while only 10.0% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

*Richmond and Oakland, CA*

143.   In Richmond and Oakland, CA:

a.   On October 13, 2011, Plaintiffs visited Defendant's REO property located at 5251 Grasswood Ct, Concord, CA 94521. This property is located in a census block group with a white population of 59.25%. This property had only 3 maintenance deficiencies: dead grass, no trespassing sign and chipped paint.

- 97 -

b.   On October 11, 2011, Plaintiffs visited Defendant's REO property located at 2139 39th Ave, Oakland, CA 94601. This property is located in a census block group with a majority non-white population of 75.15%. This property had 16 maintenance deficiencies: a broken for sale sign, an unsecured door, damaged steps, a damaged fence, broken downspout, standing water, uncovered holes, accumulated mail, and a cracked window.

c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Field Asset Services, Inc.

144.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Richmond and Oakland, CA. Overall, REO properties in predominantly white neighborhoods in Richmond and Oakland, CA were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Richmond and Oakland, CA shows:

a.  50.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 33.8% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 66.2% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 50.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 35.1% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 21.4% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 32.4% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 14.3% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

e. 33.8% of the Fannie Mae REO properties in communities of color had holes in the structure of the home, while none of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure of the home.

f. 35.1% of the Fannie Mae REO properties in communities of color had no professional "for sale" sign marketing the home, while only 14.3% of the Fannie Mae REO properties in predominantly white neighborhoods had no professional "for sale" sign marketing the home.

g. 36.5% of the Fannie Mae REO properties in communities of color had damaged siding, while only 7.1% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

h. 20.3% of the Fannie Mae REO properties in communities of color had missing or out of place gutters, while only 7.1% of the Fannie Mae REO properties in predominantly white neighborhoods had missing or out of place gutters.

*Richmond, VA*

145.   In the Richmond, VA metropolitan area:

a.   On May 30, 2014, Plaintiffs visited Defendant's REO property located at 9602 Benbow Court, Richmond, VA 23235. This property is located in a census block group with a white population of 60.46%. This property had only 3 maintenance deficiencies: no trespassing sign, chipped paint, and cable wire exposed.

b.   On May 30, 2014, Plaintiffs visited Defendant's REO property located at 515 St. James Street, Richmond, VA 23220. This property is located in a census block group with a majority non-white population of 52.55%. This property had 15 maintenance deficiencies: missing for sale sign, boarded door, uncovered holes in structure, boarded window, invasive weeds, trash and debris, damaged stucco, no trespassing sign, peeling paint, discoloration/mold,

c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Cyprexx Services, LLC.

146.   The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Richmond, VA. Overall, REO properties in predominantly white neighborhoods in the Richmond, VA metropolitan area were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of

- 100 -

differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in the Richmond, VA metropolitan area shows:

      a. 58.8% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 17.4% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

      b. 39.1% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

      c. 52.2% of the Fannie Mae REO properties in communities of color had overgrown or dead shrubbery, while only 5.9% of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

      d. 43.5% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

      e. 39.1% of the Fannie Mae REO properties in communities of color had holes in the structure of the home, while only 5.9% of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure of the home.

*San Diego, CA*

      147.   In the San Diego, CA metropolitan area:

         a.   On July 14, 2013, Plaintiffs visited Defendant's REO property located at 3683 Texas Street #2, San Diego, CA 92104. This property is located in a census block

group with a white population of 71.73%. This property had no maintenance

deficiencies.

    b.   On July 9, 2013, Plaintiffs visited Defendant's REO property located at

7383 Skyline Drive, San Diego, CA 92114. This property is located in a census block

group with a non-white population of 96.73%. This property had 6 maintenance

deficiencies: trash and debris, dead grass, a broken window, a broken screen door,

wood rot, and a trespassing or warning sign.

    c.   At the time of Plaintiffs' investigation, both of these properties were

maintained by the same Fannie Mae subcontractor/agent, Asset Management

Specialists, Inc.

148.   The foregoing facts showing differing maintenance and differing treatment based

on neighborhood racial composition of otherwise similarly situated REO properties is just one

example of the evidence of Defendant's differing treatment adduced by Plaintiffs in the San

Diego, CA metropolitan area. Overall, REO properties in predominantly white neighborhoods

in the San Diego, CA metropolitan area were far more likely to have a small number of

maintenance deficiencies or problems than REO properties in communities of color, while

REO properties in communities of color were far more likely to have large numbers of such

deficiencies or problems than those in predominantly white neighborhoods. For example, and

without listing all examples of differing maintenance because of race or national origin, the

evidence that Plaintiffs gathered in the San Diego, CA metropolitan area shows:

    a. 42.9% of the Fannie Mae REO properties in predominantly white neighborhoods

        had fewer than 5 maintenance deficiencies or problems, while only 25.0% of the

        Fannie Mae REO properties in communities of color had fewer than 5

        maintenance deficiencies or problems.

- 102 -

b. 15.0% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while none of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 45.0% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 14.3% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 30.0% of the Fannie Mae REO properties in communities of color had overgrown grass and leaves, while none of the Fannie Mae REO properties in predominantly white neighborhoods had overgrown grass and leaves.

e. 25.0% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

*Toledo, OH*

149.   In the Toledo, OH metropolitan area:

a.   On October 17, 2014, Plaintiffs visited Defendant's REO property located at 6539 Glenhurst Dr., Maumee, OH 43537. This property is located in a census block group with a white population of 86.68%. This property had 4 maintenance deficiencies: one overgrown shrub, side gate removed, stain on siding, and bent screen.

b.  On October 17, 2014, Plaintiffs visited
Defendant's REO property located at 328
Cumberland Pl, Toledo, OH 43610. This property is
located in a census block group with an African-
American population of 91.0%. This property had 11
maintenance deficiencies: trash, invasive plants, large branches left on roof,
accumulated mail, obstructed gutters, damaged fence,
damaged soffit, missing and damaged gutters, peeling
paint, uncovered holes, and water damage to wood
around windows.

c.  At the time of Plaintiffs' investigation, both of these properties were
maintained by the same Fannie Mae subcontractor/agent, Safeguard Properties
Management, LLC.

150.  The foregoing facts showing differing maintenance and differing treatment based
on neighborhood racial composition of otherwise similarly situated REO properties is just one
example of the evidence of Defendant's differing treatment adduced by Plaintiffs in the
Toledo, OH metropolitan area. Overall, REO properties in predominantly white neighborhoods
in Toledo, OH were far more likely to have a small number of maintenance deficiencies or
problems than REO properties in communities of color, while REO properties in communities
of color were far more likely to have large numbers of such deficiencies or problems than those
in predominantly white neighborhoods. For example, and without listing all examples of
differing maintenance because of race or national origin, the evidence that Plaintiffs gathered
in Toledo, OH shows:

- 104 -

a. 32.4% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 9.8% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

b. 37.3% of the Fannie Mae REO properties in communities of color had 10 or more maintenance deficiencies or problems, while 13.5% of the Fannie Mae REO properties in predominantly white neighborhoods had 10 or more maintenance deficiencies or problems.

c. 31.4% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while only 12.2% of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

d. 25.5% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 5.4% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

e. 78.4% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while 36.5% of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

f. 58.8% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while 29.7% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

*Tucson, AZ*

151. In Tucson, AZ:

a. On October 20, 2012, Plaintiffs visited Defendant's REO property located at 5731 East 9th Street, Tucson, AZ 85711. This property is located in a census block

- 105 -

group with a white population of 64.86%. This property had only 2 maintenance

deficiencies: accumulated mail and trespassing or warning signs.

  b.   On October 20, 2012, Plaintiffs visited Defendant's REO property located at

1525 South Jefferson Avenue, Tucson AZ 85711. This property is located in a census

block group with a non-white population of 62.92%. This property had 7 maintenance

deficiencies: overgrown grass, dead grass, invasive plants, a damaged fence, trespassing

or warning signs, damaged siding, and exposed or tampered-with utilities.

  c.   At the time of Plaintiffs' investigation, both of these properties were

maintained by the same Fannie Mae subcontractor/agent, which upon information and

belief was Safeguard Properties Management, LLC.

152.   The foregoing facts showing differing maintenance and differing treatment based

on neighborhood racial composition of otherwise similarly situated REO properties is just one

example of the evidence of Defendant's differing treatment adduced by Plaintiffs in Tucson,

AZ. Overall, REO properties in predominantly white neighborhoods in Tucson, AZ were far

more likely to have a small number of maintenance deficiencies or problems than REO

properties in communities of color, while REO properties in communities of color were far

more likely to have large numbers of such deficiencies or problems than those in

predominantly white neighborhoods. For example, and without listing all examples of differing

maintenance because of race or national origin, the evidence that Plaintiffs gathered in Tucson,

AZ shows:

  a. 76.9% of the Fannie Mae REO properties in predominantly white neighborhoods

    had fewer than 5 maintenance deficiencies or problems, while only 50.0% of the

    Fannie Mae REO properties in communities of color had fewer than 5

    maintenance deficiencies or problems.

