STEPHEN M. DANE, *pro hac vice*
REED COLFAX, *pro hac vice*
YIYANG WU, *pro hac vice*
REBECCA LIVENGOOD, *pro hac vice*
LILA MILLER (S. B. # 310614)
TAHIR DUCKETT, *pro hac vice*
RELMAN, DANE & COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, D.C. 20036
Telephone: (202) 728-1888
Fax: (202)-728-0848
sdane@relmanlaw.com
ywu@relmanlaw.com
rcolfax@relmanlaw.com
lmiller@relmanlaw.com
rlivengood@relmanlaw.com
tduckett@relmanlaw.com

*Attorneys for all Plaintiffs*

CASEY EPP # 284139
FAIR HOUSING ADVOCATES
OF NORTHERN CALIFORNIA
1314 Lincoln Ave., Suite A
San Rafael, CA 94901
Telephone: (415) 457-5025
Fax: (415)-457-6382
casey@fairhousingnorcal.org

*Attorney for Plaintiff Fair Housing
Advocates of Northern California*

MORGAN WILLIAMS, pro hac vice
NATIONAL FAIR HOUSING
ALLIANCE
1331 Pennsylvania Ave., NW, Suite 610
Washington, D.C. 20004
Telephone: (202) 898-1661
mwilliams@nationalfairhousing.org

*Attorney for Plaintiff NFHA*

ELIZABETH L. MCKEEN (S.B. #216690)
emckeen@omm.com
DANIELLE N. OAKLEY (S.B. #246295)
doakley@omm.com
EDGAR MARTINEZ (S.B. #255503)
emartinez@omm.com
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, California 92660-6429
Telephone:    (949) 823-6900
Facsimile:    (949) 823-6994

*Attorneys for Defendant
Federal National Mortgage Association*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

NATIONAL FAIR HOUSING ALLIANCE; *et al.*,

Plaintiffs,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION ("FANNIE MAE"),

Defendant.

Case No. 4:16-cv-06969-JSW

**JOINT CASE MANAGEMENT STATEMENT & [PROPOSED] ORDER**

The parties to the above-entitled action jointly submit this JOINT CASE MANAGEMENT STATEMENT & PROPOSED ORDER pursuant to the *Standing Order for All Judges of the Northern District of California* and Civil Local Rule 16-9.

**1. Jurisdiction & Service**

*The basis for the court's subject matter jurisdiction over plaintiff's claims and defendant's counterclaims, whether any issues exist regarding persona jurisdiction or venue, whether any parties remain to be served, and, if any parties remain to be served, a proposed deadline for service.*

     **A.    Plaintiffs' Position.**

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 2201, and 2202, and 42 U.S.C. § 3613(a). There are no issues concerning personal jurisdiction, venue, or service.

     **B.    Fannie Mae's Position.**

Fannie Mae disputes that plaintiffs have organizational standing, and therefore disputes that the Court has subject matter jurisdiction over this action.

**2. Facts**

*A brief chronology of the facts and a statement of the principal factual issues in dispute.*

     **A.    Plaintiffs' Position.**

Fannie Mae is required, under the Fair Housing Act, to maintain all REO properties, regardless of their location, without regard to race, national origin, or racial composition of neighborhood. Between July 2011 and October 2015, Plaintiffs conducted a comprehensive investigation of Fannie Mae's real estate related activities in communities of color, including predominantly African-American and Latino neighborhoods, and predominantly white neighborhoods in 38 metropolitan areas throughout the United States. Plaintiffs' investigation revealed that Fannie Mae and its agents have failed to conduct routine exterior maintenance and marketing of REO properties in communities of color, thereby leaving those REO properties in a state of neglect, while satisfactorily conducting routine exterior maintenance and marketing of its REO properties in predominantly white neighborhoods, therefore leaving those REO properties in

a materially better condition. This behavior violates the Fair Housing Act.

In addition, Fannie Mae has designed a national practice and policy of having its lower-level agents and employees determine whether to conduct an REO exterior maintenance task and how to conduct it. Fannie Mae's practice gave these agents and employees the ability to exercise high levels of discretion with minimal input from Fannie Mae. This practice and policy of committing REO exterior maintenance decisions to the subjective and unguided discretion of its lower-level agents has caused a disproportionately adverse impact on communities of color. This unguided delegation of discretion without independent quality checks resulted in REO properties in communities of color receiving less exterior maintenance than REO properties in predominantly white neighborhoods. Statistically significant disparities were found even after controlling for a host of potentially explanatory variables.

Plaintiffs alerted Fannie Mae regarding the findings of their investigation in order to secure voluntary compliance with the Fair Housing Act, but Fannie Mae did not change its behavior. With discriminatory intent and deliberate indifference to the discriminatory purpose and effects of its policies and practices, Fannie Mae continued to maintain its REO properties differently because of the predominant race and national origin of neighborhoods. As a result of these practices, Fannie Mae's actions stigmatize communities of color as less desirable than predominantly white neighborhoods. The prospects for integration in the affected neighborhoods are reduced because white buyers are deterred from purchasing homes in neighborhoods with poorly maintained REO properties, and perpetuates the existing patterns of racial segregation in the relevant neighborhoods.

Defendant Fannie Mae admits that it contracted with several companies to perform maintenance services on Fannie Mae's REO properties in all 50 states during the time periods relevant to the First Amended Complaint. Fannie Mae admits that it met with plaintiff NFHA on several occasions before Plaintiffs filed this lawsuit, and NFHA provided Fannie Mae with extensive information and evidence of the discriminatory effect and purpose of its policies applied to Fannie Mae-owned REO properties.

The following fact allegations made in Plaintiffs' Amended Complaint are also in dispute:

- When and how Fannie Mae learned of the disparity in exterior maintenance and marketing of Fannie REO properties;

- The scope of the disparity, on the basis of race, color, and national origin, in exterior maintenance and marketing of Fannie REO properties;

- What, if any, direction and supervision Fannie Mae provided to its agents with respect to the exterior maintenance and marketing of Fannie REO properties during the liability period;

- The frequency, nature, and quality of exterior maintenance and marketing performed on Fannie REO properties during the liability period; and

- The extent of the harm inflicted on each Plaintiff as a result of Fannie Mae's discriminatory practices.

**B.      Fannie Mae's Position.**

Fannie Mae did not discriminate against minorities in any way with respect to the maintenance of its REO properties. Fannie Mae did not "design[] a national practice and policy" that "caused a disproportionately adverse impact on communities of color." Fannie Mae did not "maintain its REO properties differently because of the predominant race and national origin of neighborhoods," deliberately or otherwise. Moreover, Fannie Mae disputes that it caused plaintiffs any harm, be it via a diversion of resources, a frustration of plaintiffs' mission, harming the communities that plaintiffs purport to serve, or impeding plaintiffs' community investment programs.