- 106 -

b. 50.0% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while only 23.1% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

c. 36.4% of the Fannie Mae REO properties in communities of color had damaged siding, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

d. 9.1% of the Fannie Mae REO properties in communities of color had unsecured or broken doors and locks, while none of the Fannie Mae REO properties in predominantly white neighborhoods had unsecured or broken doors and locks.

e. 27.3% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while only 15.4% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

*Vallejo, CA*

153.    In the Vallejo, CA metropolitan area:

a.    On February 13, 2014, Plaintiffs visited Defendant's REO property located at 3575 Larchmont Court, Fairfield, CA 94534. This property is located in a census block group with a white population of 58.75%. This property had only 2 maintenance deficiencies: dead shrubbery and dead grass.

b.    On February 4, 2014 Plaintiffs visited Defendant's REO property located at 1106 Kentucky Street, Vallejo, CA 94590. This property is located in a census block group with a non-white population of 76.95%. This property had 14 maintenance deficiencies: trash and debris, accumulated mail, dead leaves, dead shrubbery, dead grass, invasive plants, a damaged fence, holes in the structure of home, trespassing or

- 107 -

1   warning signs, peeling and chipped paint, damaged siding, an uneven paint job on the

2   home's siding, and a missing gutter.

3          c.   At the time of Plaintiffs' investigation, both of these properties were

4   maintained by the same Fannie Mae subcontractor/agent, Asset Management

5   Specialists, Inc.

6   154.   The foregoing facts showing differing maintenance and differing treatment based

7   on neighborhood racial composition of otherwise similarly situated REO properties is just one

8   example of the evidence of Defendant's differing treatment adduced by Plaintiffs in the

9   Valeejo, CA metropolitan area. Overall, REO properties in predominantly white

10   neighborhoods in the Vallejo, CA metropolitan area were far more likely to have a small

11   number of maintenance deficiencies or problems than REO properties in communities of color,

12   while REO properties in communities of color were far more likely to have large numbers of

13   such deficiencies or problems than those in predominantly white neighborhoods. For example,

14   and without listing all examples of differing maintenance because of race or national origin, the

15   evidence that Plaintiffs gathered in the Vallejo, CA metropolitan area shows:

16         a.   47.4% of the Fannie Mae REO properties in predominantly white neighborhoods

17             had fewer than 5 maintenance deficiencies or problems, while only 34.7% of the

18             Fannie Mae REO properties in communities of color had fewer than 5

19             maintenance deficiencies or problems.

20         b.   12.2% of the Fannie Mae REO properties in communities of color had 10 or more

21             maintenance deficiencies or problems, while none of the Fannie Mae REO

22             properties in predominantly white neighborhoods had 10 or more maintenance

23             deficiencies or problems.

c. 38.8% of the Fannie Mae REO properties in communities of color had trash visible on the property, while only 10.5% of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

d. 22.4% of the Fannie Mae REO properties in communities of color had 10.0% to 50.0% of the property covered in invasive plants, while only 10.5% of the Fannie Mae REO properties in predominantly white neighborhoods had 10.0% to 50.0% of the property covered in invasive plants.

e. 10.2% of the Fannie Mae REO properties in communities of color had damaged steps and handrails, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged steps and handrails.

f. 8.2% of the Fannie Mae REO properties in communities of color had a damaged roof, while none of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged roof.

g. 22.4% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while 10.5% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

h. 30.6% of the Fannie Mae REO properties in communities of color had holes in the structure of the home, while only 15.8% of the Fannie Mae REO properties in predominantly white neighborhoods had holes in the structure of the home.

i. 30.6% of the Fannie Mae REO properties in communities of color had damaged siding, while only 15.8% of the Fannie Mae REO properties in predominantly white neighborhoods had damaged siding.

*Washington, D.C. & Prince George's County, MD*

155.    In the Washington, D.C. and Prince George's County, MD area:

a.   On June 4, 2014, Plaintiffs visited Defendant's REO property located at 23414 Winemiller Way, Clarksburg, MD 20871. This property is located in a census block group with a white population of 56.15%. This property had 1 maintenance deficiency: a hanging sign fell from the post for sale sign.

b.   On June 4, 2014, Plaintiffs visited Defendant's REO property located at 23219 Murdock Ridge Way, Clarksburg, MD 20871. This property is located in a census block group with a majority non-white population of 66.93%. This property had 3 maintenance deficiencies: overgrown grass, trespassing warning sign, and small amount of discoloration/algae.

c.   At the time of Plaintiffs' investigation, both of these properties were maintained by the same Fannie Mae subcontractor/agent, Cyprexx Services, LLC.

156.    The foregoing facts showing differing maintenance and differing treatment based on neighborhood racial composition of otherwise similarly situated REO properties is just one example of the evidence of Defendant's differing treatment adduced by Plaintiffs in the Washington, D.C. & Prince George's County, MD area. Overall, REO properties in predominantly white neighborhoods in Washington, D.C. & Prince George's County, MD were far more likely to have a small number of maintenance deficiencies or problems than REO properties in communities of color, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in predominantly white neighborhoods. For example, and without listing all examples of differing maintenance because of race or national origin, the evidence that Plaintiffs gathered in Washington, D.C. & Prince George's County, MD shows:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    a.  80.0% of the Fannie Mae REO properties in predominantly white neighborhoods had fewer than 5 maintenance deficiencies or problems, while only 27.3% of the Fannie Mae REO properties in communities of color had fewer than 5 maintenance deficiencies or problems.

    b.  72.7% of the Fannie Mae REO properties in communities of color had 5 or more maintenance deficiencies or problems, while 20.0% of the Fannie Mae REO properties in predominantly white neighborhoods had 5 or more maintenance deficiencies or problems.

    c.  30.9% of the Fannie Mae REO properties in communities of color had trash visible on the property, while none of the Fannie Mae REO properties in predominantly white neighborhoods had trash visible on the property.

    d.  49.1% of the Fannie Mae REO properties in communities of color had peeling or chipped paint, while none of the Fannie Mae REO properties in predominantly white neighborhoods had peeling or chipped paint.

    e.  27.3% of the Fannie Mae REO properties in communities of color had broken or hanging gutters, while none of the Fannie Mae REO properties in predominantly white neighborhoods had broken or hanging gutters.

    f.  36.4% of the Fannie Mae REO properties in communities of color had damaged or boarded windows, while none of the Fannie Mae REO properties in predominantly white neighborhoods had damaged or boarded windows.

    g.  32.7% of the Fannie Mae REO properties in communities of color had a damaged fence, while none of the Fannie Mae REO properties in predominantly white neighborhoods had a damaged fence.

- 111 -

**C. Plaintiffs Advised Fannie Mae of Its Systemic Racial Discrimination, But Fannie Mae Did Not Change Its Behavior.**

157.   During an initial investigation into the maintenance of REO properties throughout the lending industry in 2009-2010, Plaintiffs observed that many of the REO properties demonstrating poor maintenance in communities of color were owned by Defendant Fannie Mae. NFHA held several meetings with Fannie Mae officials—including several vice-presidents and senior vice presidents with ultimate responsibility for REO management and maintenance—and shared evidence gathered from the investigations, including photographs and dates of the investigations, to demonstrate the nature and extent of the failed maintenance in communities of color as compared to white neighborhoods. Subsequently, in 2012, Plaintiffs published and disseminated the results of its industry-wide investigation, *see* http://www.nationalfairhousing.org/Portals/33/Banks%20are%20Back%20Final%2012.3.2012.pdf , and continued to engage with Fannie Mae officials. While this report did not name specific lenders or Fannie Mae, Plaintiffs informed Fannie Mae of its findings regarding Fannie Mae-owned properties and appealed to Fannie Mae to instruct its REO maintenance agents to cease and desist their discriminatory behavior. Plaintiffs even offered examples of Freddie Mac maintaining its REO properties in predominantly minority neighborhoods to a quality standard that Fannie Mae should adopt. Plaintiffs thereafter continued to gather additional evidence regarding Fannie Mae's agents' maintenance of its REO properties. Prior to the initiation of this litigation, Plaintiffs met several more times with multiple sets of Fannie Mae officials, informing Fannie Mae officials repeatedly that their agents' maintenance of REO properties remained discriminatory because the same discriminatory pattern was unchanged since 2009.

158.   At these meetings, Plaintiffs provided photographs and comparative data to Fannie Mae demonstrating its agents' poor maintenance of REO properties in communities of color. Plaintiffs specifically identified which of Fannie Mae's agents performing the REO maintenance—including Safeguard Properties Management, LLC; Cyprexx Services, LLC; and Asset Management Specialists, Inc.—were engaging in the discriminatory maintenance behavior. Plaintiffs asked Fannie Mae to take appropriate action against its agents, and to eliminate its own corporate policies (identified below) that contributed to its agents' discriminatory behavior.

159.   Despite Plaintiffs' providing notice and factual evidence of its agents' discriminatory behavior, Fannie Mae officials did nothing to change that behavior, renewed its contracts with these same agents, and allowed the discrimination to continue. Plaintiffs continued to investigate the behavior of Fannie Mae and its agents after these meetings, but the discrimination continued.

160.   In 2013 and 2014, Plaintiffs filed with the U.S. Department of Housing and Urban Development ("HUD") several administrative complaints of discrimination against Defendant's REO maintenance agents pursuant to 42 U.S.C. § 3610, including Safeguard Properties Management, LLC, Cyprexx Services, LLC, and Asset Management Specialists, Inc.. Plaintiffs advised Defendant of those HUD administrative complaints against its agents, and continued to offer concrete solutions to the ongoing problem of discriminatory differing treatment. Plaintiffs made more attempts to obtain voluntary compliance and met with Fannie Mae representatives again in September 2014 and January 2015.