Plaintiffs allege that Fannie Mae's delegation of discretion to its REO maintenance vendors, and the manner in which the vendors exercised that discretion, caused an unlawful disparate impact, on the basis of race, within each of 38 specified metropolitan areas. Plaintiffs also allege that Fannie Mae engaged in disparate treatment with respect to maintaining its REO properties by failing to change its REO maintenance practices when plaintiffs told Fannie Mae that Fannie Mae's REO maintenance vendors' actions were having a discriminatory impact on minority communities. The facts do not support either theory of discrimination.

First, Fannie Mae has never had a policy of delegating "unguided discretion" to REO maintenance vendors that permits them to discriminate on the basis of race. Rather, Fannie Mae has consistently required vendors to meet uniform maintenance standards, which are designed to preserve the value of Fannie Mae-owned REO properties regardless of the property's location. Moreover, Fannie Mae's policies expressly prohibit discrimination on the basis of race. And the vendors' performance is subject to quality checks by independent contractors. Fannie Mae anticipates that a well-conducted analysis of Fannie Mae's REO maintenance practices would conclude that Fannie Mae's REO maintenance practices—and specifically, the policy plaintiffs' challenge here of delegating to vendors the responsibility to perform maintenance to Fannie Mae's specifications—have had no disparate impact on the basis of race.

Plaintiffs' investigation was all but designed to reach a different conclusion based on a fundamentally flawed methodology. Plaintiffs did not conduct a comprehensive assessment of Fannie Mae's REO maintenance practices. Rather, plaintiffs deliberately ignored properties where REO maintenance appeared to be underway. They also conducted single-point-in-time visits that failed to capture Fannie Mae's ongoing maintenance activities at its REO properties. Plaintiffs also selected properties for inclusion in their investigation from only a subset of zip codes within particular metropolitan areas—those "with the highest foreclosure rates" (Am. Compl. ¶ 59)—resulting in a biased sample set. Finally, Plaintiffs made no effort to assess whether Fannie Mae's REO maintenance practices impacted the availability or pricing of housing in the specified metropolitan areas on the basis of race. Plaintiffs' flawed analytical framework and resulting defective conclusions cannot be used to show what plaintiffs claim—that Fannie Mae's REO maintenance practices had a disparate impact on housing availability on the basis of race within the 38 metropolitan areas that are the subject of plaintiffs' complaint. *See, e.g.*, HUD, Determination of No Reasonable Cause, *Nat'l Fair Hous. Alliance v. U.S. Bank N.A.*, Case No. 01-12-0283-8 (Jan. 8, 2016) (concluding that it was logically impossible to establish disparate impact based on the same investigative methodology NFHA used here).

Second, while Fannie Mae disputes that NFHA provided the company with extensive "evidence of the discriminatory effect and purpose" of any Fannie Mae policy, Fannie Mae did

not ignore concerns raised by NFHA regarding the maintenance of REO properties. In fact, in 2009, Fannie Mae provided a grant to NFHA specifically to support the organization's investigation of potential discrimination in lenders' REO maintenance practices. Moreover, Fannie Mae met repeatedly with NFHA to discuss the results of that organization's investigations. After Fannie Mae and NFHA's initial meetings, NFHA publicly acknowledged that Fannie Mae "took corrective action" as a result of NFHA's investigations, including by "ask[ing] NFHA to update Fannie Mae's fair lending training program to provide a module on REO disposition and fair housing," and "provid[ing] a new grant to NFHA that includes funding to assist in the development of an online training program for real estate agents who list, market and sell REOs."[1]

Fannie Mae continued meeting with NFHA in the years leading up to plaintiffs' filing of their complaint, but NFHA's contributions during those meetings became less effective and less constructive. NFHA frequently refused to provide support for its assertions of discriminatory practices or impact on the part of Fannie Mae. When NFHA did present Fannie Mae with purported "evidence" of its findings, the evidence often related to properties not owned by Fannie Mae or was based on site visits conducted a few days before scheduled REO maintenance was performed. In such instances, NFHA's alleged evidence of discriminatory practices was uninformative and unhelpful. NFHA also failed to account for other critical factors in its investigations, such as the properties' condition at the time they became owned by Fannie Mae, which bears on the degree to which exterior maintenance deficiencies should be attributed to Fannie Mae or its vendors; and whether the purported REO deficiencies identified by NFHA, such as boarded-up windows, reflected compliance with local ordinances rather than maintenance failures.

Notwithstanding the defects in NFHA's investigation—which Fannie Mae explained to NFHA in good faith, informed by Fannie Mae's own independent evaluation of the properties that

---

[1] NFHA, "Here Comes the Bank, There Goes Our Neighborhood: How Lenders Discriminate in the Treatment of Foreclosed Homes," (Apr. 11, 2011), *available at* https://nationalfairhousing.org/wp-content/uploads/2017/04/There-Goes-Our-Neighborhood-REO-report-2011-for-website.pdf.

JOINT CASE MANAGEMENT
STATEMENT & [PROPOSED] ORDER
4:16-cv-06969-JSW

were the subject of NFHA's investigation—Fannie Mae nevertheless endeavored to build upon its already robust anti-discriminatory policies and practices.  Thus, before plaintiffs filed their HUD complaint in 2015—and well before plaintiffs filed their amended complaint in this action in 2018 alleging that Fannie Mae engaged in disparate treatment—Fannie Mae had already implemented numerous enhancements to its REO maintenance practices.  These enhancements included:

- increasing quality control inspections of work performed by maintenance vendors in minority neighborhoods from 30 percent of properties to 100 percent of properties;
- creating new management-level positions within Fannie Mae to oversee vendor quality;
- revising maintenance contracts to expand allowable expenses and increase the frequency of exterior services;
- replacing the use of plywood with clear-board and retro-fitting over 4,000 properties with clear-board, with the intended effect of improving the exterior appearance of the properties; and
- improving tools for neighbors to report concerns about REO property conditions directly with Fannie Mae.

Rather than ignore NFHA's concerns about potential discriminatory REO practices, Fannie Mae took those concerns seriously and took numerous concrete steps to mitigate those concerns.

**3. Legal Issues**

*A brief statement, without extended legal argument, of the disputed points of law, including reference to specific statutes and decisions.*

**A.      Plaintiffs' Position.**

The parties dispute several points of law relevant to this case, including the following:

- Plaintiffs have standing under the Fair Housing Act;
- Fannie Mae's policy of delegating discretion to lower level employees or contractors, or failing to adequately supervise them, gives rise to a disparate impact claim in violation of the Fair Housing Act;

- Fannie Mae's deliberate indifference to, or knowing disregard of, discriminatory behavior gives rise to a claim of intentional discrimination under the Fair Housing Act; and

- Fannie Mae is subject to liability for punitive damages or attorneys' fees for their discriminatory conduct.