161.   After six years of meetings with the Defendant and expanding their investigations to 38 metropolitan areas, on May 13, 2015, Plaintiffs filed with HUD an administrative complaint of discrimination against Defendant Fannie Mae pursuant to 42

- 113 -

1  U.S.C. § 3610. That administrative complaint, as well as the administrative complaints against

2  its REO maintenance agents, was voluntarily withdrawn by Plaintiffs after this litigation was

3  filed.

4       162.   Despite Plaintiffs' notices and lengthy efforts to obtain Fannie Mae's voluntary

5  compliance with the Fair Housing Act, and with intent and knowledge of the allegations above,

6  and deliberate indifference, Fannie Mae did not change its behavior, continued to use the same

7  maintenance agents, did not manage the discriminatory behavior of its maintenance agents, and

8  continued to maintain its REO properties differently based on the predominant race or national

9

10  origin of neighborhoods.

11       163.   Not only was Fannie Mae thus put on actual notice of the discriminatory

12  maintenance described in this complaint, Fannie Mae is well aware of the negative effects that

13  poorly maintained REO dwellings can have on neighborhoods. Fannie Mae maintains a

14  website that lists all of its REO inventory: www.homepath.com. On this website, Fannie Mae

15  states that, in addition to maintaining its REO inventory to a level of market readiness, it also

16  strives to "be a good neighbor," "support marketing efforts," and "support neighborhood

17  stabilization." Its stated goals include to "minimize Fannie Mae's exposure to potential

18

19  property damage and liability and remove any REO stigma from Fannie Mae-owned

20  properties."

21       164.   The Homepath website also states that "Fannie Mae's property maintenance

22  practices are part of its overall neighborhood stabilization efforts, which include prioritizing

23  sales to owner occupants and selling properties in a timely manner to promote stability and

24

25  minimize the impact to the local community."

26       165.   Fannie Mae has also maintained a "First Look" program throughout the time that

27  Plaintiffs were conducting their REO investigation. The First Look program allows owner-

28

occupants and non-profits to purchase foreclosures for 20 days prior to when they are made available to investors. The program was created at Fannie Mae to "promote homeownership and support neighborhood stabilization." Yet, most homeowners are not inclined to purchase a poorly maintained home, and many real estate agents will not actively show homes in poor condition, so in communities of color the 20-day First Look program does little to nothing to prevent investor purchases from dominating the REO market.

166.    Fannie Mae's statements and programs demonstrate its understanding that adequate REO maintenance and disposition are a critical component of neighborhood stabilization and recovery. They also establish Fannie Mae's knowledge that neglecting its REO properties and allowing them to deteriorate has a direct, negative effect on entire neighborhoods. Despite this awareness of the negative effects of poorly maintained REO dwellings, and despite its stated business policy of maintaining properties for market readiness, Fannie Mae acted in a manner that is inconsistent with these standards, even after Plaintiffs presented evidence that its agents were poorly maintaining REO dwellings in neighborhoods of color.

**D. Fannie Mae and/or Its Agents Have Acted With Intent to Discriminate Because of Race or With Deliberate Indifference to the Racial Consequences of Their Actions.**

167.    The evidence Plaintiffs have accumulated thus far and set forth above strongly suggests that Fannie Mae and/or its agents have acted with intent or with deliberate indifference to the consequences of their actions. Many of the factual indicia of a discriminatory motive are present here, including: the differing treatment of similarly situated comparators (¶¶ 63-78, 79-155); departures from the Defendant's normal or substantive criteria (¶¶ 54-56); behavior that is inconsistent with the Defendant's legitimate business purposes and its goals to maximize resale value (¶¶ 53, 54-56, 163-166); behavior that is inconsistent with industry norms (¶¶ 157, 171);

- 115 -

the pronounced disparate impact and segregative effect of the Defendant's actions (¶¶ 63-78, 173, 174-186); and the Defendant's knowledge that its behavior and the behavior of its agents might be in violation of the Fair Housing Act by causing discrimination in neighborhoods of color as compared to predominantly white neighborhoods, but not changing its behavior (¶¶ 157-166, 172).

168.    The intentional differing maintenance and treatment of REO properties because of the racial composition of the neighborhood in which the properties are located is the direct and proximate cause of the disparities alleged herein and revealed by Plaintiffs' investigation.

169.    This consistent and repetitive pattern of discriminatory treatment—across cities and over the span of time and involving multiple REO maintenance agents—further indicates that Defendant's practices are the result of an intentional and purposeful discriminatory policy set at a high level of Defendant's management with responsibility for Defendant's policies nationwide.

170.     Defendant's actions are also inconsistent with legitimate business purposes. There are no valid business purposes served by, or valid excuses for, Defendant's differing maintenance of REO properties based on neighborhood racial composition. Fannie Mae has a financial interest in maintaining and securing its inventory of REO properties in order to preserve the value of the property until it is sold. That it fails to act in accordance with what should be its financial interest raises an inference that it is instead motivated by discriminatory intent.

171.    Defendant's actions are also inconsistent with industry norms. Notably, during the relevant time period, Plaintiffs' investigation of REO properties owned by Freddie Mac, an analogous public government-sponsored enterprise, revealed no differences between the quality of maintenance of Freddie Mac's REO properties in communities of color and those in

predominantly white neighborhoods. Freddie Mac is a sound comparator to Fannie Mae because it is similarly situated to Fannie Mae with respect to its REO maintenance responsibilities: both are government-sponsored enterprises that purchase and guarantee home mortgages on the secondary market; both obtain title and ownership of properties if those mortgages default and are foreclosed upon; both experienced a significant increase in property ownership as a result of the financial crisis, resulting in large inventories of REO properties throughout the nation; and both were subsequently responsible for the large-scale endeavor of maintaining those REO properties. However, in stark contrast to their findings with respect to Fannie Mae, Plaintiffs found no differences in Freddie Mac's exterior maintenance of REO properties based on racial or ethnic composition of the neighborhood.

172.    In addition, and as set forth above in ¶¶ 18-20, 157-162, on numerous occasions throughout the course of their investigation, Plaintiffs met with Fannie Mae officials, including officials from Fannie Mae's REO division, and informed Fannie Mae of their findings and appealed to Fannie Mae to cease and desist its discriminatory behavior. Prior to the initiation of this litigation, Plaintiffs met several more times with Fannie Mae officials and informed them again that their maintenance of REO properties was discriminatory, a pattern that had remained unchanged since 2009. Plaintiffs provided photographs and comparative data to Fannie Mae demonstrating its poor maintenance of REO properties in communities of color as compared to white neighborhoods. Despite Plaintiffs' notices and lengthy efforts to obtain Fannie Mae's voluntary compliance with the Fair Housing Act, and with intent and deliberate indifference, and with reckless disregard as to whether it was violating the Fair Housing Act, Fannie Mae did not change its behavior and continued to maintain its REO properties differently based on the predominant race or ethnicity of neighborhoods.

173.   Moreover, the evidence establishing a finding of disparate impact is also highly probative of Fannie Mae's motive, because "a racial imbalance is often a telltale sign of purposeful discrimination." *Int'l Bhd of Teamsters v. U.S.,* 431 U.S. 324, 339-40 n.20 (1977). And evidence of a disproportionate outcome can provide an important starting point in establishing a claim of intentional discrimination. Thus, Fannie Mae's maintenance policies and practices are also relevant to Plaintiffs' claims that its inferior and inadequate maintenance disproportionately occurring in communities of color is intentional.

**E. Fannie Mae's REO Maintenance Policies and Practices Cause a Disproportionate Adverse Impact on Communities of Color.**

174.   Fannie Mae has designed a national practice and policy of having its lower-level agents and employees determine whether to conduct an REO exterior maintenance task and how to conduct it. Fannie Mae's practice thus gave these agents and employees the ability to exercise high levels of discretion with minimal input from Fannie Mae. Fannie Mae's practice and policy of committing REO exterior maintenance decisions to the subjective and unguided discretion of its lower-level agents and employees have caused a disproportionately adverse impact on communities of color.

175.   Fannie Mae's discretionary exterior maintenance practice and policy allows agents to discriminate in the exercise of their maintenance duties. For example, Fannie Mae did not provide specific requirements regarding how often exterior REO maintenance should be performed by its agents or employees. In contrast, Fannie Mae provided detailed instructions to its agents with regard to other REO services, including directing them to perform tasks on a monthly basis.

176.   Moreover, Fannie Mae relied almost exclusively on the reports of its lower-level agents to ensure that REO properties were being maintained in a proper manner. Unless the

- 118 -

lower-level agents requested a bid or payment for conducting an exterior maintenance task, then Fannie Mae's business practice allowed for little (if any) independent knowledge of whether the property actually required exterior maintenance. Notably, upon information and belief, during the relevant time period, Fannie Mae performed independent quality checks on as few as 10.0% of its properties on an annual basis. A 2015 report by the Office of Inspector General of the Federal Housing Finance Agency criticized Fannie Mae's quality control protocol, noting that there was "significant risk" that it would be insufficient to assess the quality of REO maintenance activities over a sustained period of time.

177.   The exercise of the agents and employees' subjective and unguided discretion (and Fannie Mae's policy allowing for this discretion without appropriate quality control) resulted in REO properties in communities of color receiving less exterior maintenance than REO properties in predominantly white neighborhoods. The observed disparities persist even after a regression analysis for non-racial factors.