### B. Fannie Mae's Position.

The parties dispute whether plaintiffs have organizational standing, whether plaintiffs can demonstrate any infringement of FHA-protected rights, whether plaintiffs can show unlawful disparate treatment on the basis of race under Supreme Court and Ninth Circuit precedent, whether plaintiffs can show disparate impact under Supreme Court precedent, whether Fannie Mae's use of vendors to perform maintenance functions constitutes a policy that can give rise to a disparate impact claim, whether plaintiffs suffered damages caused by Fannie Mae's alleged delegation of discretion to vendors, whether the FHA's statute of limitations bars plaintiffs' claims in whole or in part, and whether Fannie Mae may be held liable for the acts of its REO maintenance vendors. This Court has already ruled as a matter of law that Fannie Mae is not liable for punitive damages with respect to plaintiffs' claims. (Dkt. 70 at 10–11.)

*Standing*. To establish organizational standing, each plaintiff will have to show that it diverted resources specifically to combat Fannie Mae's alleged discriminatory REO maintenance and that it suffered a frustration of its organizational mission. *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004).[2] Plaintiffs allege that they diverted resources and time away from other intended projects and programs, and that they engaged in "community outreach and public education efforts." (*E.g.*, Am. Compl. ¶¶ 199–200.) But plaintiffs received grant funding from the U.S. Department of Housing and Urban Development—and from Fannie Mae— specifically to perform the investigation that is the subject of their complaint. Thus, to the extent

---

[2] Plaintiffs conceded at dismissal that they do not have representational standing to pursue claims on behalf of the residents of the communities that were the subject of their investigation. (*See* MTD, Dkt. 29, at 20 (arguing that plaintiffs do not assert representations standing to represent any neighborhood residents, potential homebuyers, or local governments referenced in plaintiffs' allegations); Pls.' Opp. to MTD, Dkt. 30, at 20–24 (arguing only that plaintiffs have organizational standing).)

plaintiffs conducted their investigation and outreach programs with resources specifically allocated to REO maintenance investigations, they cannot have diverted such resources from other projects. Moreover, plaintiffs' missions are to "to ensure equal housing opportunities and to fight unlawful discrimination and segregation." (*E.g.*, Am. Compl. ¶ 201.) Plaintiffs' investigation to assess whether Fannie Mae and other housing industry participants are engaging in discriminatory conduct is inherent to that very mission, and their mission cannot have been frustrated by actions that plaintiffs would have taken anyway.

***Infringement of an FHA-Protected Right***. It is not enough that plaintiffs show that different REO properties in different neighborhoods were in different states of exterior condition on the date plaintiffs visited each property. To maintain a viable claim under the FHA, plaintiffs must show that:

- Fannie Mae's alleged policy of delegating REO maintenance functions to vendors made properties unavailable to persons because of race, 42 U.S.C. §§ 3604(a), 3605, 24 C.F.R. § 100.70(c)(1);

- Fannie Mae's alleged REO maintenance policy, with respect to REO properties that were for sale or rent, discriminated against persons because of race, such that the sale or rental terms of the properties differed based on race, 42 U.S.C. § 3604(b), 24 C.F.R. § 100.65; and

- Fannie Mae took an adverse action against neighbors of its REO properties in retaliation for the neighbors' exercise or enjoyment of FHA-protected rights, 42 U.S.C. § 3617.

Plaintiffs have not alleged that any of these outcomes have occurred, but instead have pursued an unprecedented theory untethered to the rights protected by the FHA.

***Disparate Treatment***. To show disparate treatment, plaintiffs must establish that Fannie Mae acted with intent to discriminate on the basis of race. Plaintiffs base their disparate treatment claim on the theory that Fannie Mae failed to change its behavior following pre-suit meetings with NFHA in which NFHA identified a purported disparate impact. But to show intentional discrimination, a defendant must have failed to take action to stop known instances of intentional

discrimination.  *See, e.g.*, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999) (school district liable for intentional discrimination under Title IX where it was deliberately indifferent to known acts of intentional teacher-student discrimination).  Plaintiffs will not be able to establish that Fannie Mae's REO maintenance vendors engaged in any intentional discrimination, much less that Fannie Mae knew that its vendors had engaged in intentional discrimination based on the information NFHA provided to Fannie Mae during the parties' pre-suit meetings.  Nor will plaintiffs be able to show that Fannie Mae failed to take appropriate corrective action based on the information NFHA provided.

*Disparate Impact*.  Plaintiffs will have to show (1) a statistical disparity in the availability of housing, the terms and conditions of housing, or in the provision of services to retained properties; (2) on the basis of race; (3) that was caused by Fannie Mae's alleged policy of delegating REO maintenance functions to vendors.  *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S.Ct. 2507, 2523 (2015); 42 U.S.C. §§ 3604(a)-(b), 3605; 24 C.F.R. §§ 100.65, 100.70.  Moreover, plaintiffs cannot establish their disparate-impact claim unless they demonstrate "robust causality" between Fannie Mae's policy or policies and a statistical disparity.  *Inclusive Cmtys.*, 135 S.Ct. at 2523.  Plaintiffs must also demonstrate a statistical disparity within the FHA's two-year statute of limitations.  *City of Los Angeles v. Wells Fargo & Co.*, No. 13-cv-09007, 2015 WL 4398858, at *7 (C.D. Cal. July 17, 2015) (granting summary judgment of FHA claims where plaintiffs failed to demonstrate a statistical disparity within the limitations period).  Plaintiffs will not be able to show an unlawful disparate impact on the basis of race under *Inclusive Communities*.

*Policy Relating to Fannie Mae's Use of Vendors to Perform REO Maintenance Functions*.  Each of plaintiffs' claims is based on an alleged Fannie Mae policy of delegating "unguided discretion" to the vendors that maintain Fannie Mae's REO properties, and the allegation that Fannie Mae's vendors exercised their discretion in a way that caused discriminatory outcomes.  But even if such an alleged policy could form the basis of an FHA claim, plaintiffs cannot establish that Fannie Mae had a policy of delegating a level of discretion to REO maintenance vendors that permitted them to discriminate on the basis of race.  Rather,

Fannie Mae has consistently required vendors to meet uniform maintenance standards designed to preserve the value of Fannie Mae-owned REO properties regardless of the property's location, Fannie Mae maintains controls to ensure the vendors satisfy Fannie Mae's requirements, and Fannie Mae's policies expressly prohibit discrimination on the basis of race.