178.   Data further establishes that the exterior maintenance of REO properties under Fannie Mae's maintenance practices and policies varied based on the age and/or the value of the properties.

179.   Policies and practices based on the age or value of residential property can result in an adverse impact on homeowners in communities of color. As early as 1994, HUD and other federal financial regulatory agencies noted that housing policies that vary based on the age or value of properties can have a disproportionate effect on minority communities. Fannie Mae's maintenance practices and policies that are linked to the REO property age and/or value cause inferior maintenance to occur disproportionately in communities of color.

180.    Separately and in combination, Fannie Mae's maintenance policies and practices are a cause of inferior and inadequate maintenance disproportionately occurring in communities of color.

**F.  Fannie Mae's Discriminatory Maintenance of REO Properties Perpetuates Segregation.**

181.    Each of the cities in which Defendant's maintenance of REO properties was investigated except Vallejo, CA is moderately or highly segregated under the dissimilarity index measure.

182.    The "dissimilarity index" is a well-recognized standard for evaluating a community's level of segregation. The index measures whether one particular racial group is distributed across census tracts in the metropolitan area in the same way as another racial group. A high dissimilarity index indicates that the two groups tend to live in different tracts. The index ranges from 0 to 100. A value of 60 or more is considered a very high level of segregation. It means that 60% (or more) of the members of one group who reside in the area would need to move to a different tract within that area in order for the two groups to be equally distributed. Values of between 40 and 50 demonstrate a moderate level of segregation, and values of 30 or below indicate a low level of segregation.

183.    The cities investigated by Plaintiffs are located in metropolitan areas that have the following dissimilarity indices:

| Metropolitan Area | 2010 Black-White Dissimilarity Index | 2010 Hispanic-White Dissimilarity Index |
|---|---|---|
| Albuquerque, New Mexico | 29.2 | 36.4 |
| Atlanta, Georgia | 58.4 | 49.4 |
| Baltimore, Maryland | 64.3 | 39.8 |
| Baton Rouge, Louisiana | 57.2 | 32.7 |
| Charleston, South Carolina | 40.8 | 39.8 |
| Chicago, Illinois | 75.2 | 56.3 |
| Cleveland, Ohio | 72.6 | 52.3 |
| Columbus, Ohio | 60.0 | 41.4 |

| | | |
|---|---|---|
| Dallas, Texas | 55.5 | 50.3 |
| Dayton, Ohio | 63.3 | 27.3 |
| Denver, Colorado | 59.4 | 48.8 |
| Fort Worth, Texas | 56.3 | 45.6 |
| Gary, Indiana | 76.8 | 43.7 |
| Grand Rapids, Michigan | 61.4 | 50.4 |
| Greater Palm Beaches, Florida | 57.3 | 42.6 |
| Hartford, Connecticut | 62.3 | 58.4 |
| Indianapolis, Indiana | 64.5 | 47.3 |
| Kansas City, Missouri | 58.6 | 44.4 |
| Las Vegas, Nevada | 35.9 | 42.0 |
| Louisville, Kentucky | 56.2 | 38.7 |
| Memphis, Tennessee | 62.2 | 50.7 |
| Miami, Florida | 64.0 | 57.4 |
| Milwaukee, Wisconsin | 79.6 | 57.0 |
| Minneapolis, Minnesota | 50.2 | 42.5 |
| Muskegon, Michigan | 71.2 | 30.4 |
| New Orleans, Louisiana | 63.3 | 38.3 |
| Newark, New Jersey | 78.0 | 62.6 |
| Oakland, California | 56.6 | 48.3 |
| Orlando, Florida | 49.3 | 40.2 |
| Philadelphia, Pennsylvania | 67.0 | 55.1 |
| Phoenix, Arizona | 41.3 | 49.3 |
| Providence, Rhode Island | 50.8 | 60.1 |
| Richmond, California | 51.1 | 50.6 |
| Richmond, Virginia | 51.6 | 44.9 |
| San Diego, California | 48.4 | 49.6 |
| Toledo, Ohio | 63.2 | 31.4 |
| Tucson, Arizona | 34.5 | 46.2 |
| Vallejo, California | 41.5 | 29.2 |
| Washington, D.C. & Prince George's County, MD | 61.0 | 48.3 |

184.   From the 1990s through 2008, many financial institutions in the country engaged in persistent discrimination and reverse redlining to target minority neighborhoods for high-priced, high risk mortgages. These predatory practices contributed to the financial crisis—indeed, analyses have shown that segregation was a significant cause of the foreclosure crisis—and resulted in the concentration of foreclosures, and thus bank-owned REO properties, in minority neighborhoods. The high concentration of foreclosures in minority neighborhoods served to exacerbate the existing high levels of residential segregation in many communities. All of this was or should have been known to Fannie Mae.

- 121 -

185.   By failing to maintain REO dwellings in communities of color according to the same standards as it maintains REO dwellings in predominantly white neighborhoods, Fannie Mae perpetuates racial segregation. These communities of color "have long suffered the harsh consequences of segregated housing patterns." *Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.,* 135 S. Ct. 2507, 2525 (2015). Fannie Mae's behavior is the type of "covert and illicit stereotyping", *id.* at 2522, that stigmatizes communities of color as less desirable than predominantly white neighborhoods. The prospects for integration in the affected neighborhoods are reduced because white buyers are deterred from purchasing homes in neighborhoods with poorly maintained REO properties, leaving the existing segregated racial composition of these neighborhoods unchanged or worsened.

186.   The existence of poorly maintained REO dwellings in a neighborhood diminishes home values for surrounding homeowners. According to HUD, vacant properties become a problem "when the property owner abandons the basic responsibilities of ownership, such as routine maintenance . . . ." *See Vacant and Abandoned Properties: Turning Liabilities Into Assets*, available at https://www.huduser.gov/portal/periodicals/em/winter14/highlight1.html. Vacant and abandoned properties have negative spillover effects that affect neighboring properties and, when concentrated, entire communities and cities. Research links foreclosed, vacant, and abandoned properties with reduced property values, increased crime, increased risk to public health and welfare, and increased costs for municipal governments. *Id.* The Appraisal Institute cautions that such "external obsolescence" can lower neighboring home values by 5.0% to 10.0%. The reduction in home values in predominantly minority neighborhoods necessarily reduces the equity minority homeowners can use to buy a new home, thereby restricting the ability of minority homeowners to move to other, less segregated neighborhoods. Allowing

REO properties in neighborhoods of color to deteriorate has the necessary and foreseeable consequence of perpetuating segregation by re-entrenching the vestiges of historically discriminatory practices.

<div align="center">

**V.      INJURY CAUSED BY DEFENDANT'S BEHAVIOR**

</div>

**A.  Injury to All Plaintiffs**

187.   The unlawful discriminatory practices of Defendant have proximately caused actual injury to each of the Plaintiffs.

188.   The particularized and concrete injuries suffered by Plaintiffs are intimately connected to the conduct that the Fair Housing Act prohibits. Specifically, Defendant's housing practices have injured Plaintiffs by: (a) undermining Plaintiffs' education, advocacy, and training programs designed to promote fair housing and fair lending; (b) requiring Plaintiffs to divert scarce resources away from their usual activities and instead to devote substantial time to evaluating properties, reviewing data, interviewing witnesses, engaging in a counteractive education and outreach campaign, and developing educational materials to identify and address Defendant's racially discriminatory maintenance practices; (c) frustrating Plaintiffs' missions of increasing fair and equal access to housing for all Americans and in all neighborhoods, regardless of race, color, or national origin; (d) frustrating Plaintiffs' missions to eliminate racial segregation in their communities; (e) harming the communities that Plaintiffs serve; and (f) impeding Plaintiffs' community investment programs designed to stabilize neighborhoods of color and increase homeownership for all people in these same neighborhoods.

189.   By requiring Plaintiffs to expend substantial time and resources investigating and counteracting Defendant's unlawful conduct, Defendant has harmed Plaintiffs economically by forcing Plaintiffs to divert scarce resources away from their usual education, counseling,

<div align="center">

- 123 -

</div>

investigation, and capacity-building activities and services. As Defendant's discriminatory

practices persist, addressing and counteracting Defendant's discriminatory conduct will

continue to require a substantial diversion of resources by Plaintiffs away from their usual

activities.

190.   In order to identify and counteract Defendant's discriminatory conduct, Plaintiffs

had to divert scarce resources and time away from other projects and programs. These

expenditures were not initially included in Plaintiffs' budgets. As a result, each Plaintiff had to

pull resources away from other planned and budgeted projects in order to garner the resources

necessary to counteract Fannie Mae's behavior. New grant applications had to be refocused

from longstanding needs to address the immediate problem caused by Fannie Mae's failure to

maintain its REO properties.

191.   Because of the measures Plaintiffs were forced to take to identify and counteract

Defendant's discriminatory practices, Plaintiffs were forced to delay, suspend, or forgo other

existing programs or projects. For example, NFHA had to forgo conducting sales

investigations to combat racial steering because staff was needed to conduct REO

investigations of Fannie Mae across the country. Despite this impact on Plaintiffs' other

programs and services, Plaintiffs nevertheless diverted resources to these counteractive

measures because, if left unaddressed, Fannie Mae's discriminatory policies would have a

significant harmful effect on Plaintiffs' communities and the constituents they serve.