**Damages and Causation**. To recover under the FHA, plaintiffs must show that they suffered damages directly caused by the Fannie Mae policy plaintiffs challenge—*i.e.*, delegation of REO maintenance functions to vendors. *See, e.g.*, *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017) (holding that "proximate cause under the FHA requires some direct relation between the injury asserted and the injurious conduct alleged," and that mere foreseeability of harm is insufficient to establish proximate cause); *cf. Inclusive Cmtys.*, 135 S.Ct. at 2523 (requiring a "robust" causal link between the defendant's practices and the alleged discriminatory outcomes to establish a prima facie disparate impact claim under the FHA). Organizational plaintiffs may recover actual damages resulting only from a "diversion of resources," and from a "frustration of mission" caused by the defendant's unlawful actions. *See Fair Hous. of Marin v. Combs*, No. 97-cv-01247, 2000 WL 365029, at *3–4 (N.D. Cal. Mar. 29, 2000) (explaining that "diversion of resources" damages generally include recruitment and training costs, worker time, and expenses incurred in investigating the defendant's conduct, and that "frustration of mission" damages generally include expenditures on education, counseling, or outreach that is "necessary to counterbalance the effects of a defendant's discriminatory practices"); 42 U.S.C. § 3613(c).

Plaintiffs purport to claim as a basis for their damages expenditures on "education, advocacy, and training programs designed to promote fair housing and fair lending," devotion of "time to evaluating properties, reviewing data, interviewing witnesses," and frustration of plaintiffs' "missions of increasing fair and equal access to housing for all Americans and in all neighborhoods, regardless of race, color, or national origin." (*E.g.*, Am. Compl. ¶ 188.) But plaintiffs' very mission is to "ensure equal housing opportunities and to fight unlawful discrimination and segregation." (*E.g.*, Am. Compl. ¶ 201.) Moreover, plaintiffs' investigation was part of a broader inspection of industrywide REO maintenance practices—including those of

Freddie Mac, Wells Fargo, Bank of America, and other institutional REO owners—and thus the funds plaintiffs expended to conduct that inspection cannot be attributed to Fannie Mae. Further, plaintiffs secured grant funding for the specific purpose of conducting their investigation. Plaintiffs cannot claim that Fannie Mae caused them any damages relating to educational and investigative activities plaintiffs would have undertaken regardless of the alleged Fannie Mae REO maintenance policy at issue. *See, e.g.*, *Combs*, 2000 WL 365029, at *3 (rejecting damages amounts expended in support of a program unrelated to the defendant's discriminatory practices).

Further, plaintiffs purport to claim as damages harm to "the communities that plaintiffs serve," and impediments to plaintiffs' "community investment programs designed to stabilize neighborhoods of color and increase homeownership for all people in these same neighborhoods." (Am. Compl. ¶¶ 185–86, 188, 192.) But these are not alleged harms for which damages are recoverable under the FHA. *Combs*, 2000 WL 365029, at *3–4 (both "diversion of resources" damages and "frustration of mission" damages are measured based on plaintiffs' expenditures in investigating and counteracting the defendant's unlawful conduct). Moreover, plaintiffs acknowledge and specifically allege that harms to plaintiffs' communities were caused by others long before Fannie Mae engaged in any of the allegedly discriminatory REO maintenance practices that are the subject of plaintiffs' claims. (*E.g.*, Am. Compl. ¶ 184 ("From the 1990s through 2008, many financial institutions in the country engaged in persistent discrimination and reverse redlining to target minority neighborhoods for high-priced, high risk mortgages.").) Relatedly, plaintiffs cannot recover damages for any alleged harm to neighborhood residents, potential homebuyers, or local governments referenced in plaintiffs' Amended Complaint—to the extent plaintiffs seek to recover such amounts—because plaintiffs lack representational standing to recover damages for harms felt by such persons or entities. *See id.* (*See also supra*, n.2.)

Even if plaintiffs had representational standing and damages for such harms were recoverable, plaintiffs cannot show that Fannie Mae's alleged policy of delegating REO maintenance functions to vendors directly impacted property values and the health and safety of community residents, or perpetuated segregation, especially given that the harms about which plaintiffs complain were caused by entities other than Fannie Mae. *See, e.g.*, *City of Miami*, 137

JOINT CASE MANAGEMENT
STATEMENT & [PROPOSED] ORDER
4:16-cv-06969-JSW

S. Ct. at 1306 (damages and defendant's allegedly discriminatory conduct must be directly related to one another); *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18-cv-839, 2019 WL 5963633, at *8 (N.D. Ill. Nov. 13, 2019) (dismissing plaintiffs' claim for damages based on alleged harm to communities).  Accordingly, plaintiffs will not be able to establish that Fannie Mae's alleged policy of delegating REO maintenance functions to vendors directly caused plaintiffs' purported damages based on any of plaintiffs' frustration-of-mission theories.  *See Deutsche Bank*, 2019 WL 5963633, at *7–8.

    ***Statute of Limitations***.  Plaintiffs must demonstrate that the alleged discrimination occurred within the FHA's two-year limitations period, which began to run no earlier than May 12, 2013—two years before plaintiffs' filed their complaint against Fannie Mae with HUD.  *See* 42 U.S.C. § 3613(a) (establishing a two-year limitations period, which excludes time during which an administrative proceeding is pending based on the alleged discriminatory practice); *City of Los Angeles*, 2015 WL 4398858, at *4 ("Any claim under the [FHA] must be brought within two years of the occurrence or termination of an alleged discriminatory housing practice.") (internal quotation marks omitted).  Because plaintiffs commenced their investigation in 2009, many of the amounts plaintiffs will attempt to claim as damages likely were incurred before the beginning of the statute of limitations period on May 12, 2013.  This will likewise be true of the diversion of resources or frustration of mission that some or all plaintiffs will seek to leverage as support for their assertion of standing.  Thus, Fannie Mae expects to show that some or all plaintiffs did not sustain damages or injury sufficient to support standing within the statute of limitations period, and that some or all of plaintiffs' individual claims will be precluded by the application of the statute of limitations to liability.

    ***Fannie Mae's Liability for the Acts of Its Vendors***.  The *Merrill Doctrine* provides that government instrumentalities cannot be held liable for unauthorized, unlawful acts of their agents. *See, e.g.*, *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *Faiella v. Fed. Nat'l Mortg. Ass'n,* 928 F.3d 141, 149 (1st Cir. 2019) (holding that Fannie Mae is a federal instrumentality for purposes of the *Merrill* doctrine and affirming summary judgment in Fannie Mae's favor).  To the extent plaintiffs' claims are based on the acts of Fannie Mae's REO maintenance vendors,

plaintiffs will have to show that the *Merrill Doctrine* does not apply, or that Fannie Mae expressly authorized its vendors to engage in the allegedly discriminatory conduct.

**4. Motions**

*All prior and pending motions, their current status, and any anticipated motions.*

The Court granted in part and denied in part Fannie Mae's motions to dismiss (see Orders at Dkt. 38, 70), and has ruled on all prior administrative motions. There are no motions pending at this time.