192.   Defendant's discriminatory conduct has also injured Plaintiffs economically by

hindering Plaintiffs' community investment efforts. Over the past three years, Plaintiffs have

provided over $18 million to 13 fair housing organizations so they could provide services and

grants to local housing non-profit organizations and neighborhood investment funds in 13

communities included within this Complaint. Plaintiffs also provided more than $8 million in 6

neighborhoods in cities that are also part of this complaint to conduct education and outreach around REO best practices and to foster homeownership, to assist with rebuilding predominantly African-American and Latino neighborhoods affected by the foreclosure crisis, and to promote diverse, inclusive communities. These funds have been leveraged to obtain an additional $17.3 million in corporate and foundation grants for the same communities. They have allowed 790 homeowners to remain in their homes through foreclosure prevention or home repair grants, rehabilitated 685 abandoned or blighted dwellings, and made 182 housing units accessible to persons with disabilities.

193.   These financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the same communities.

194.   In efforts to address and attempt to counteract the effects of Defendant's discriminatory conduct, prior to the filing of this action, each of the Plaintiffs engaged in community outreach and public efforts to raise awareness of these discriminatory practices in the communities each Plaintiff serves.

195.   The diversion and expenditure of financial resources and staff time, included, but was not limited to: time and costs associated with drafting and distributing educational materials; mailing costs and graphic design expenses; travel time and expenses; and staff hours diverted from other work to conduct these outreach activities. In addition to implementing these counteractive measures, Plaintiffs were required to spend additional time designing and preparing counteractive strategies specifically targeted toward addressing the impact of Defendant's unlawful behavior. Thus, Plaintiffs not only diverted scarce time and resources away from routine tasks and activities to conducting education and outreach, but also to preparing the education and outreach strategy and materials on REO maintenance.

196.   These injuries have caused Plaintiffs to incur costs that are above and beyond the operational activities and costs normally expended by Plaintiffs.

**B.  Injuries to Individual Plaintiffs**

197.   Each Plaintiff has suffered particularized and concrete injuries caused by Defendant's discriminatory behavior.

<center>**National Fair Housing Alliance**</center>

198.   Over the course of five years, Plaintiff NFHA has conducted hundreds of inspections of Fannie Mae REO properties across the nation. NFHA has also conducted joint inspections with many of the Plaintiffs listed below. In total, NFHA has expended more than 4,000 hours on its investigation into Fannie Mae's discriminatory maintenance and marketing.

199.   As a result of this expenditure of time and resources, NHFA was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused NFHA to forgo opportunities including executing new fair housing advocacy projects or investigations, conducting additional consulting and training of housing providers, applying for new grants and funding sources, attending conferences, and professional staff development.

200.   In addition, NFHA engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. NFHA's efforts include: meeting with local, state, and federal government officials (including the Federal Reserve Board, state House of Representatives, and at least 10 local governments/jurisdictions); authoring and distributing at least three reports about discrimination in maintenance of REO properties, which were subsequently mailed to local and state governments; conducting numerous fair housing trainings regarding REO maintenance to real estate professionals and bank employees; planning and sponsoring a conference on REO

<center>- 126 -</center>

1   maintenance; serving as keynote speaker and presenting on numerous panels regarding the

2   economic impact of discriminatory REO maintenance; and authoring a book chapter regarding

3   discrimination in REO maintenance.

4       201.   Defendant's actions have also frustrated the mission and purpose of NFHA. As

5   described in greater detail above, NFHA's mission is to ensure equal housing opportunities and

6   to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance

7   directly impedes its efforts and frustrates its mission.

8       202.   Finally, NFHA has expended at least $3.4 million of its own funds to engage in

9   community development, homeownership promotion, and neighborhood stabilization efforts

10  across the nation. NFHA's financial investments have been and are continuing to be

11  undermined by the existence of deteriorating and poorly maintained Fannie Mae REO

12  properties in those communities.

13

14                        **Fair Housing Advocates of Northern California**
15                        **(formerly Fair Housing of Marin)**

16      203.   Plaintiff FHANC conducted inspections of Fannie Mae REO properties across

17  the greater Solano and Contra Costa counties, expending over 310 hours throughout the course

18  of this investigation.

19

20      204.   As a result of this expenditure of time and resources, FHANC was forced to

21  divert resources and time away from other intended projects and programs, and to delay,

22  suspend, or even cancel such programming. Defendant's discriminatory conduct caused

23  Plaintiff to forgo opportunities including: consulting opportunities, professional staff

24  development, coalition meetings, and new or additional funding applications.

25      205.   In addition, FHANC engaged in significant community outreach and public

26  education efforts in order to address and attempt to counteract the effects of Defendant's

27  conduct. Plaintiff's efforts include: meeting with local government officials regarding REO

28

- 127 -

maintenance, including visits to senators and representatives on Capitol Hill; meeting with local service providers such as Housing and Economic Rights Advocates; creating and distributing public service announcements and conducting radio campaigns; publishing advertisements in local newspapers; sending specialized mailings to neighbors of REO properties; participating in community events; and engaging with media to raise awareness of REO-related issues.

206.    Defendant's actions have also frustrated the mission and purpose of FHANC. As described in greater detail above, FHANC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

207.    Finally, FHANC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Solano and Contra Costa counties.

**Central Ohio Fair Housing Association**

208.    Plaintiff COFHA conducted inspections of Fannie Mae REO properties, expending over 75 hours throughout the course of this investigation.

209.    As a result of this expenditure of time and resources, COFHA was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including: community and coalition meetings, professional staff development, and new funding applications.

210.   In addition, COFHA engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: organizing and conducting outreach and trainings for real estate agents in the greater Columbus metropolitan region; providing educational materials and meeting with local code or government officials regarding REO maintenance; preparing and publishing brochures/reports; creating public service announcements and advertising in local print and radio; designing targeted websites and specialized mailings; participating in community events, including presentations to Habitat for Humanity Mid-Ohio, Somali Community Association of Ohio, Legal Aid Society of Columbus, and Columbus Realtist Association; engaging with media to raise awareness of REO-related issues; and meeting with officials from the City of Columbus and Franklin County, OH.

211.   Defendant's actions have also frustrated the mission and purpose of COFHA. As described in greater detail above, COFHA's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

212.   Finally, COFHA has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Columbus metropolitan region.

**Connecticut Fair Housing Center**

213.   Plaintiff CFHC conducted inspections of Fannie Mae's REO properties throughout Connecticut, expending over 30 hours throughout the course of this investigation.

214.    As a result of this expenditure of time and resources, CFHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including but not limited to developing new or additional fair housing investigations, community and coalition meetings, consulting and training opportunities, new funding applications, and professional staff development.

215.    In addition, CFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: conducting classes for more than 100 real estate agents on their obligations to maintain REO properties in a non-discriminatory manner; testifying at legislative hearings at the Connecticut legislature on blight bills to raise awareness of the problems caused by differential treatment of REO properties; meeting with the Mayor of New Haven to highlight problems with REO properties in her city; and discussing REO maintenance with Connecticut's Congressional delegation during meetings on fair housing problems in Connecticut.

216.    Defendant's actions have also frustrated the mission and purpose of CFHC. As described in greater detail above, CFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

**Denver Metro Fair Housing Center**

217.    Plaintiff DMFHC conducted inspections of Fannie Mae REO properties across the greater Denver metropolitan area, expending over 185 hours throughout the course of this investigation.

- 130 -

218.    As a result of this expenditure of time and resources, DMFHC was forced to divert limited resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including consulting and training opportunities, new funding applications, professional staff development, and new or additional fair housing investigations.

219.    In addition, DMFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. DMFHC's efforts include: organizing and conducting trainings regarding REO maintenance for housing providers, municipal housing employees, HUD housing counseling agency staff, and the general public in the greater Denver Metro region; meeting with local government officials regarding REO issues, including the Denver Regional Council of Governments, City and County of Denver, City of Aurora, and the State of Colorado Division of Housing; preparing and publishing brochures/reports; creating public service announcements and advertising; designing specialized mailings; participating in community events, including the Montbello 50th Anniversary Fair; and engaging with media to raise awareness for REO-related issues.

220.    Defendant's actions have also frustrated the mission and purpose of DMFHC. As described in greater detail above, DMFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

221.    Finally, DMFHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of

1   deteriorating and poorly maintained Fannie Mae REO properties in the greater Denver

2   metropolitan region.

3                      **Fair Housing Center of Central Indiana**

4       222.   Plaintiff FHCCI conducted inspections of Fannie Mae REO properties across the

5   greater Indianapolis metropolitan region, expending 150 hours throughout the course of this

6   investigation.

7       223.   As a result of this expenditure of time and resources, FHCCI was forced to divert

8   resources and time away from other intended projects and programs, and to delay, suspend, or

9   even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo

10  opportunities including: fair housing training opportunities, new funding applications,

11  professional staff development, and expanded forms of education and outreach.

12      224.   In addition, FHCCI engaged in significant community outreach and public

13  education efforts in order to address and attempt to counteract the effects of Defendant's

14  conduct. FHCCI's efforts include organizing and conducting trainings for community

15  development and neighborhood organizations in the greater Indianapolis region; meeting with

16  local community development organizations and government officials regarding REO

17  maintenance; meeting with local service providers; preparing and publishing reports; creating

18  public service announcements for local print and radio; designing specialized mailings; and

19  engaging with media to raise awareness of REO-related issues and answer media related

20  inquiries.

21      225.   Defendant's actions have also frustrated the mission and purpose of FHCCI. As

22  described in greater detail above, FHCCI's mission is to ensure equal housing opportunities

23  and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance

24  directly impedes its efforts and frustrates its mission.