**A.    Plaintiffs' Anticipated Motions.**

Plaintiffs are not presently contemplating any non-administrative motions.

**B.    Fannie Mae's Anticipated Motions.**

Fannie Mae intends to move for summary judgment after the close of all discovery. Fannie Mae also anticipates that targeted briefing on the following issues, potentially through one or more early motions for summary judgment, may substantially narrow the issues at trial.

First, discovery may confirm that Fannie Mae's alleged policy of delegating REO maintenance functions to vendors, which plaintiffs allege caused the discriminatory outcomes on which plaintiffs base their claims, did not directly cause some or all of plaintiffs' alleged damages. *E.g.*, *City of Miami*, 137 S. Ct. at 1306 (direct relationship between unlawful conduct and alleged injury required to establish proximate cause under the FHA); *Deutsche Bank*, 2019 WL 5963633, at *7–8 (dismissing organizational plaintiffs' claims for categories of damages not directly caused by the defendants' allegedly discriminatory REO maintenance conduct); *Combs*, 2000 WL 365029, at *3 (rejecting damages claims to the extent the amounts were not aimed at investigating and redressing the defendant's discrimination, and to the extent the plaintiff did not demonstrate a "nexus between" the defendant's conduct and plaintiff's claimed damages).

Second, discovery may confirm that some or all plaintiffs lack organizational standing. *See, e.g.*, *Friends of the Earth v. Sanderson Farms, Inc.*, No. 17-cv-03592, 2019 WL 3457787, at *5 (N.D. Cal. July 31, 2019) (dismissing claims for lack of organizational standing where discovery showed that plaintiffs would have undertaken the same actions regardless of the defendant's conduct, and that plaintiffs therefore "did not divert resources because of" the

defendant's conduct). For example, as discussed above, Fannie Mae intends to demonstrate that some or all plaintiffs received resources specifically earmarked for the investigation they performed and/or that they would have undertaken the same activities regardless of Fannie Mae's alleged policy of delegating REO maintenance functions to vendors. If true, plaintiffs did not "divert" any resources as a result of Fannie Mae's specific REO maintenance policy.

Third, the statute of limitations may bar plaintiffs' claims with respect to a subset of the metropolitan areas identified in the Amended Complaint based on the dates on which plaintiffs inspected Fannie Mae-owned REO properties in these metropolitan areas. *See, e.g.*, *City of Los Angeles*, 2015 WL 4398858, at *7 (granting summary judgment of FHA claims where plaintiffs failed to demonstrate a statistical disparity within the limitations period). For example, discovery may show that plaintiffs' investigation within certain metropolitan areas occurred entirely outside the limitations period. This would preclude any liability or damages based on such an investigation.

Fourth, plaintiffs cannot demonstrate a statistically significant disparate impact within a subset of the metropolitan areas identified in plaintiffs' Amended Complaint given the small number of Fannie Mae-owned REO properties in these metropolitan areas. *See, e.g.*, *id.*, at *7 (granting summary judgment of FHA claims where any disparities were not statistically significant given the small number of loans at issue available in the data). For example, discovery may show that plaintiffs visited too small a number of properties within a given metropolitan area for their analytical conclusions based on their investigation to be reliably extrapolated to the entire metropolitan area using sound statistical methodologies and without violating Fannie Mae's due process rights.

**5. Amendment of Pleadings**

*The extent to which parties, claims, or defenses are expected to be added or dismissed and a proposed deadline for amending the pleadings.*

Plaintiffs amended their original complaint on April 10, 2018 (Dkt. No. 39). The parties' proposed deadline for amendment of pleadings is March 13, 2020, or ninety days after the Case Management Conference, to allow for sufficient time for the parties to exchange initial discovery

before the amendment deadline.

**6. Evidence Preservation**

*A brief report certifying that the parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines"), and confirming that the parties have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues reasonably evident in this action. See ESI Guidelines 2.01 and 2.02, and Checklist for ESI Meet and Confer.*

The parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information and have begun to meet and confer regarding reasonable and proportionate steps taken to preserve evidence in accordance with applicable rules and case law.

**7. Disclosures**

*Whether there has been full and timely compliance with the initial disclosure requirements of Fed. R. Civ. P. 26 and a description of the disclosures made. For ADA and employment cases, see General Order Nos. 56 and 71.*

The parties have not exchanged any disclosures to date. Pursuant to Rule 26(a)(1)(C), the parties stipulate to the exchange of initial disclosures on or before January 13, 2020, or thirty days after the Case Management Conference.

**8. Discovery**

*Discovery taken to date, if any, the scope of anticipated discovery, any proposed limitations or modifications of the discovery rules, a brief report on whether the parties have considered entering into a stipulated e-discovery order, a proposed discovery plan pursuant to Fed. R. Civ. P. 26(f), and any identified discovery disputes.*

**Discovery Taken To Date**. On November 21, 2019, Fannie Mae propounded ninety-nine requests for production, sixteen interrogatories, and four requests for admission to Plaintiff National Fair Housing Alliance. On November 22, 2019, Fannie Mae propounded four interrogatories to the remaining twenty plaintiffs.

**Discovery Scope**. The parties have met and conferred and begun the process of negotiating a stipulated e-discovery order, a proposed discovery plan, and a protective order,

1  which they will submit to the Court as soon as practicable. During the discovery period, the

2  parties intend to propound written discovery, conduct depositions of Rule 30(b)(6) corporate

3  representatives and fact witnesses, propound subpoenas to third parties, and conduct expert

4  discovery.

5      **A.      Plaintiffs' Position.**

6          Plaintiffs anticipate that, given the geographic scope of the case and the extended period

7  of alleged liability, the parties will need 50 interrogatories and at least 50 depositions per side;

8  however, until some discovery is exchanged, they are uncertain as to an exact number of

9  depositions.

10          Plaintiffs anticipate needing at least 50 depositions due to the number of Fannie Mae

11 employees who have knowledge of its nationwide REO program; the number of Fannie Mae

12 employees who met with NFHA representatives to discuss the results of Plaintiffs' investigation;

13 and the number of potentially relevant third-party witnesses. For example, Plaintiffs intend to

14 depose: Fannie Mae REO regional and corporate managers (at least 10); Fannie Mae REO quality

15 control specialists (unknown number, but approximately 10); Fannie Mae REO vendor managers

16 and subcontractors (unknown number, but approximately 10); Fannie Mae employees and former

17 employees who met with NFHA (at least 10); Fannie Mae employees responsible for code

18 compliance issues (unknown number, but approximately 10); representatives of each of Fannie

19 Mae's outside maintenance vendors (at least 5); representatives from Freddie Mac (at least 3);

20 and real estate agents with knowledge of Fannie Mae properties (unknown number).