25

26

27

28

                                    - 132 -

226.   Finally, FHCCI has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Indianapolis metropolitan region.

**Fair Housing Center of Greater Palm Beaches**

227.   Plaintiff FHCGPB conducted inspections of Fannie Mae REO properties across the greater Palm Beach metropolitan region and expended over 90 hours over the course of this investigation.

228.   As a result of this expenditure of time and resources, FHCGPB was forced to divert resources and time away from other intended projects and programs, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including fair housing education and consulting opportunities with housing providers and municipalities and new funding applications.

229.   In addition, FHCGPB engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: holding over a dozen workshops to community service providers and local housing providers regarding REO maintenance; disseminating anti-discrimination literature; and counseling citizens of the greater Palm Beach metropolitan region on their fair housing rights under federal, Florida, and local fair housing laws.

230.   Defendant's actions have also frustrated the mission and purpose of FHCGPB. As described in greater detail above, FHCGPB's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

- 133 -

**Fair Housing Center of West Michigan**

1

2      231.   Plaintiff FHCWM conducted inspections of Fannie Mae's REO properties across

3      the western Michigan region, expending over 200 hours throughout the course of this

4      investigation.

5      232.   As a result of this expenditure of time and resources, FHCWM was forced to

6

7      divert resources and time away from other intended projects and programs, and to delay,

8      suspend, or even cancel such programming. Defendant's discriminatory conduct caused

9      Plaintiff to forgo opportunities including community meetings and collaborative efforts,

10     consulting opportunities, conferences and staff development, other systemic investigations, and

11     funding applications.

12     233.   In addition, FHCWM engaged in significant community outreach and public

13     education efforts in order to address and attempt to counteract the effects of Defendant's

14     conduct. Plaintiff's efforts include: holding workshops regarding REO issues at its Fair

15     Housing Luncheon & Workshop Series; meeting with local code or government officials

16     regarding REO maintenance; meeting with local service providers, stakeholders and

17     community groups; preparing and publishing newsletters; participating in community events;

18     and engaging with media to raise awareness of REO-related issues.

19

20     234.   Defendant's actions have also frustrated the mission and purpose of FHCWM.

21     As described in greater detail above, FHCWM's mission is to ensure equal housing

22     opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory

23     maintenance directly impedes its efforts and frustrates its mission.

24

25     235.   Finally, FHCWM has expended its own funds to engage in community

26     development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's

27     financial investments have been and are continuing to be undermined by the existence of

28

- 134 -

1   deteriorating and poorly maintained Fannie Mae REO properties in the western Michigan

2   region.

3                           **Fair Housing Continuum, Inc.**

4       236.    Plaintiff Fair Housing Continuum, Inc. conducted inspections of Fannie Mae

5   REO properties in the central Florida region, expending approximately 564 hours throughout

6   the course of this investigation.

7       237.    As a result of this expenditure of time and resources, the Continuum was forced

8

9   to divert resources and time away from other intended projects and programs, and to delay,

10  suspend, or even cancel such programming. Defendant's discriminatory conduct caused

11  Plaintiff to forgo opportunities including: new or additional fair housing investigations,

12  individual complaint enforcement, fair housing training opportunities, and professional staff

13  development.

14      238.    In addition, the Continuum engaged in significant community outreach and

15  public education efforts in order to address and attempt to counteract the effects of Defendant's

16

17  conduct. Plaintiff's efforts include hosting 141 presentations or speaking engagements related

18  to REO issues from July 2013 through Sept. 2016 as well as engaging with media to raise

19  awareness of REO-related issues.

20      239.    Defendant's actions have also frustrated the mission and purpose of the

21  Continuum. As described in greater detail above, the Continuum's mission is to ensure equal

22  housing opportunities and to fight unlawful discrimination and segregation. Defendant's

23  discriminatory maintenance directly impedes its efforts and frustrates its mission.

24

25

26

27

28

**Greater New Orleans Fair Housing Action Center**

240.   Plaintiff GNOFHAC conducted inspections of Fannie Mae REO properties across the New Orleans metropolitan area, expending over 100 hours throughout the course of this investigation.

241.   As a result of this expenditure of time and resources, GNOFHAC was forced to divert resources and time away from other intended projects and programs, and to delay or suspend such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including presenting fair housing courses and to delay work related to its annual outreach and education events as well as for planned investigations.

242.   In addition, GNOFHAC engaged in significant community outreach and public efforts in order to address and attempt to counteract the effects of Defendant's conduct. GNOFHAC's efforts include: organizing and conducting trainings to groups of service providers in the Greater New Orleans area, including meeting with BlightsOut, an organization dedicated to eradicating blight; meeting with government officials regarding REO maintenance; creating public service announcements and advertising in local print and radio; participating in community events, including the Mission Possible Conference with over 100 conference attendees, and engaging with media to raise awareness of REO-related issues.

243.   Defendant's actions have also frustrated the mission and purpose of GNOFHAC. As described in greater detail above, GNOFHAC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

244.   Finally, GNOFHAC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of

- 136 -

deteriorating and poorly maintained Fannie Mae REO properties in the greater New Orleans metropolitan region.

### HOPE Fair Housing Center

245.   Plaintiff HOPE conducted inspections of Fannie Mae REO properties across the greater Chicago metropolitan region, expending over 550 hours throughout the course of this investigation.

246.   As a result of this expenditure of time and resources, HOPE was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including: consulting opportunities, new funding applications, professional staff development, and community and coalition meetings.

247.   In addition, HOPE engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: organizing and conducting trainings for a regional coalition of housing providers, non-profit service providers and government staff in the greater Chicago metropolitan region; meeting with local code or government officials regarding REO maintenance in Elgin and other local municipalities; meeting with local service providers and real estate trade organizations; preparing and publishing brochures/reports; designing targeted websites and specialized mailings; participating in community events, including the Chicago Urban League Homebuyers Fair, among others; and engaging with media to raise awareness of REO-related issues.

248.   Defendant's actions have also frustrated the mission and purpose of HOPE. As described in greater detail above, HOPE's mission is to ensure equal housing opportunities and

1   to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance

2   directly impedes its efforts and frustrates its mission.

3       249.   HOPE has also expended its own funds to engage in community development,

4   homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial

5   investments have been and are continuing to be undermined by the existence of deteriorating

6   and poorly maintained Fannie Mae REO properties in the greater Chicago metropolitan region.

7

8                   **Housing Opportunities Made Equal of Virginia**

9       250.   Plaintiff HOME of Virginia conducted inspections of Fannie Mae's REO

10  properties in Virginia, expending 165 hours throughout the course of this investigation.

11      251.   As a result of this expenditure of time and resources, HOME of Virginia was

12  forced to divert resources and time away from other intended projects and programs, and to

13  delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused

14  Plaintiff to forgo opportunities including education and outreach activities that would have

15  furthered its mission, training on volunteer recruitment, fair housing planning consulting work,

16  community meetings, and collaborative efforts, and the delay of its internal strategic planning

17  exercises.

18

19      252.   In addition, HOME of Virginia engaged in significant community outreach and

20  public education efforts in order to address and attempt to counteract the effects of Defendant's

21  conduct. Plaintiff's efforts include: corresponding with City officials regarding REO

22  maintenance and ongoing costs to the localities; meeting with community development

23  corporations; and engaging with media to raise awareness of REO-related issues.

24

25      253.   Defendant's actions have also frustrated the mission and purpose of HOME of

26  Virginia. As described in greater detail above, HOME of Virginia's mission is to ensure equal

27

28

housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

**Housing Opportunities Project for Excellence (HOPE Inc.)**

254.   Plaintiff HOPE, Inc., conducted inspections of Fannie Mae REO properties across the state of Florida and expended over 110 hours throughout the course of this investigation.

255.   As a result of this expenditure of time and resources, HOPE, Inc. was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including resource development, public policy advocacy, identifying opportunities to educate underserved and un-served populations, utilizing research and technology to identify discriminatory trends in housing, and furtherance of the organization's Strategic Plan.

256.   In addition, HOPE, Inc. engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: preparation and publication of newsletter articles promoting community awareness; engagement with media engagement to raise awareness of REO-related issues; and development of educational presentations inclusive of REO-related topics, including homebuyer/foreclosure prevention workshops, housing provider trainings, and local (Miami-Dade and Broward County) and statewide (Florida) fair housing workshops.

257.   Defendant's actions have also frustrated the mission and purpose of HOPE, Inc. As described in greater detail above, HOPE Inc.'s mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

**Housing Research & Advocacy Center**

258.   Plaintiff HRAC conducted inspections of Fannie Mae REO properties across the greater Cleveland metropolitan area, expending over 140 hours over the course of this investigation.

259.   As a result of this expenditure of time and resources, HRAC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such activities. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including production of an annual report, Racial and Ethnic Disparities in Mortgage Lending.

260.   In addition, HRAC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. HRAC's efforts include: the discussion of REO maintenance issues in more than 200 presentations to housing providers and real estate agents in Northeast Ohio; meeting with local code or government officials regarding REO maintenance; meeting with local service providers; sharing investigation's findings with the community; and engaging with media to raise awareness of REO-related issues.