21          Fannie Mae is incorrect that Plaintiffs seek 50 depositions of Fannie Mae employees; the

22 number includes Plaintiffs' approximation of third-party depositions, as well.

23          Fannie Mae's proposal that it can take 21 depositions but Plaintiffs can only take 10 is

24 untenable. As Fannie Mae is well-aware, this case is not simply about the existence of a policy.

25 Fannie Mae suggests that, because Plaintiffs have pled a nationwide policy, they are

26 "unreasonable" in seeking depositions of the key regional executors of REO decisions--all the

27 while ignoring the fact that Fannie Mae has denied the existence of this policy and that Plaintiffs

28 are entitled to probe that defense. Fannie Mae's own recitation of facts as stated *supra* Section

2(b) refers to numerous Fannie Mae employees who have personal knowledge of the issues and defenses relevant to this case, including those who communicated with NFHA during numerous meetings; Fannie Mae's vendors; Fannie Mae employees who performed "Fannie Mae's own independent evaluation of the properties;" employees tasked with quality control; and so on.

Fannie Mae seeks to expand the Federal Rules' default of 25 interrogatories to 525 interrogatories, while simultaneously urging the Court to confine Plaintiffs to 10 depositions.[3] The same "good cause" standard applies in both situations. Therefore, Fannie Mae's arguments against expanding the number of depositions are undermined by its own request for *more than 20 times* 25 interrogatories. Regardless of Defendant's attempt at a technical reading of a difference between interrogatory and deposition limits, it is nonsensical to allow Defendant 525 interrogatories and Plaintiffs 10 depositions. Plaintiffs' approach of 50 interrogatories (instead of Fannie Mae's suggestion of 525) and 50 depositions (instead of 21 for Defendant and 10 for Plaintiffs) per side is more balanced and appropriate.

Finally, Plaintiffs also do not agree that they will only depose Fannie Mae once; given the scope of Plaintiffs' allegations and Fannie Mae's corporate structure, it is likely that they will need to issue more than one 30(b)(6) deposition notice. In fact, it may be efficient to have a 30(b)(6) deposition early in discovery (for example, regarding preservation and location of documents) and then another 30(b)(6) deposition later in the discovery period. Such an approach is efficient in terms of number of depositions. In sum, Plaintiffs agree to treat a 30(b)(6) deposition of Fannie Mae as one deposition for purposes of counting, but Plaintiffs may need to issue more than one 30(b)(6) notice during the discovery period.

### B. Fannie Mae's Position.

*Interrogatories.* Fannie Mae proposes that the Federal Rules of Civil Procedure govern the number of interrogatories each party may serve (25 interrogatories per *party*). Fed. R. Civ. P.

---

[3] Notably, Fannie Mae is not taking the position that all Plaintiffs must respond to 25 interrogatories (including, for example, about their distinct damages), but instead saying that Fannie Mae gets 525 distinct interrogatories (and Plaintiffs get a total of 10 depositions).

33 ("[A] party may serve on any other party no more than 25 written interrogatories . . . .").[4] There are twenty-one plaintiffs in this action, each of whom (1) alleges that it undertook separate actions in the metropolitan area it allegedly serves to investigate Fannie Mae's REO maintenance, (2) must establish standing based on its own diversion of resources and frustration of mission, and (3) must establish its own damages. It would be prejudicial to limit each *side* to 50 interrogatories at this time—thereby reducing the number of interrogatories Fannie Mae would otherwise be entitled to serve under the Federal Rules by more than a factor of ten—when Fannie Mae needs distinct discovery from 21 plaintiffs.

*Depositions.* Fannie Mae proposes that (a) each party may be deposed once, and (b) each side may take nine additional depositions. Plaintiffs' proposal to depose at least 40 and perhaps more than 50 current and former employees of Fannie Mae regarding Fannie Mae's REO practices, conduct multiple 30(b)(6) depositions, and depose an unspecified number of third parties is excessive. Rule 30's limit of ten depositions per side should be amended in this case at this time solely to account for the fact that there are 21 plaintiffs in the case, each of which should be subject to deposition. No further departure from Rule 30 is warranted at this time.

There is no need to preauthorize more than five times the number of depositions for which Rule 30 provides when no discovery responses have yet been served by either party, no potential witness has been identified, and without any showing of good cause. *Compare* Fed. R. Civ. P. 30(a)(2)(A)(i) ("A party must obtain leave of court [to take a deposition if] . . . the deposition would result in more than 10 depositions being taken . . . by the plaintiffs, or by the defendants . . . ."); *Thykkuttathil v. Keese*, 294 F.R.D. 597, 598–99 (W.D. Wash. 2013) (holding that Rule 30 is "unambiguous in limiting depositions to ten per side," including in multi-party cases) (collecting cases). Should either party believe, as discovery proceeds, that specific additional depositions are warranted, they could so stipulate at that time; or, in the event of a disagreement about whether good cause exists to permit additional depositions, the parties may seek leave of

---

[4] Plaintiffs mischaracterize Fannie Mae's proposal as seeking to "expand the Federal Rules' default of 25 interrogatories to 525 interrogatories" by ignoring that whereas Rule 30 limits depositions to ten per side, Rule 33 limits written interrogatories to 25 per party.

court. But unless and until the parties know whose depositions they want to take and why, and can assess whether the desired discovery could be obtained through less-burdensome means, there is no basis for granting such unfettered discovery. *Cf., e.g.*, *Nat. Res. Def. Council, Inc. v. Winter*, No. 05-cv-7513, 2008 WL 11338647, at *2 (C.D. Cal. July 11, 2008) (denying party's motion for leave to take 50 additional depositions, noting that "[c]ourts generally do not grant leave to take additional depositions until the moving party has exhausted the ten depositions permitted as of right," and that "the moving party must exhaust less expensive and burdensome means of discovery before resorting to a request for relief" from Rule 30's limit).