Defendant's actions have also frustrated the mission and purpose of HRAC. As described in greater detail above, HRAC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

**Miami Valley Fair Housing Center**

261.   Plaintiff MVFHC conducted inspections of Fannie Mae REO properties across the greater Miami Valley region, expending over 130 hours throughout the course of this investigation.

262.   As a result of this expenditure of time and resources, MVFHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including: consulting and training opportunities, community and coalition meetings, new funding applications, and professional staff development.

263.   In addition, MVFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: organizing and conducting trainings for real estate agents, property managers, municipal government employees, and the general public in the greater Miami Valley region; meeting with local code or government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures/reports; creating public service announcements and advertising in local print and radio; designing targeted websites and specialized mailings; participating in community events (including presentations to the Latino Connection, the Dayton Area Realtists, Catholic Social Services, the Dayton Mortgage Broker's Association, and the Ahiska Turkish American Community Center); and engaging with media to raise awareness of REO-related issues.

264.   Finally, MVFHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Miami Valley region.

265.   Defendant's actions have also frustrated the mission and purpose of MVFHC. As described in greater detail above, MVFHC's mission is to ensure equal housing opportunities

and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

### Metro Fair Housing Services, Inc.

266.   Plaintiff Metro conducted inspections of Fannie Mae REO properties across the greater Atlanta metropolitan region, expending over 325 hours throughout the course of this investigation.

267.   As a result of this expenditure of time and resources, Metro was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including consulting and training opportunities, new funding applications, professional staff development, and new or additional fair housing investigations.

268.   In addition, Metro engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: organizing and conducting trainings for local jurisdictional staffs, private and public housing providers, real estate agents and consumers in the greater Atlanta metropolitan region; meeting with local code or government officials regarding REO maintenance; preparing and publishing brochures/reports; participating in community events, including the agency's annual fair housing events, partnership fairs and workshops and professional education and outreach activities; and engaging with media to raise awareness for REO-related issues.

269.   Defendant's actions have also frustrated the mission and purpose of Metro. As described in greater detail above, Metro's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

- 142 -

FIRST AMENDED COMPLAINT
Case No. 4:16-cv-06969-JSW: National Fair Housing Alliance, *et al.* v. Federal National Mortgage Association

270.   Finally, Metro has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Atlanta metropolitan region.

**Metropolitan Milwaukee Fair Housing Council**

271.   Plaintiff MMFHC conducted inspections of Fannie Mae REO properties across the greater Milwaukee metropolitan area, expending over 400 hours throughout the course of this investigation.

272.   As a result of this expenditure of time and resources, MMFHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including fair lending outreach and education, fair housing outreach and education, fair housing investigations, data collection activities, and housing industry trainings.

273.   In addition, MMFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include conducting REO-related presentations and meetings with government officials, community organizations, academic institutions, housing providers, individual realtors and realtors' associations, neighborhood associations, lending institutions, community activists, faith-based institutions, and homeowners and residents of neighborhoods affected by discriminatory REO maintenance and marketing practices.

274.   Defendant's actions have also frustrated the mission and purpose of MMFHC. As described in greater detail above, MMFHC's mission is to ensure equal housing

- 143 -

opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission

### North Texas Fair Housing Center

275.   Plaintiff NTFHC conducted inspections of Fannie Mae REO properties across the greater Dallas-Fort Worth metropolitan region, expending over 135 hours throughout the course of the investigation.

276.   As a result of this expenditure of time and resources, NTFHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including expanded forms of outreach and coalition-building, professional staff development, and new funding applications.

277.   In addition, NTFHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: organizing and conducting trainings for social service providers and property management personnel in the Dallas-Fort Worth region; meeting with local government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures; creating public service announcements and advertising in local print and radio; designing specialized mailings; participating in community events, including community resource fairs; and engaging with media to raise awareness of REO-related issues.

278.   Defendant's actions have also frustrated the mission and purpose of NTFHC. As described in greater detail above, NTFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

- 144 -

279.   NTFHC has also spent its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Dallas-Fort Worth region.

**Open Communities**

280.   Plaintiff Open Communities conducted inspections of Fannie Mae REO properties in the greater Chicago metropolitan region, expending over 262 hours throughout the course of this investigation.

281.   As a result of this expenditure of time and resources, Open Communities was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including conducting fair housing testing and investigations, holding landlord and tenant mediation services, performing community outreach and professional staff development.

282.   Defendant's actions have also frustrated the mission and purpose of Open Communities. As described in greater detail above, Open Communities' mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

**South Suburban Housing Center**

283.   Plaintiff SSHC conducted inspections of Fannie Mae REO properties across the greater Chicago metropolitan area, expending over 329 hours throughout the course of this investigation.

284.   As a result of this expenditure of time and resources, SSHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or

- 145 -

even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including additional fair housing complaint intakes and investigations, fair housing presentations for the general public and housing providers, counseling and advocacy on behalf of mortgage-distressed discrimination victims, and expanded forms of outreach and coalition-building.

285.   In addition, SSHC has engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include conducting REO-related presentations and meetings with municipal and county officials, community organizations, housing providers, individual realtors and realtors' associations, lending institutions, community service agencies, faith-based institutions, and homeowners and residents of communities affected by discriminatory REO maintenance and marketing practices.

286.   Defendant's actions have also frustrated the mission and purpose of SSHC. As described in greater detail above, SSHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

287.   Finally, SSHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts, including down payment assistance and mortgage distress assistance programs. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Chicago metropolitan area.

## Toledo Fair Housing Center

288.   Plaintiff TFHC conducted inspections of Fannie Mae REO properties across the greater Toledo metropolitan area, expending over 316 hours throughout the course of this investigation.

289.   As a result of this expenditure of time and resources, TFHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendant's discriminatory conduct caused Plaintiff to forgo opportunities including providing fair housing training to community partners, attending conferences and other forms of professional staff development, and advocating for housing discrimination victims.

290.   In addition, TFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendant's conduct. Plaintiff's efforts include: organizing and conducting trainings for housing industry professionals and the general public in the Northwest Ohio region; meeting with government officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; participating in community events and meetings; engaging with media to raise awareness of REO-related issues; interviewing neighbors; and participating in neighborhood beautification and revitalization efforts.

291.   Defendant's actions have also frustrated the mission and purpose of TFHC. As described in greater detail above, TFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendant's discriminatory maintenance directly impedes its efforts and frustrates its mission.

292.   Finally, TFHC has expended its own funds to engage in community development, homeownership promotion, neighborhood stabilization, foreclosure prevention

- 147 -

and beautification efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Fannie Mae REO properties in the greater Toledo metropolitan region.

**C. Injuries to Neighborhood Residents and Communities**

293.   The damaging effects of Defendant's discriminatory conduct extends beyond Plaintiffs, also harming the communities Plaintiffs serve. Defendant's failure to maintain REO properties in communities of color has created deteriorating eye sores and depressed property values in communities of color, undermining neighborhood stabilization, and curtailing economic recovery.

294.   Where REO properties are not maintained, their effects on the neighborhood and the community can be powerful. They can diminish the value of surrounding properties and destabilize economic and social conditions in the neighborhood. Several academic and government reports acknowledge the negative effects of neglected vacant properties on neighboring homeowners, whole neighborhoods, and local governments. For example, the Government Accountability Office issued very detailed findings on the negative effects of abandoned foreclosures in 2010 in its Report "Mortgage Foreclosures: Additional Mortgage Servicer Actions Could Help Reduce the Frequency and Impact of Abandoned Foreclosures," GAO-11-93, available at http://www.gao.gov/new.items/d1193.pdf. Vacant and abandoned properties often deteriorate quickly and can result in structural damage, mold, broken windows, accumulated trash and debris, overgrown grass, among other things. *Id.* at 29-31. They can also create public safety concerns, and pose significant public health, safety, and welfare issues at the local level. *Id.* at 31-32. These harmful effects are well-known to Fannie Mae, and this GAO report was provided to Fannie Mae for comment prior to its final release in November 2010. *See also* Government Accountability Office, "Vacant Properties: Growing Number

Increases Communities' Costs and Challenges," GAO-12-34 (Nov. 4, 2011), at 27-48,

available at http://www.gao.gov/products/GAO-12-34 ; Woodstock Institute, Deciphering

Blight: Vacant Buildings Data Collection in the Chicago Six County Region (June 2013) at 2

(citing studies), available

at http://www.woodstockinst.org/sites/default/files/attachments/decipheringblight_buitrago_jun

e2013.pdf.

295.    Poorly maintained REO properties strip neighboring homeowners of wealth

through decreased equity in their homes. Research shows that living on the same block as a

foreclosed property or a blighted property can result in significant decreases in one's home

value and equity. This problem is particularly acute in communities of color. Moreover,

residents in the affected neighborhoods are often required to expend their own labor and money

to maintain Fannie Mae's REO properties, but cannot do so in a comprehensive and sufficient

manner.

296.    Poorly maintained REO properties affect the health and safety of surrounding

residents. The stress related to living near a neglected, vacant property has been documented to

contribute to increased high blood pressure rates for neighboring homeowners. Properties that

are vacant and boarded up increase a sense of social isolation and anxiety for the residents

living in those neighborhoods. Increased criminal activity and arson and accidental injuries

from fires, as well as injuries related to unsecure and unstable structures, are more likely to

occur in neighborhoods with vacant and neglected REO properties. Blighted properties also

pose health and safety for neighbors due to rodent and insect infestation, decay, and

vulnerability to crime.