Plaintiffs' premature request for approval to depose 40 to 50 or more current and former Fannie Mae employees regarding Fannie Mae's REO maintenance practices is particularly unreasonable given that plaintiffs base their claims on alleged "policies and practices set at a level of Defendant's management with responsibility for Defendant's policies nationwide," and that plaintiffs' alleged observations are "consistent in metropolitan areas regardless of their location." (*E.g.*, Am. Compl. ¶¶ 14, 78, 169.) Further, Plaintiffs do not "need more than one 30(b)(6) deposition" of Fannie Mae. Each party is entitled to a single 30(b)(6) deposition of each other party, and plaintiffs have identified no basis to serve more than one 30(b)(6) notice to Fannie Mae, particularly where plaintiffs suggest a distinct 30(b)(6) deposition "regarding preservation and location of documents" before plaintiffs have served any document requests, much less shown any basis to question Fannie Mae's document retention. *E.g.*, *In re Jemsek Clinic, P.A.*, No. 07-bk-3006, 2013 WL 3994666, at *7–9 (Bankr. W.D.N.C. Aug. 2, 2013) (denying request for Rule 30(b)(6) deposition on the topic of plaintiff's efforts to identify, collect, and produce documents as irrelevant absent "real proof that documents and information were willfully destroyed"). It is up to the deponent to determine whether multiple designees should provide testimony in response to a single Rule 30(b)(6) deposition notice, but a Rule 30(b)(6) deposition of a party counts as a single deposition nevertheless. *See* Fed. R. Civ. P. 30(a) advisory committee's note (1993 Amendment) ("A deposition under Rule 30(b)(6) should, for purposes of this [10-deposition] limit, be treated as a single deposition even though more than one person may be designated to testify."); *Lehman Bros. Holdings, Inc. v. CMG Mortg., Inc.*, No. 10-cv-0402,

2011 WL 203675, at *2 (N.D. Cal. Jan. 21, 2011) (same).

**9. Class Actions**

*If a class action, a proposal for how and when the class will be certified.*

Not applicable.

**10. Related Cases**

*Any related cases or proceedings pending before another judge of this court, or before another court or administrative body.*

Undersigned counsel are unaware of any related cases or proceedings.

**11. Relief**

*All relief sought through complaint or counterclaim, including the amount of any damages sought and a description of the bases on which damages are calculated. In addition, any party from whom damages are sought must describe the bases on which it contends damages should be calculated if liability is established.*

    **A.    Plaintiffs' Position.**

Plaintiffs submit that Defendant's housing practices have injured Plaintiffs by: (a) undermining Plaintiffs' education, advocacy, and training programs designed to promote fair housing and fair lending; (b) requiring Plaintiffs to divert scarce resources away from their usual activities and instead to devote substantial time to evaluating properties, reviewing data, interviewing witnesses, engaging in counteractive education and outreach campaigns, and developing educational materials to identify and address Defendant's racially discriminatory maintenance practices; (c) frustrating Plaintiffs' missions of increasing fair and equal access to housing for all Americans and in all neighborhoods, regardless of race, color, or national origin; (d) frustrating Plaintiffs' missions to eliminate racial segregation in their communities; (e) harming the communities that Plaintiffs serve; and (f) impeding Plaintiffs' community investment programs designed to stabilize neighborhoods of color and increase homeownership for all people in these same neighborhoods. Dkt. 39 at ¶ 188. An individualized recitation of the harm inflicted on each Plaintiff by Defendant's discriminatory maintenance and marketing practices is set forth in detail in the Amended Complaint in ¶¶ 187-292; *see also id.* at ¶¶ 26, 293-302, and Section

VII.  Plaintiffs' damages will be supported by expert testimony on or before the deadline for expert reports.

**B.      Fannie Mae's Position.**

Fannie Mae denies that plaintiffs are entitled to any relief whatsoever.  First, for the reasons discussed above, Fannie Mae did not discriminate against minorities in any way with respect to the maintenance of its REO properties.  (*See supra* Section 2.B.)  Second, plaintiffs have not sustained damages caused by Fannie Mae.

Organizational plaintiffs may recover only actual damages resulting from a "diversion of resources," and from a "frustration of mission" specifically caused by the defendant's unlawful actions.  (*See supra*, Sections 3.B, 4.B; *supra*, n.2.)  Organizational plaintiffs are not entitled to recover amounts on behalf of their members without representational standing, and plaintiffs have conceded that they do not have representational standing to recover on behalf of the residents of the communities that were the subject of their investigation.  Accordingly, plaintiffs cannot recover damages for harms allegedly suffered by such residents or communities, including damages based on diminished property values and alleged harms to residents' health and safety.

Because plaintiffs are only entitled to diversion of resources and frustration of mission damages, no expert testimony should be required to tabulate the amounts plaintiffs allegedly incurred in conducting the investigation, education, and outreach efforts alleged in the Amended Complaint.[5]  In any event, Fannie Mae denies that it caused plaintiffs any damages, and Fannie

---

[5] Even if it were reasonable for plaintiffs to rely on expert testimony at trial to introduce evidence of damages, plaintiffs cannot withhold during fact discovery "the amount of any damages sought and a description of the bases on which damages are calculated."  Standing Order for All Judges: Contents of Joint Case Management Statement, ¶ 11.  *See also, e.g., Greater New Orleans Fair Hous. Action Ctr., Inc. v. Dorian Apartments, LLC*, No. 15-cv-6406, 2016 WL 6157534, at *4 (E.D. La. Oct. 24, 2016) (overruling organizational plaintiff's objection in FHA case that damages interrogatory was premature, compelling plaintiff to supplement its response "to reflect allocation of resources and how the expenditures were diverted from another effort to the present matter," and to "quantify [plaintiff's] claim for expenses in frustration of its mission, including future expenses") (internal marks omitted); *Corning Optical Commc'ns Wireless Ltd. v. Solid, Inc.*, 306 F.R.D. 276, 278–79 (N.D. Cal. 2015) (holding plaintiff's damages interrogatory response summarized as "wait until we serve our expert report" was "plainly insufficient," and compelling further interrogatory responses and Rule 26(a)(1)(A)(iii) disclosures identifying

Mae denies that plaintiffs are entitled to any relief whatsoever. Fannie Mae did not cause plaintiffs to divert resources because plaintiffs would have undertaken the same industry-wide investigation and outreach efforts regardless of Fannie Mae's alleged policy of delegating REO maintenance functions to vendors, which is fundamental to each of plaintiffs' claims. Nor can plaintiffs recover damages based on their various frustration-of-mission theories because any alleged impediments to plaintiffs' community investments were not caused by Fannie Mae's alleged policy of delegating REO maintenance functions to vendors. Further, to the extent Fannie Mae's alleged policy had any harmful impact on the communities identified in the Amended Complaint, these harms do not constitute diversion-of-resources or frustration-of-mission damages recoverable under the FHA, the relationship between Fannie Mae's alleged policy and the alleged harms is too remote to be actionable, and plaintiffs lack representational standing to recover for such harms.