297.    Allowing REO properties in communities of color to deteriorate has the

necessary and foreseeable consequence of perpetuating segregation by re-entrenching the

- 149 -

vestiges of historically discriminatory practices engaged in by private and government actors. By failing to maintain REO dwellings in communities of color according to the same standards as it maintains REO dwellings in predominantly white neighborhoods, Fannie Mae stigmatizes communities of color as less desirable than predominantly white neighborhoods. Vacant and foreclosed properties are well known to depress surrounding home values; poor maintenance can only exacerbate that effect. And as shoddy maintenance and neglect result in deteriorating appearances and physical conditions for REO properties, their availability for sale is adversely affected, constraining housing options in impacted communities. The prospects for integration in the affected neighborhoods are reduced because white buyers are deterred from purchasing homes in neighborhoods with poorly maintained REO properties, leaving the existing segregated racial composition of these neighborhoods unchanged. As a consequence, potential home buyers, as well as existing homeowners, are being deprived of the social, professional, business and economic, political, and aesthetic benefits of living in integrated communities free of housing discrimination.

298.   Lower home values in communities of color also restrict the ability of minority homeowners to move to majority white or integrated neighborhoods by reducing the equity they can use to buy a new home. Poor maintenance of REO properties significantly reduces the number of potential buyers in the housing market, deflecting sales prices downward. At the same time, research has shown that white homeowners in predominantly minority neighborhoods with high concentrations of foreclosed properties have greater resources to leave those neighborhoods, and the presence of poorly maintained REO properties increases their incentive to move out.

299.   Poorly maintained properties are also much more likely to be purchased by an investor as opposed to an owner-occupant. Because Defendant's poorly maintained properties

are more heavily concentrated in African-American and Latino communities, communities of color that formerly thrived with high owner-occupancy rates are increasingly becoming investor-owned rental communities. Predatory investor ownership occurs most often in low-income communities of color and can include bulk purchasing of homes with the intention of renting them out with little or no maintenance or rehabilitation.

300.   Finally, Fannie Mae's failure to maintain REO properties in communities of color also harms governments. Local municipalities are forced to shoulder heavy costs for each vacant, poorly maintained property within their jurisdiction, and these costs can increase when the particular local jurisdiction has a high rate of foreclosures. When large scale property owners, such as Fannie Mae, neglect their assets, many of the related expenses become the burden of the local government. In addition, a significant reduction in property values directly injures municipalities by diminishing their tax base, thus threatening their ability to bear the costs of local government and provide services.

**D.  The Injuries Caused by Defendant's Conduct Continues**

301.   Until remedied, Defendant's unlawful, discriminatory actions will continue to injure Plaintiffs by, *inter alia*:

a.  interfering with Plaintiffs' efforts and programs intended to bring about equality of opportunity in housing;

b.  requiring the commitment of scarce resources, including substantial staff time and funding, to counteract Defendant's discriminatory conduct in the communities identified above, thus diverting those resources away from Plaintiffs' usual activities and services, such as education, outreach, and counseling;

- 151 -

c. frustrating Plaintiffs' missions and purposes of promoting the equal availability of
   housing to all persons without regard to any protected category, including race
   and the racial composition of a neighborhood;

d. frustrating Plaintiffs' missions and purposes of promoting racial integration and
   eliminating racial segregation in their communities; and

e. impeding the accomplishments of Plaintiffs' community investment programs.

302.   All of these injuries flow directly from Defendant Fannie Mae's conduct. They are fairly traceable to Defendant Fannie Mae's discriminatory behavior in Plaintiffs' communities, and they are likely to be redressed by a favorable judicial decision. They are directly related to the zone of interests protected by the Fair Housing Act.

## VI.   VIOLATIONS OF THE FAIR HOUSING ACT

303.   Plaintiffs adopt and re-allege the allegations of paragraphs 1 through 257 of this Complaint.

304.   The REO properties investigated by Plaintiffs are "dwelling[s]" within the meaning of 42 U.S.C. § 3602(b).

305.   Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race [or] national origin[.]" 42 U.S.C. § 3604(a). HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin … to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. 100.70(a). Such acts "include, but are not limited to: (1) Discouraging any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or] national origin . . . of persons in a community, neighborhood or development." 24 C.F.R. 100.70(c)(1). The discriminatory provision of maintenance services to REO properties in communities of color creates significant barriers to the sale or purchase of those properties,

- 152 -

making them otherwise unavailable. Accordingly, Defendant has discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of 42 U.S.C. § 3604(a).

306.    Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin. 42 U.S.C. §3604(b). The maintenance of REO properties constitutes "the provision of services" in connection with dwellings. HUD's regulations implementing this section specify that "[p]rohibited actions under this section include, but are not limited to…[f]ailing or delaying maintenance or repairs of sale or rental dwellings" because of race or national origin. 24 C.F.R. § 100.65. Accordingly, Defendant has discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of 42 U.S.C. § 3604(b).

307.    In addition, sales transactions involving poorly maintained REO properties in communities of color result in the transfer of title to the dwelling under less favorable "terms" and "conditions" that place on buyers the responsibility of catching up on delayed maintenance and cleaning up the property to avoid code violations. Accordingly, Defendant has discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. § 3604(b).

308.    Section 805 of the Fair Housing Act makes it unlawful for any entity "whose business includes engaging in residential real-estate-related transactions" to discriminate against any person in making available such a transaction because of race or national origin. 42 U.S.C. § 3605. The discriminatory provision of maintenance services to REO properties in

- 153 -

FIRST AMENDED COMPLAINT
Case No. 4:16-cv-06969-JSW: National Fair Housing Alliance, *et al.* v. Federal National Mortgage Association

communities of color creates significant barriers to the sale or purchase of those properties. Accordingly, Defendant has discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of 42 U.S.C. § 3605.

309.   Section 818 of the Fair Housing Act makes it unlawful, among other things, to "interfere with any person in the exercise or enjoyment of . . . any right granted or protected by" other provisions of the Act. 42 U.S.C. § 3617. People living in the communities adversely affected by Defendant's practices, who are predominantly people of color, have seen their property values and enjoyment of their homes diminished because of race. By failing to maintain REO properties in predominantly minority communities, Defendant has interfered with the rights of neighboring residents and homeowners to use and enjoy their homes and communities. The health and safety risks created by Fannie Mae's REO properties in communities of color and the deleterious effects of those properties on their surrounding neighborhoods create a hostile living environment for their neighbors, in violation of 42 U.S.C. § 3617.

310.   Defendant has violated the above provisions of the Fair Housing Act by engaging in the actions and developing, implementing, and maintaining practices that have the purpose and effect of discriminating on the basis race and national origin and that have the effect of perpetuating housing segregation. Accordingly, Defendant's perpetuation and encouragement of patterns of racial segregation violate the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

## VII.   JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

- 154 -

## VIII.  PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs pray that this Court grant judgment in their favor, and against Defendant, as follows:

a.  Declare, pursuant to 28 U.S.C. § 2201, that the conduct of Defendant in its maintenance of its REO properties, as alleged herein, is in violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and the applicable regulations;

b.  Enjoin, pursuant to 42 U.S.C. § 3613(c), Defendant, its officers, directors, employees, agents, successors, assigns, and all other persons in active concert or participation with any of them, both temporarily during the pendency of this action and permanently from violating the Fair Housing Act;

c.  Award such damages as would fully compensate Plaintiffs for their injuries incurred as a result of Defendant's discriminatory housing practices and conduct pursuant to 42 U.S.C. § 3613(c);

d.  Award such punitive damages against Defendant as is proper under law pursuant to 42 U.S.C. § 3613(c);

e.  Award Plaintiffs their costs and attorneys' fees incurred herein pursuant to 42 U.S.C. § 3613(c); and

f.  Award Plaintiffs such other relief as this Court deems just and proper.


DATED this 10th day of April, 2018.

Respectfully Submitted,

/s/ Stephen M. Dane
Stephen M. Dane*
Yiyang Wu*
Sasha Samberg-Champion*
Laura Gaztambide-Arandes (CA Bar #298373)
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W., Suite 600

- 155 -

Washington, D.C. 20036
(202) 728-1888
sdane@relmanlaw.com

*Attorneys for all Plaintiffs*

Morgan Williams*
NATIONAL FAIR HOUSING ALLIANCE
1101 Vermont Ave., N.W., Suite 710
Washington, D.C. 20005
(202) 898-1661
mwilliams@nationalfairhousing.org

*Attorney for Plaintiff National Fair Housing Alliance*

Casey Epp (CA Bar # 284139)
Fair Housing Advocates of Northern California
1314 Lincoln Ave. Suite A,
San Rafael, CA 94901
(415) 457-5025
casey@fairhousingnorcal.org

*Attorney for Plaintiff Fair Housing Advocates of Northern California*

*\* Appearing with Permission Pro Hac Vice*

- 156 -

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on this 10th day of April, 2018, a true and correct copy of the

3

foregoing Plaintiffs' First Amended Complaint was filed through this court's CM/ECF system

4

and served on the following counsel of record through the same:

5

Elizabeth L. Mckeen

6

Danielle N. Oakley
O'MELVENY & MYERS LLP

7

610 Newport Center Drive, 17th Floor
Newport Beach, California 92660

8

Telephone: (949)-823-6900
Fax: (949)-823-6994

9

emckeen@omm.com

10

doakley@omm.com

11

12

13

/s/ Stephen M. Dane
Stephen M. Dane

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 157 -