**12. Settlement and ADR**

*Prospects for settlement, ADR efforts to date, and a specific ADR plan for the case, including which ADR process option the parties have selected and a proposed deadline, or if the parties do not agree, each party's preferred option and timing, in compliance with ADR L.R. 3-5. In addition, the parties should include a description of key discovery or motions necessary to position the parties to negotiate a resolution.*

This case has been assigned to the ADR Multi-Option Program, and the parties have conferred about ADR processes in conformance with ADR L.R. 3-5. The parties are currently engaging in independent settlement discussions. If the parties reach a point where it appears that

---

(1) the amount of damages plaintiff sought under each asserted damages theory, (2) apportionment of damages among the defendants, (3) the time period for which plaintiff sought damages, (4) witnesses and documents on which plaintiff intended to rely to support its damages claim, and (5) other facts on which plaintiff based its damages claim). Allowing plaintiffs to withhold such information is tantamount to permitting plaintiffs to circumvent Rule 11. *See, e.g.*, *Nat'l Cmty. Reinvestment Coal. v. NovaStar Fin., Inc.*, No. CV 07-861 (RCL), 2009 WL 10719757, at *2 (D.D.C. July 13, 2009) (compelling organizational plaintiff in FHA case to supplement responses to interrogatories seeking information relating to plaintiff's damages claims, noting that "plaintiffs must have had some factual basis for concluding that they had sustained losses at the time the complaint was filed as required by Rule 11") (internal marks omitted).

ADR will increase the likelihood of resolving this matter, they will notify the Court. Fannie Mae's position is that discovery into Plaintiffs' alleged damages, and possibly a Court ruling on the categories and type of damages Plaintiffs may recover, will likely be needed before any formal ADR.

**13. Consent to Magistrate Judge For All Purposes**

*Whether **all** parties will consent to have a magistrate judge conduct all further proceedings including trial and entry of judgment.* ____ YES  _X_ NO

**14. Other References**

*Whether the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.*

The parties agree that this case is not suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

**15. Narrowing of Issues**

*Issues that can be narrowed by agreement or by motion, suggestions to expedite the presentation of evidence at trial (e.g., through summaries or stipulated facts), and any request to bifurcate issues, claims, or defenses.*

   **A.    Plaintiffs' Position.**

At this stage of the case, Plaintiffs do not propose any issues that can be narrowed by agreement or motion, and disagree that the issues identified by Defendant below are able to be narrowed.

   **B.    Fannie Mae's Position.**

Fannie Mae anticipates that the issues in this case can be substantially narrowed by agreement or motion as follows:

(1) specifying the types of damages that plaintiffs may recover in this action in accordance with Supreme Court precedent and other applicable law;

(2) specifying the statute of limitations cut-off applicable to plaintiffs' claims, which are based on alleged conduct from 2011 to 2015, thus clarifying the scope of conduct for which Fannie Mae is potentially liable and the potential damages in this case; and

(3) a determination of whether the plaintiffs visited too few properties in specific metropolitan areas to support any statistically significant conclusions about alleged disparate impacts in those metropolitan areas, precluding claims premised on alleged discriminatory outcomes in those metropolitan areas.

(*See supra*, Sections 2.B, 3.B and 4.B.)

**16. Expedited Trial Procedure**

*Whether this is the type of case that can be handled under the Expedited Trial Procedure of General Order 64, Attachment A. If all parties agree, they shall instead of this Statement, file an executed Agreement for Expedited Trial and a Joint Expedited Case Management Statement, in accordance with General Order No. 64, Attachments B and D.*

The parties agree that this case is not suitable for expedited trial procedures.

**17. Scheduling**

*Proposed dates for completion of initial ADR session, designation of experts, discovery cutoff, hearing of dispositive motions, pretrial conference and trial.*

The parties propose the following schedule:

- Fact discovery cut-off: December 14, 2020
- Designation of experts and opening expert reports: February 3, 2021
- Rebuttal expert reports: April 12, 2021
- Discovery cut-off: May 27, 2021
- Motions for summary judgment: July 12, 2021
- Oppositions to motions for summary judgment: August 26, 2021
- Replies in support of summary judgment: September 16, 2021
- Hearing on dispositive motions: October 1, 2021, or as otherwise ordered by the Court
- Pretrial conference: first Monday that falls at least 90 days after the Court's order(s) on the parties' motions for summary judgment
- Trial: to be set by the Court

**18. Trial**

*Whether the case will be tried to a jury or to the court and the expected length of the trial.*

The parties anticipate a jury trial lasting approximately three weeks.

**19.  Disclosure of Non-party Interested Entities or Persons**

*Whether each party has filed the "Certification of Interested Entities or Persons"*
*required by Civil Local Rule 3-15. In addition, each party must restate in the case management*
*statement the contents of its certification by identifying any persons, firms, partnerships,*
*corporations (including parent corporations) or other entities known by the party to have either:*
*(i) a financial interest in the subject matter in controversy or in a party to the proceeding; or (ii)*
*any other kind of interest that could be substantially affected by the outcome of the proceeding.*

Plaintiffs and Fannie Mae have filed Certifications of Interested Entities or Persons as
required by Civil Local Rule 3-15.  Plaintiffs certified that there are no interested non-party
persons, firms, partnerships, corporations, or other entities to report.  Fannie Mae certified that the
following listed persons, associations of persons, firms, partnerships, corporations (including
parent corporations) or other entities (i) have a financial interest in the subject matter in
controversy or in a party to the proceeding, or (ii) have a non-financial interest in that subject
matter or in a party that could be substantially affected by the outcome of this proceeding: the
Federal Housing Finance Agency.

**20.  Professional Conduct**

*Whether all attorneys of record for the parties have reviewed the Guidelines for*
*Professional Conduct for the Northern District of California.*

All attorneys of record for the parties have reviewed the Guidelines for Professional
Conduct for the Northern District of California.

**21.  Other**

*Such other matters as may facilitate the just, speedy and inexpensive disposition of this*
*matter.*

None.

| | |
|---|---|
| Dated: December 6, 2019 | By: /s/ Lila Miller |
| | Lila Miller |
| | |
| | Relman, Dane & Colfax PLLC |
| | 1225 19th St. NW, Suite 600 |
| | Washington, D.C. 20036 |
| | (202) 728-1888 |
| | |
| | Attorney for Plaintiffs National Fair |
| | Housing Alliance, *et al.* |

| | |
|---|---|
| Dated: December 6, 2019 | By: /s/ Danielle N. Oakley |
| | Danielle N. Oakley |
| | |
| | O'Melveny & Myers LLP |
| | 610 Newport Center Drive, 17th Floor |
| | Newport Beach, CA 92660 |
| | (949) 823-6900 |
| | |
| | Attorney for Defendant Federal National |
| | Mortgage Association |

**CASE MANAGEMENT ORDER**

The above JOINT CASE MANAGEMENT STATEMENT & PROPOSED ORDER is approved as the Case Management Order for this case and all parties shall comply with its provisions.

IT IS SO ORDERED.

Dated:

_____

UNITED STATES DISTRICT JUDGE

## <u>ATTESTATION</u>

I hereby attest that the other signatories listed, on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.


Dated: December 6, 2019

O'Melveny & Myers LLP


By: /s/ Danielle N. Oakley
Danielle N. Oakley